1  SCHIFFRIN BARROWAY
   TOPAZ & KESSLER, LLP
2  Alan R. Plutzik, of Counsel (Bar No. 077785)
3  2125 Oak Grove Road, Suite 120
   Walnut Creek, California 94598
4  Telephone: (925) 945-0200
   Fax: (925) 945-8792
5
   -and-
6
   Eric L. Zagar
7  Tara P. Kao
8  280 King of Prussia Road
   Radnor, PA  19087
9  Telephone: (610) 667-7706
   Fax: (610) 667-7056
10
   Attorneys for Plaintiff
11
                    **UNITED STATES DISTRICT COURT**
12
                    **NORTHERN DISTRICT OF CALIFORNIA**
13
                    **SAN FRANCISCO/OAKLAND DIVISION**
14
15  MARVIN W. NACH, derivatively on behalf of     )   Case No.
    PEET'S COFFEE & TEA, INC.                     )   C07-00740
16                                                )
17              Plaintiff,                        )   **SHAREHOLDER DERIVATIVE**
                                                  )   **COMPLAINT**
18          v.                                    )
                                                  )
19  GERALD BALDWIN, HILARY BILLINGS,              )
    GORDON A. BOWKER, MICHAEL CLOUTIER,           )
20  JAMES E. GRIMES, H. WILLIAM JESSE,            )
    WILLIAM M. LILLA, BRUCE A. MACLAREN,          )
21  DEBORAH McGRAW, PETER B. MEHRBERG,            )
    CHRISTOPHER P. MOTTERN, PATRICK               )
22  O'DEA, JAMES A. REYNOLDS, MARK N.             )
    RUDOLPH, JEAN-MICHEL VALETTE,                 )
23  and WILLIAM D. WELSH                          )
                                                  )
24              Defendant,                        )
                                                  )
25  and                                           )   **JURY TRIAL DEMANDED**
                                                  )
26  PEET'S COFFEE & TEA, INC.                     )
                                                  )
27              Nominal Defendant.                )
28  _____      )

                    SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Marvin W. Nach, by the undersigned attorneys, submits this Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a shareholder's derivative action brought for the benefit of nominal defendant Peet's Coffee & Tea, Inc. ("Peet's" or the "Company") against certain members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, unjust enrichment, statutory violations, and other violations of law.

2.     For several years, a majority of Peet's directors, together with its top officers, engaged in a secret scheme to grant undisclosed, in-the-money stock options[1] to themselves and others by backdating stock option grants to coincide with historically low closing prices of Peet's common stock. In fact, in a striking pattern, 100% of the discretionary grants made from the beginning of 2001 to mid-2003 coincided with low closing prices. All of the backdated stock options were also granted to Peet's top five compensated executives whose grants are disclosed in the Company's proxy statements.

3.     Defendants (defined herein) knowingly and deliberately engaged in a practice of backdating stock option grants to the Option Recipient Defendants (defined herein) in a manner designed to create immediate and risk-free rewards for such recipients in direct contravention of the Company's shareholder-approved stock option plans and disclosures in SEC filings. By falsifying the date on which options were granted, the Individual Defendants caused the Company to materially understate Peet's expenses and overstate its net income. Defendants knew, or recklessly disregarded, that because the Company had not recognized a compensation expense for the backdated options, Peet's reported earnings and expenses were false and

---

[1] A stock option is a contract that gives the holder the option to purchase a designated quantity of shares of a company's stock at a set price called the exercise or strike price. When the option is exercised, the holder acquires a restricted number of shares at the stated price, regardless of the stock's contemporaneous market price. A stock option is "in-the-money" when the exercise price of an option is below the market price of the underlying stock on the date of grant. An option is "at-the-money" when the exercise price equals the market price and "out-of-the-money" when the exercise price is higher than the market price.

1 misleading and not in compliance with the Generally Accepted Accounting Principles

2 ("GAAP").

3     4.    Peet's has suffered, and will continue to suffer, significant financial and non-

4 monetary damages and injuries, several of which were identified in a report issued by the Center

5 for Financial Research and Analysis on May 16, 2006, titled "Options Backdating – Which

6 Companies Are at Risk?":

7     • Securities [and] Exchange Commission ("SEC") investigation risk –
8     The SEC has begun information investigations at many companies in
    recent months and has also begun to call for improved disclosures
9     around all areas of executive compensation.

10     • Accounting restatement risk – Some companies which have admitted
    backdating options have accompanied those admissions with financial
11     restatements impacting both the balance sheet and earnings.

12     • Tax/Cash implications – The change in options from the practice of
    options backdating may force some companies to restate tax positions
13     for the years in question, which could result in an obligation to pay
14     back taxes.

15     • Management credibility risk – If a reputable management team is
    found to have repeatedly backdated options, thereby enriching
16     themselves at the expense of shareholder, the reputation of
17     management (and the related stock premium for superior
    management) could take a hit.

18

19     5.    The Defendants' backdating scheme surreptitiously and illegally lined their own

20 pockets and caused Peet's to issue materially false financial statements and also undermined the

21 key purpose of stock-based executive compensation, i.e., to provide incentive to improve the

22 Company's performance and increase the Company's stock price and market capitalization. By

23 manipulating options such that they carried a strike price lower than the stock price on the date

24 of grant, Peet's insiders benefited immediately upon the grant of the options without doing

25 anything to improve the Company's business or financial condition – a situation which

26 government officials found clearly improper and illegal.

27     6.    For instance, Senator Chuck Grassley stated: "[Options backdating] is behavior

28 that, to put it bluntly, is disgusting and repulsive." SEC Chairman Christopher Cox was quoted,

saying "[Backdating options] isn't a question about 'Whoops, I may have (accidentally) crossed a line here' . . . It's a question of knowingly betting on a race that's already been run." Deputy Attorney General Paul J. McNulty described the practice of stock option backdating "as a brazen abuse of corporate power." The Chairman of the Banking and Housing Urban Affairs Committee of the United States Senate, Senator Richard Shelby, also stated that manipulation of options grant dates "appears to be a *black-and-white example of securities fraud."*

7.    Peet's has now *admitted* that this egregious misconduct denounced by these government officials occurred at the Company. Specifically, in a November 7, 2006 press release, Peet's *admitted that "the Company will most likely need to restate its historical financial statements to record additional non-cash stock-based compensation expense related to stock option grants as a result of errors in recording the measurement date for certain stock option grants."* (emphasis added).

8.    In sum, as alleged in detail herein, in gross breach of their fiduciary duties as officers and/or directors of Peet's, Defendants colluded with one another to:

   a.    improperly backdate many grants of Peet's stock options to Peet's executives, in violation of the Company's shareholder-approved stock option plans;

   b.    improperly record and account for the backdated stock options, in violation of GAAP;

   c.    improperly take tax deductions based on the backdated stock options, in violation of Section 162(m) of the Internal Revenue Code, 26 U.S.C. § 162(m) ("Section 162(m)"); and

   d.    produce and disseminate to Peet's shareholders and the market false financial statements and other false SEC filings that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options.

9.    As a result of Defendants' egregious misconduct, Peet's has sustained substantial damages, and the recipients of the backdated stock options have garnered a significant amount in unlawful profits.

1

## JURISDICTION AND VENUE

2

3   10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that

4   this Complaint states a federal question. This Court has supplemental jurisdiction over the state

5   law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to
confer jurisdiction on a court of the United States which it would not otherwise have.

6

7   11.     Venue is proper in this district because a substantial portion of the transactions

8   and wrongs complained of herein, including the defendants' primary participation in the

9   wrongful acts detailed herein, occurred in this district. One or more of the defendants either

10  resides in or maintains executive offices in this district, and defendants have received substantial

11  compensation in this district by engaging in numerous activities and conducting business here,
which had an effect in this district.

12

## PARTIES

13

14  12.     Plaintiff Marvin W. Nach is, and was at all relevant times, shareholders of
nominal defendant Peet's.

15

16  13.     Nominal defendant Peet's is a Washington corporation with its principal

17  executive offices located at 1400 Park Avenue, Emeryville, California 94608-3520. According

18  to its public filings, Peet's is a specialty coffee roaster and marketer of fresh roasted whole bean
coffee.

19

### Director Defendants

20

21  14.     Defendant Gerald Baldwin ("Baldwin") has served as a director of the Company

22  since 1971 and previously served as Chairman of the Board from 1994 to January 2001 and as
President and Chief Executive Officer ("CEO") of Peet's from 1971 until 1994.

23

24  15.     Defendant Hilary Billings ("Billings") has served as a director of Peet's and as a

25  member of the Compensation Committee of the Board (the "Compensation Committee") since
January 2002.

26

27  16.     Defendant Gordon A. Bowker ("Bowker") has served as a director of the

28  Company from 1971 to 1987 and since September 1994 and as a member of the Audit

1    Committee of the Board (the "Audit Committee") since at least 2000.

2        17.    Defendant H. William Jesse ("Jesse") has served as a director of the Company

3    since August 1998 and as a member of both the Compensation Committee and the Audit

4    Committee since at least 2000.  He also served as Chairman from January 2001 to May 2002.

5        18.    Defendant Patrick J. O'Dea ("O'Dea") has served as Peet's CEO and President

6    and as a director of the Company since May 2002.

7        19.    Defendant Jean-Michel Valette ("Valette") has served as Chairman of the Board

8    since January 2004 and as a director of the Company and as a member of both the Compensation

9    Committee and the Audit Committee since July 2001.

10       20.    Defendants Baldwin, Billings, Bowker, Jesse, O'Dea and Valette are referred to

11   herein as "Director Defendants."

12                          **Option Recipient Defendants**

13       21.    Defendant Michael Cloutier ("Cloutier") has served as Peet's Vice President,

14   Information Technology and Chief Technology Officer since August 1999 and previously served

15   as its Systems Manager from August 1999 to December 1999.

16       22.    Defendant James E. Grimes ("Grimes") has served as Vice President of

17   Operations and Information Systems since July 2002.

18       23.    Defendant William M. Lilla ("Lilla") has served as Executive Vice President of

19   the Company since December 2000 and previously served as Peet's Vice President, Marketing

20   and Strategy from April 1998 to December 2000.

21       24.    Defendant Bruce A. MacLaren ("MacLaren") served as the Company's Vice

22   President, Direct Delivery from July 1999 to 2000.

23       25.    Defendant Deborah McGraw ("McGraw") served as Peet's Vice President, Retail

24   Operations from October 1995 to October 2003.  She also held various positions at the Company

25   since 1982, including store manager, District Manager, Regional Director, and Director of Retail

26   Operations.

27       26.    Defendant Peter B. Mehrberg ("Mehrberg") served as Vice President, Business

28   Development of the Company from 1997 to 2005 and as its General Counsel and Assistant

1   Secretary from 1994 to 2005.

2        27.    Defendant Christopher P. Mottern ("Mottern") served as Peet's CEO and
3   President and as a director of the Company from 1997 to December 2004.

4        28.    Defendant James A. Reynolds ("Reynolds") has served as the Company's Vice
5   President, Coffee and Tea since February 1994 and previously served as its Secretary from
6   February 1988 to May 2001 and as a director of the Company from 1985 to 1997.

7        29.    Defendant Mark N. Rudolph ("Rudolph") served as Chief Financial Officer of the
8   Company from September 1988 to July 2003 and was appointed Vice President in September
9   1994 and Treasurer and Secretary in May 2001.   Rudolph also served as Peet's Assistant
10  Secretary from September 1994 to May 2001.

11       30.    Defendant William D. Welsh ("Welsh") served as Vice President of Peet's from
12  2001 to at least 2004.

13       31.    Defendants Cloutier, Grimes, Lilla, MacLaren, McGraw, Mehrberg, Mottern,
14  O'Dea, Reynolds, Rudolph and Welsh are referred to herein as "Option Recipient Defendants."

15                                    **Defendants**

16       32.    Collectively, the Director Defendants and the Option Recipient Defendants are
17  referred to herein as "Defendants."

18                          **DUTIES OF THE DEFENDANTS**

19       33.    By reason of their positions as officers and/or directors of the Company and
20  because of their ability to control the business and corporate affairs of the Company, Defendants
21  owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and
22  due care, and were and are required to use their utmost ability to control and manage the
23  Company in a fair, just, honest, and equitable manner.  The Defendants were and are required to
24  act in furtherance of the best interests of the Company and its shareholders so as to benefit all
25  shareholders equally and not in furtherance of their personal interest or benefit.  Each director
26  and officer of the Company owes to the Company and its shareholders the fiduciary duty to
27  exercise good faith and diligence in the administration of the affairs of the Company and in the
28  use and preservation of its property and assets, and the highest obligations of fair dealing.

1   34.   Defendants, because of their positions of control and authority as directors and/or

2   officers of the Company, were able to and did, directly and/or indirectly, exercise control over

3   the wrongful acts complained of herein.

4   35.   To discharge their duties, Defendants as officers and directors of the Company

5   were required to exercise reasonable and prudent supervision over the management, policies,

6   practices and controls of the Company. By virtue of such duties, Defendants were required to,

7   among other things:

8        a.   exercise good faith in ensuring that the affairs of the Company
9           were conducted in an efficient, businesslike manner so as to
        make it possible to provide the highest quality performance of
10          its business;

11       b.   exercise good faith in ensuring that the Company was operated
        in a diligent, honest and prudent manner and complied with all
12          applicable federal and state laws, rules, regulations and
13          requirements, including acting only within the scope of its legal
        authority;

14
15       c.   exercise good faith in supervising the preparation, filing and/or
        dissemination of financial statements, press releases, audits,
16          reports or other information required by law, and in examining
        and evaluating any reports or examinations, audits, or other
17          financial information concerning the financial condition of the
        Company; and

18
19       d.   exercise good faith in ensuring  that the Company's financial
        statements were prepared in accordance with GAAP; and

20
21       e.   refrain from unduly benefiting themselves and other Company
        insiders at the expense of the Company.

22  36.   The Defendants were responsible for maintaining and establishing adequate

23  internal accounting controls for the Company and to ensure that the Company's financial

24  statements were based on accurate financial information. According to GAAP, to accomplish

25  the objectives of accurately recording, processing, summarizing, and reporting financial data, a

26  corporation must establish an internal accounting control structure. Among other things,

27  Defendants were required to:

28

   (1)    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

   (2)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

        (a)    transactions are executed in accordance with management's general or specific authorization; and

        (b)    transactions are recorded as necessary to permit preparation of financial statements in conformity with [GAAP].

37.    Peet's Audit Committee Charter provides that the Audit Committee shall be responsible for, among other things:

- ***Annual Audit Results.*** To review with management and the Auditors the results of the annual audit, including the Auditors' assessment of the quality, not just acceptability, of accounting principles, the reasonableness of significant judgments and estimates (including material changes in estimates), any material audit adjustments proposed by the Auditors and any adjustments proposed but not recorded, the adequacy of the disclosures in the financial statements and any other matters required to be communicated to the Committee by the Auditors under the standards of the Public Company Accounting Oversight Board (United States), as appropriate.

- ***Quarterly Results.*** To review with management and the Auditors, as appropriate, the results of the Auditors' review of the Company's quarterly financial statements, prior to public disclosure of quarterly financial information, if practicable, or filing with the Securities and Exchange Commission of the Company's Quarterly Report on Form 10-Q, and any other matters required to be communicated to the Committee by the Auditors under standards of the Public Company Accounting Oversight Board (United States).

- ***Management's Discussion and Analysis.*** To review with management and the Auditors, as appropriate, the Company's disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in its periodic reports to be filed with the Securities and Exchange Commission.

- ***Press Releases.*** To review with management and the Auditors, as appropriate, earnings press releases, as well as the substance of financial information and earnings guidance provided to analysts and ratings agencies, which discussions may be general discussions of the

type of information to be disclosed or the type of presentation to be made. {The Chair of the Committee may represent the entire Committee for purposes of this discussion.}

- ***Accounting Principles and Policies.*** To review with management and the Auditors significant issues that arise regarding accounting principles and financial statement presentation, including critical accounting policies and practices, alternative accounting policies available under generally accepted accounting principles ("GAAP") related to material items discussed with management and any other significant reporting issues and judgments . . . .

- ***Proxy Report.*** To prepare the report required by the rules of the Securities and Exchange Commission to be included in the Company's annual proxy statement . . . .

## FACTUAL ALLEGATIONS

### Backdating of Stock Option Grants

38.     Pursuant to the terms of the Company's shareholder-approved stock option plans, including the 1997 Equity Incentive Plan and 2000 Equity Incentive Plan (collectively, the "Plans"), the exercise price of stock options "shall be not less than one hundred percent (100%) of the Fair Market Value of the stock . . . on the date of grant," where fair market value is defined as "the closing sales price for such stock . . . on the last market trading day prior to the day of determination."

39.     Pursuant to Accounting Principles Board Opinion No. 25 ("APB 25"), the applicable GAAP provision at the time of the foregoing stock option grants, if the market price on the date of grant exceeds the exercise price of the options, the company must recognize the difference as an expense.

40.     Pursuant to Section 162(m), compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's five most highly-compensated officers is tax deductible only if: (i) the compensation is payable solely on account of the attainment of one or more performance goals; (ii) the performance goals are determined by a compensation committee comprised solely of two or more outside directors, (iii) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the

1  payment of the compensation, and (iv) before any payment of such compensation, the
2  compensation committee certifies that the performance goals and any other material terms were
3  in fact satisfied.

4      41.    From 2001 to 2003, the Compensation Committee, which, according to the
5  Company's 2002-2004 proxy statements, "ma[de] recommendations concerning salaries and
6  incentive compensation, awards stock options and stock purchase rights to employees and
7  consultants under the Company's stock option plans and otherwise determine[d] compensation
8  levels and perform[ed] such other functions regarding compensation as the Board may delegate,"
9  with the knowledge and approval of the entire Board, knowingly and deliberately violated the
10 terms of the Plans, APB 25 and Section 162(m) by knowingly and deliberately backdating grants
11 of stock options to make it appear as though the grants were made on dates when the market
12 price of Peet's stock was lower than the market price on the actual grant dates, thereby benefiting
13 the recipients of the backdated options. The entire Board knowingly and deliberately approved
14 the backdating scheme with knowledge of its consequences, e.g., its effects on Peet's financial
15 statements.

16     42.    Certain Option Recipient Defendants, including former CEO and President
17 Mottern, received Peet's stock options backdated to February 25, 2001 with an exercise price of
18 85% of fair market value on the purported date of grant.[2]  Peet's closing stock price decreased
19 dramatically before February 25, 2001 and rose $0.64, or 7.5%, in ten (10) trading days
20 following the purported grant date, as demonstrated below:

21

22

23

24

25

26

27     [2] According the Plans, the exercise price of a Nonstatutory Stock Option "shall be not less than eighty-five
percent (85%) of the Fair Market Value of the Common Stock subject to the Option on the date the Option is
28 granted."

SHAREHOLDER DERIVATIVE COMPLAINT
-10-



| Purported Date of Grant | Name | Exercise Price | Number of Options[3] |
|---|---|---|---|
| 02/25/01 | Mottern | $7.23 | 99,999 |
| | Lilla | $7.23 | 19,968 |
| | Rudolph | $7.23 | 9,984 |
| | Mehrberg | $7.23 | 9,984 |
| | McGraw | $7.23 | 9,984 |
| | Cloutier | $7.23 | 9,984 |
| | MacLaren | $7.23 | 9,984 |
| | Reynolds | $7.23 | at least 9,424 |
| | Welsh | $7.23 | at least 4,320 |

43.    Similarly, Mottern and other Option Recipient Defendants were granted Company stock options purportedly on June 5, 2001 when Peet's closing price decreased significantly before June 5, 2001 and rose $0.71, or 8.74%, in forty (40) trading days following the purported grant date, as demonstrated below:

---

[3] Where the total number of options is unknown, *i.e.* where the phrase "at least" is utilized, the stock option grant did not appear in any proxy statements filed by the Company but was first disclosed in Form 4 filings, which only included the number of options pursuant to the grant that were exercised and left unexercised on the transaction date.

1
2
3
4
5
6
7
8
9



10
11
12
13
14
15
16
17

| Purported Date of Grant | Name | Exercise Price | Number of Options |
|---|---|---|---|
| 06/05/01 | Mottern | $8.12 | 43,103 |
| | Lilla | $8.12 | 18,011 |
| | Rudolph | $8.12 | 14,963 |
| | Mehrberg | $8.12 | 13,855 |
| | McGraw | $8.12 | 12,469 |
| | Cloutier | $8.12 | 11,084 |
| | MacLaren | $8.12 | 7,158 |
| | Reynolds | $8.12 | at least 10,493 |
| | Welsh | $8.12 | at least 6,158 |

18
19
20
21

44.     Furthermore, several Option Recipient Defendants, including Mottern, were granted stock options backdated to December 31, 2001, after which Peet's stock price rose $2.70, or 24.1% in thirty (30) trading days, as demonstrated below:

22
23
24
25
26
27
28



12/31/01: Options granted at $11.20

| Purported Date of Grant | Name | Exercise Price | Number of Options |
|---|---|---|---|
| 12/31/01 | Mottern | $11.20 | 31,250 |
| | Lilla | $11.20 | 13,058 |
| | Rudolph | $11.20 | 10,848 |
| | Mehrberg | $11.20 | 10,045 |
| | Cloutier | $11.20 | 8,036 |
| | McGraw | $11.20 | 9,040 |
| | Reynolds | $11.20 | at least 6,365 |

45.    Similarly, certain Option Recipient Defendants received Company stock options backdated to May 29, 2002 of which President and CEO O'Dea received 600,000. Peet's closing price dropped sharply before May 29, 2002 and rose $2.61, or 16.85%, in thirty (30) trading days following the purported grant date, as demonstrated below:

| Purported Date of Grant | Name | Exercise Price | Number of Options |
|---|---|---|---|
| 05/29/02 | Mottern | $15.49 | 9,984 |
| | O'Dea | $15.49 | 600,000 |
| | Lilla | $15.49 | 9,984 |
| | Rudolph | $15.49 | 9,984 |
| | Mehrberg | $15.49 | 9,984 |
| | Cloutier | $15.49 | 9,984 |
| | McGraw | $15.49 | 9,984 |
| | Reynolds | $15.49 | 9,984 |

46.     Prior to the enactment of the Sarbanes-Oxley Act of 2002 ("SOX"), Defendants were able to engage in backdating of option grants with relative ease because under federal law they were only required to report option grants to the SEC once a year.  Pursuant to SOX, beginning on August 29, 2002, executives and directors were required to report option grants to the SEC within two days of the grant.

47.     Notwithstanding the SOX reporting requirement, Cloutier, Grimes, Lilla, Mehrberg and Reynolds **never** reported their February 10, 2003 stock option grants in a Form 4 Filing, while O'Dea did not report his February 10, 2003 grant until July 23, 2003.  Between the purported grant date of February 10, 2003 and reporting date of July 23, 2003, Peet's closing price rose $4.90, or 37.75%, as demonstrated below:



| Purported Date of Grant | Name | Exercise Price | Number of Options |
|---|---|---|---|
| 02/10/03 | O'Dea | $12.98 | 50,000 |
| | Cloutier | $12.98 | 10,015 |
| | Grimes | $12.98 | 25,000 |
| | Lilla | $12.98 | 15,023 |
| | Mehrberg | $12.98 | 25,000 |
| | Reynolds | $12.98 | at least 2,500 |

48.     100% (5 of 5) of the discretionary grants made between 2001 and early-2003 that were disclosed in proxy statements and Form 4s and 5s were backdated to coincide with particularly low closing prices. Moreover, all of those grants were made to certain of the top five compensated executives as disclosed in the Company's proxy statements.

49.     In addition, each and every one of the aforementioned stock option grants were dated just before a significant increase in Peet's stock price. The reason for the extraordinary pattern set forth in the preceding paragraphs is that the purported grant dates set forth therein were not the actual dates on which the stock option grants were made. Rather, the Compensation Committee members, with the knowledge and approval of the other members of the Board, knowingly and deliberately backdated the stock option grants to make it appear as though the grants were made on dates when the market price of Peet's stock was lower than the market price on the actual grant dates, thereby unduly benefiting the Option Recipient Defendants. This

1  improper backdating, which violated the terms of the Plans, resulted in option grants with lower

2  exercise prices, which improperly increased the value of the options and improperly reduced the

3  amounts the Defendants had to pay the Company upon exercise of the options.

4  <center>**Dissemination of False Financial Statements**</center>

5       50.    Defendants prepared, approved and/or signed Peet's annual and quarterly SEC

6  reports during the relevant period.  The Defendants knowingly and deliberately caused the

7  Company to disseminate materially false and misleading statements in the periodic filings that

8  Defendants prepared, approved, and/or signed.

9       51.    Defendants' option backdating scheme caused each of Peet's Forms 10-K and 10-

10  Qs for the relevant period to materially understate Peet's compensation expense and materially

11  overstate the Company's net income, because Defendants failed to expense the in-the-money

12  portion of Peet's stock option grants during the period as required by APB 25.

13       52.    As a result of the improper backdating of stock options, the Company, with the

14  knowledge, approval, and participation of each of Defendants,

15
16          a.    violated the terms of the Plans by granting stock options with exercise prices less than the fair market value of the stock on the actual date of grant;

17
18          b.    violated GAAP by failing to recognize compensation expenses incurred when the improperly backdated options were granted;

19
20          c.    violated Section 162(m) by taking tax deductions based on stock option grants that were not payable solely on account of the attainment of one or more performance goals and violated the
21  terms of the Plans; and

22          d.    produced and disseminated to Peet's shareholders and the market
23  false financial statements that improperly recorded and accounted for the backdated option grants, and thereby understated
24  compensation expenses and overstated net income.

25       53.    The Company, with the knowledge, approval, and participation of each of

26  Defendants, disseminated its false financial statements in, *inter alia*, the following Form 10-K

27  filings:

28

a.   Form 10-K for the year ended December 31, 2001, filed with the SEC on March 28, 2002, and signed by defendants Mottern, Rudolph, Baldwin, Bowker, Jesse, Valette and Billings;

b.   Form 10-K for the year ended December 31, 2002, filed with the SEC on March 31, 2003, and signed by defendants O'Dea, Rudolph, Mottern, Baldwin, Billings, Bowker, Jesse and Valette;

c.   Form 10-K for the year ended December 31, 2003, filed with the SEC on March 12, 2004, and signed by defendants O'Dea, Valette, Baldwin, Billings, Bowker, Jesse and Mottern;

d.   Form 10-K for the year ended December 31, 2004, filed with the SEC on March 18, 2005, and signed by defendants O'Dea, Valette, Baldwin, Billings, Bowker and Jesse; and

e.   Form 10-K for the year ended December 31, 2005, filed with the SEC on March 16, 2006, and signed by defendants O'Dea, Valette, Baldwin, Billings, Bowker and Jesse.

54.   Specifically, in the Company's annual report on Form 10-K for fiscal years 2001 to 2003, Defendants caused Peet's to falsely state that "[t]he Company accounts for stock-based awards to employees using the intrinsic value method in accordance with Accounting Principle Board, (APB), No. 25, Accounting for Stock Issued to Employees.   Accordingly, no compensation cost has been recognized for the stock option awards granted at fair market value." Such statements were materially false and misleading in each of these years because Peet's had granted stock options at prices that were below fair market value on the date of the grant and failed to account for the in-the-money options as required by APB 25.

55.   As alleged previously, APB 25 required Defendants to record compensation expense for options that were in-the-money on the date of grant.   However, they did not do so, thereby materially understating Peet's compensation expense and materially overstating Peet's net income.   These statements were designed to conceal, and did in fact conceal, the fact that Defendants were engaged in a continuous and systematic scheme of backdating stock option grants to Peet's insiders in violation of state and federal laws.

56.   Additionally, Peet's materially false and misleading financial statements for fiscal years 2001 to 2003 were included in its Forms 10-K filed for subsequent fiscal years. For this reason, and to the extent they included financials from earlier periods, Peet's annual reports on

Form 10-K for fiscal years 2004 to 2005 were also materially false and misleading.  By participating in the secret backdating scheme, and by reviewing and/or signing these subsequent annual reports, Defendants knew, or were reckless in not knowing, that the financial statements in these later filings were materially false and misleading.

57.    Furthermore, Defendant O'Dea also filed false Certifications of Chief Executive Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of SOX (the "Certification"), certifying that each Annual Report of Peet's on Forms 10-K "fully complies with the requirements of section 13(a) or section 15(d) of the Securities Exchange Act of 1934, as amended, and [t]he information contained in the Annual Report fairly presents, in all material respects, the financial condition and results of operations of the Company."  Defendant O'Dea signed the false Certifications for the Forms 10-K for fiscal 2004 and for fiscal 2005.

## Defendants' Concealment of Their Misconduct

58.    Defendants caused Peet's to disseminate to shareholders and to file with the SEC proxy statements in connection with the Company's annual shareholder meetings and periodically for special shareholder meetings during the Relevant Period.  The Individual Defendants prepared and/or reviewed each proxy statement between 2002 and 2004 and knew that the proxies were materially false and misleading.  Each proxy statement sent to shareholders during this period contained materially false and misleading disclosures or omitted information about Peet's stock option practices, as detailed above.

59.    From 2002 to 2004, the Company, with the knowledge, approval, and participation of each of Defendants, for the purpose and with the effect of concealing the improper option backdating, disseminated to shareholders and filed with the SEC annual proxy statements that falsely reported the dates of stock option grants to Defendants and falsely stated that options were granted to Defendants with an exercise price "equal to the fair market value of the Common Stock on the date of grant," as follows:

> a.    Peet's proxy statement filed with the SEC on April 23, 2002 falsely reported that options granted to Mottern, Lilla, Rudolph and Mehrberg were granted on February 25, 2001 and June 5, 2001;

b.   Peet's proxy statement filed with the SEC on April 22, 2003 falsely reported that options granted to Mottern, Lilla, Rudolph and Mehrberg were granted on December 31, 2001, and options granted to Mottern, O'Dea, Lilla, Rudolph and Mehrberg were granted on May 29, 2002; and

c.   Peet's proxy statement filed with the SEC on April 23, 2004 falsely reported that options granted to O'Dea, Cloutier, Grimes, Lilla and Mehrberg were granted on February 10, 2003.

60.   Moreover, in the Compensation Committee Reports in the Company's proxy statements filed in 2002 through 2004, the Company falsely stated that the "[s]tock options under the Company's stock option plans are used to underscore the common interests of shareholders and management. Options are granted to executives to provide a continuing financial incentive to maximize long-term value to shareholders," when in fact the backdated stock options provided the option recipients with immediate profits regardless of the Company's stock performance.

61.   From 2003 to 2005, Peet's, with the knowledge, approval and participation of each of the Defendants, for the purpose and with the effect of concealing the improper stock option backdating, filed with the SEC Form 4s that falsely reported the dates of Peet's stock option grants to the Option Recipient Defendants, as follows:

a.   Mottern's Form 4 filed with the SEC on September 3, 2003 falsely reported that options granted to Mottern had been granted on June 5, 2001;

b.   Reynolds' Form 4 filed with the SEC on November 4, 2003 falsely reported that options granted to Reynolds had been granted on February 25, 2001;

c.   Reynolds' Form 4 filed with the SEC on December 3, 2003 falsely reported that options granted to Reynolds had been granted on February 25, 2001 and June 5, 2001;

d.   Reynolds' Form 4 filed with the SEC on December 31, 2003 falsely reported that options granted to Reynolds had been granted on June 5, 2001;

e.   Reynolds' Form 4 filed with the SEC on February 19, 2004 falsely reported that options granted to Reynolds had been granted on June 5, 2001, December 31, 2001 and May 29, 2002;

f.   Mottern's Form 4 filed with the SEC on February 26, 2004 falsely reported that options granted to Mottern had been granted on February 25, 2001;

g.   Reynolds' Form 4 filed with the SEC on March 29, 2004 falsely reported

1                  that options granted to Reynolds had been granted on February 25, 2001, May 29, 2002 and February 10, 2003;

h.      Reynolds' Form 4 filed with the SEC on April 30, 2004 falsely reported that options granted to Reynolds had been granted on February 25, 2001 and May 29, 2002;

i.      Welsh's Form 4 filed with the SEC on May 7, 2004 falsely reported that options granted to Welsh had been granted on February 25, 2001 and June 5, 2001;

j.      Grimes' Form 4 filed with the SEC on May 17, 2004 falsely reported that options granted to Grimes had been granted on February 10, 2003;

k.      Mottern's Form 4s filed with the SEC on May 27, 2004 and May 28, 2004 falsely reported that options granted to Mottern had been granted on February 25, 2001;

l.      Mottern's Form 4s filed with the SEC on June 1, 2004, June 3, 2004, June 17, 2004, August 6, 2004, August 18, 2004, August 20, 2004, September 2, 2004, September 07, 2004, November 4, 2004, December 7, 2004 and January 5, 2005, falsely reported that options granted to Mottern had been granted on February 25, 2001;

m.      Grimes' Form 4s filed with the SEC on March 28, 2005, April 20, 2005 and May 25, 2005 falsely reported that options granted to Grimes had been granted on February 10, 2003;

n.      Reynolds' Form 4 filed with the SEC on May 27, 2005 falsely reported that options granted to Reynolds had been granted on February 25, 2001; and

o.      Reynolds' Form 4 filed with the SEC on May 27, 2005 falsely reported that options granted to Reynolds had been granted on May 29, 2002.

### **Backdating Revealed at Peet's**

62.      The Defendants continued to conceal their foregoing misconduct until November 7, 2006, when Peet's issued a press release announcing the formation of an Option Review Committee to perform a review of Company's historical stock option grants:

> The Company also announced today that on October 20, 2006, the Board of Directors appointed an Option Review Committee consisting of two independent directors to oversee a review of the Company's past stock option granting practices. This voluntary review was initiated in light of the recent media coverage regarding stock option granting practices of other publicly traded companies. This review involves examination of past stock option grants including those prior to the Company's initial public

1   offering in January 2001. The Committee is conducting this review with
the assistance of independent legal counsel and accounting advisors. The
2   Committee, on the Company's behalf, has voluntarily contacted the
Securities and Exchange Commission staff to inform them about the
3   ongoing review.

4   The Option Review Committee has not completed its factual investigation
nor reached any conclusions, but it has discussed with the Audit
5   Committee in general terms the information it has obtained through the
interviews and document reviews completed to date. Following these
6   discussions, Bill Jesse, Chairman of the Audit Committee, said, "Although
we recognize there remains a significant amount of factual review yet to
7   be done by the Option Review Committee and new information could be
discovered at any time, the preliminary information that has been shared
8   with us to date does not suggest to me that there was any purposeful
9   misconduct by persons involved in the Company's past stock option
grants."
10

11   Although the Option Review Committee's review is ongoing, the Audit
Committee has concluded *the Company will most likely need to restate its*
12   *historical financial statements to record additional non-cash stock-based*
*compensation expense as a result of errors in recording the*
13   *measurement date for certain stock option grants.* Any additional stock-
based compensation expense recorded will not affect the Company's cash
14   position or reported revenue for the third quarter of 2006 or any previous
15   periods. Accordingly, the Company advises that its financial statements
and related communications for periods commencing on or after January
16   1, 1996 should not be relied upon until the Option Review Committee
completes its review and any adjustments that may result from the review
17   of certain stock option grants have been determined and reflected in
18   restated historical financial statements.

19   The Company does not expect to be in a position to announce final
financial results for the third quarter until the Option Review Committee
20   has completed its review. At this time, the Company does not expect to
file its Form 10-Q for the third quarter by the November 13, 2006 due
21   date.

22   (emphasis added).

23   63.   On November 22, 2007, Peet's issued a press release announcing a request for a

24   hearing before the NASDAQ Panel:

25   Peet's Coffee & Tea, Inc. (Nasdaq: PEET) today announced that it will
request a hearing before the NASDAQ Listing Qualifications Panel in
26   response to the receipt of a NASDAQ Staff Determination letter
indicating that the Company is not in compliance with the filing
27   requirements for continued listing as set forth in Marketplace Rule
4310(c)(14). As anticipated, the letter was issued in accordance with
28

NASDAQ procedures due to the Company's failure to file its Form 10-Q for the quarter ended October 1, 2006. Pending a decision by the Panel, the Company's shares will remain listed on The NASDAQ Global Select Market.

As previously announced by the Company on November 7, 2006, an Option Review Committee consisting of two independent members of its Board of Directors is conducting a voluntary review of the Company's stock option practices from 1996 through the current fiscal year. As a result of the ongoing review, the Company has been unable to file its Quarterly Report on Form 10-Q for the quarter ended October 1, 2006.

### Defendants' Insider Selling

64.    From 2003 to 2006, Defendants Baldwin, Bowker, Cloutier, Jesse, Lilla, McGraw, Mottern, Reynolds, Rudolph and Welsh (collectively, the "Insider Selling Defendants), while in possession of materially adverse non-public information regarding the backdating of stock options and the false financial statements resulting therefrom, sold more than $20 million in Peet's stock, a significant portion of which was obtained through the exercise of improperly backdated stock options, as demonstrated below:

| Defendant | Dates of Transaction | Number of Shares | Total Proceeds |
|-----------|----------------------|------------------|----------------|
| Baldwin | 6/25/03 to 9/1/06 | 268,197 | $6,979,866.31 |
| Bowker | 5/14/03 to 11/30/05 | 86,550 | $2,047,004.36 |
| Cloutier | 02/18/04 | 33,276 | $655,537.20 |
| Jesse | 8/27/03 to 5/22/06 | 47,468 | $1,184,635.54 |
| Lilla | 2/23/04 to 2/24/04 | 25,000 | $499,820.16 |
| McGraw | 08/05/03 | 5,000 | $105,000.00 |
| Mottern | 11/5/02 to 1/3/05 | 362,635 | $6,929,854.61 |
| Reynolds | 3/17/03 to 5/25/05 | 88,908 | $1,669,181.12 |
| Rudolph | 5/22/03 to 5/29/03 | 16,786 | $292,866.20 |
| Welsh | 5/5/04 to 8/16/05 | 16,578 | $437,776.20 |
| **TOTAL** | **11/5/02 to 9/1/06** | **950,398** | **$20,801,541.71** |

## PEET'S FALSE FINANCIAL REPORTING
## IN VIOLATION OF GAAP, SEC REGULATIONS AND IRS RULES

65.     As a result of Defendants' improper backdating of stock options, Defendants caused Peet's to violate GAAP, SEC regulations and Internal Revenue Service ("IRS") rules and regulations.

66.     Peet's financial results for 2001 through 2003 were included in reports filed with the SEC and in other shareholder reports.  In these reports, Defendants represented that Peet's financial results were presented in a fair manner and in accordance with GAAP.

67.     Defendants' representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information "a fair presentation" of the Company's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

68.     GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time. Regulation S-X, to which the Company is subject as a registrant under the Securities Exchange Act of 1934 ("Exchange Act"), 17 C.F.R. §210.4-01(a)(1), provides that financial statements filed with the SEC, which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate.

### Violations of GAAP

69.     During the relevant period, Defendants caused the Company to understate its compensation expense by not properly accounting for its stock options under GAAP and thus overstated the Company's net earnings.

70.     Under well-settled accounting principles in effect throughout the relevant period, Peet's did not need to record an expense for options granted to employees at the current market price (at-the-money).  The Company was, however, required to record an expense in its financial statements for any options granted below the current market price (in-the-money).  In order to provide Peet's executives and employees with far more lucrative in-the-money options, while avoiding having to inform shareholders about millions of dollars incurred by the Company in

1   compensation expenses (and without paying the IRS millions of dollars in employment taxes),

2   Defendants systematically falsified Company records to create the false appearance that options

3   had been granted at the market price on an earlier date.

4        71.    Throughout the relevant period, Peet's accounted for stock options using the

5   intrinsic method described in APB 25.  Under APB 25, employers were required to record as an

6   expense on their financial statements the "intrinsic value" of a fixed stock option on its

7   "measurement date."  An option that is in-the-money on the measurement date has intrinsic

8   value, and the difference between its exercise price and the quoted market price must be recorded

9   as compensation expense to be recognized over the vesting period of the option.  Options that are

10   at-the-money or out-of-the-money on the measurement date need not be expensed.  Excluding

11   non-employee directors, APB No. 25 required employers to record compensation expenses on

12   options granted to non-employees irrespective of whether they were in-the-money or not on the

13   date of grant.

14                **Peet's GAAP Violations Were Material**

15        72.    Peet's false and misleading relevant period statements and omissions regarding its

16   accounting were material, particularly in light of SEC guidance on materiality.  SEC Staff

17   Accounting Bulletin ("SAB") Topic 1M, Materiality, summarizes GAAP definitions of

18   materiality.  Among other items, SAB Topic 1M says: "A matter is 'material' if there is a

19   substantial likelihood that a reasonable person would consider it important." It also stresses that

20   materiality requires qualitative, as well as quantitative, considerations.  For example, if a known

21   misstatement would cause a significant market reaction, that reaction should be taken into

22   account in determining the materiality of the misstatement.

23        73.    SAB Topic 1M further states:

24                among the considerations that may well render material a quantitatively

25            small misstatement of a financial statement item are –

26                      *      *      *

27               whether the misstatement masks a change in earnings or other trends

28

whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise

\*       \*       \*

whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability.

74.   SAB Topic 1M also says that an intentional misstatement of even immaterial items may be illegal and constitute fraudulent financial reporting.

75.   Peet's misstatements satisfy these criteria and thus were material from both a quantitative and qualitative perspective.

## Peet's Financial Statements Violated Fundamental Concepts of GAAP

76.   Due to these accounting improprieties, the Company presented its financial results and statements in a manner that violated GAAP, which are described by the following statements:

(a)   The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, ¶10);

(b)   The principle that financial reporting should provide information that is useful to existing and potential investors and creditors and other users in making rational investment, credit and similar decisions (Financial Accounting Standards Board  ("FASB") Statement of Concepts No. 1, ¶34);

(c)   The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources FASB Statement of Concepts No. 1, ¶40);

(d)   The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to stockholders for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)   The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶58-59);

(f)   The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶79); and

(g)   The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, ¶¶95, 97).

77.   Further, the undisclosed adverse information concealed by Defendants during the relevant period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

### Peet's Financial Statements Violated SEC Regulations

78.   During the relevant period, Defendants caused Peet's to violate SEC regulations by failing to disclose that the Company's senior executives had been granted backdated stock options.

79.   Under SEC Regulations, Item 8 of Form 14-A and Item 11 of Form 10-K, an issuer must furnish information required by Item 402 of Regulation S-K [17 C.F.R. §229.303]. Item 402(b) and (c) require a company to provide both a Summary Compensation Table and an Option/SAR Grants table identifying the compensation of the named executive officers – the Company's CEO and its next four most highly paid executives. Item 402 requires particularized disclosures involving a company's stock option grants in the last fiscal year. In the summary compensation table, the issuer must identify in a column "other annual compensation" received by the named executives that is not properly categorized as salary or bonus, including any "[a]bove market or preferential earnings on restricted stock, options, SARs or deferred compensation" paid to the officer during the period. Item 402(b)(2)(iii)(C)(2). In the option grant table, the issuer must identify in a column "[t]he per-share exercise or base price of the options. . . . If such exercise or base price is less than the market price of the underlying security

on the date of grant, a separate, adjoining column shall be added showing market price on the date of grant. . . ." Item 402(c)(2)(iv).

80.     Defendants caused Peet's to violate SEC regulations by failing to disclose that the Company's named executive officers had been granted options with exercise prices below the market value on the date the Board or Compensation Committee approved the grant.

### Violations of IRS Rules and Regulations

81.     During the relevant period, Defendants further caused Peet's to violate IRS rules and regulations due to its improper accounting for the backdated stock options. As a result, the Company's tax liabilities were understated, exposing Peet's to potential amounts owed for back taxes, penalties and interest to the IRS for improperly reporting compensation.

82.     The Defendants caused the Company to violate Section 162(m), which generally limits a publicly traded company's tax deductions for compensation paid to each of its named executive officers to $1 million unless the pay is determined to be "performance-based." In order for compensation to be performance-based, the Compensation Committee must have set pre-established and objective performance goals. The goals must then be approved by the shareholders. Section 162(m) defines stock options as performance-based provided they are issued at an exercise price that is no less than the fair market value of the stock on the date of the grant. Accordingly, properly issued stock options do not have to be taken into account in calculating whether an executive's compensation has exceeded the $1 million compensation cap.

83.     Section 162(m), known as the $1 million rule, was enacted in 1993 in order to tie top executives' soaring pay packages more closely to a company's performance. This change in the tax law turned compensation practices for a company's top executives away from straight salary-based compensation to performance-based compensation, including stock options. According to former SEC Chairman Harvey Pitt: "What [162[m]] did was create incentives to find other forms of compensation so people could get over the $1 million threshold without running afoul of the code."

84.     The Defendants caused Peet's to violate Section 162(m) by providing backdated options to the Company's named executive officers, which were granted with exercise prices that

1    were less than the fair market value of the stock on the date of the grant. As a result, all of the

2    income resulting from the exercise of the options must be included for purposes of calculating

3    whether the named executive's compensation exceeds the $1 million cap for federal tax

4    purposes.

5         85.    The chart below illustrates Peet's false and misleading annual financial results

6    which materially understated its compensation expenses and thus overstated its earnings and

7    earnings per share:

| Fiscal Year | Reported Earnings (Loss) | Reported Basic Earnings (Loss) Per Share |
|---|---|---|
| 2001 | $1.155 million | $0.15 |
| 2002 | $4.657 million | $0.43 |
| 2003 | $5.178 million | $0.41 |
| 2004 | $8.785 million | $0.66 |
| 2005 | $10.687 million | $0.77 |

15        86.    Peet's expects to restate its financial statements due to errors in accounting for its

16   historical stock option grants. The Company has yet to do so, which would decrease its reported

17   earnings and earnings per share by a material amount to be determined.

18   **DEFENDANTS' BREACHES OF FIDUCIARY DUTIES**

19        87.    Former SEC Chairman Harvey L. Pitt was quoted saying "What's so terrible

20   about backdating options grants? For one thing, it likely renders a company's proxy materials

21   false and misleading. Proxies typically indicate that options are granted at fair market value.

22   But if the grant is backdated, the options value isn't fair – at least not from the vantage point of

23   the company and its shareholders."

24        88.    SEC Chairman Christopher Cox announced that "[backdating in many cases]

25   makes a hash of (companies') financial statements . . . [and is] poisonous [to efficient markets]. .

26   . . It is securities fraud if you falsify books and records. It is securities fraud if you present

27   financial statements to the SEC that do not comply with generally accepted accounting

28   principles. There is no requirement that (the defendant) personally profit [to prove that a crime

occurred.]" He further stated, "Rather obviously, this fact pattern [of backdating options] results in a violation of the SEC's disclosure rules, a violation of accounting rules, and also a violation of the tax laws." The Commissioner of the IRS Mark Everson agreed and further stated, "Picking a date on which the stock price was low in comparison with the current price gives the employee the largest potential for gain on the option and makes it possible for the employee to benefit from corporate performance that occurred before the option was granted."

89.    In addition, Senator Chuck Grassley stated: "[options backdating] is behavior that, to put it bluntly, is disgusting and repulsive. It is behavior that ignores the concept of an 'honest day's work for an honest day's pay' and replaces it with a phrase that we hear all too often today, 'I'm going to get mine.' . . . [S]hareholders and rank-and-file employees were ripped off by senior executives who rigged stock option programs -- through a process called 'back-dating' -- to further enrich themselves. And as we have found far too often in corporate scandals of recent years, boards of directors were either asleep at the switch, or in some cases, willing accomplices themselves. . . ."

90.    In addition to the foregoing, a recent academic study revealed that outside directors of companies were also benefiting from backdating and were recipients of manipulated stock option grants, as detailed in *The Wall Street Journal* article published on December 18, 2006 below:

> A new academic study suggests that many outside directors received manipulated stock-option grants, a finding that may help explain why the practice of options backdating wasn't stopped by the boards of some companies.
>
> The statistical study, which names no individuals or firms, estimates that 1,400 outside directors at 460 companies received questionable option grants, suggesting the widespread practice extended well beyond the executive suite.
>
> The study is notable because it suggests that outside, or independent, directors -- who are supposed to play a special role safeguarding against cozy board relationships with management -- may have been co-opted in options backdating by receiving manipulated grants themselves. The New York Stock Exchange requires that a majority of board seats, and all compensation- and audit-committee members, be independent . . . .

> The evidence "contributes to understanding the possible factors that led to or enabled manipulation to occur," states the unpublished study, which was conducted by professors at Harvard and Cornell universities and the French business school Insead . . . .

91.     In a misguided effort to attract and retain employees in a competitive environment, Defendants exceeded the bounds of the law and legitimate business judgment by perpetrating their backdating scheme. Defendants' misconduct was unjustifiable and constituted a gross breach of their fiduciary duties by:

    a.    colluding with each other to backdate stock option grants;

    b.    colluding with each other to violate GAAP and Section 162(m);

    c.    colluding with each other to produce and disseminate to Peet's shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

    d.    colluding with each other to file false proxy statements, false financial statements and false Form 4s in order to conceal the improper backdating of stock options.

92.     Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, it was intended to, and did, unduly benefit the Defendants who received backdated options at the expense of the Company.

93.     As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has sustained substantial damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company will be required to incur, the loss of funds paid to the Company upon the exercise of stock options resulting from the difference between the fair market value of the stock option on the true date of grant and the price that was actually paid as a result of the backdated stock option grant, and costs and expenses incurred in connection with the Company's internal investigation and restatement of historical financial statements.

94.     The Option Recipient Defendants have exercised thousands of backdated options at improperly low prices and have then sold the shares for substantial profits.  Consequently, these Defendants have been unjustly enriched by garnering significant amounts in illicit profits

1  and depriving the Company of substantial payments that the Company should have received

2  upon exercise of the options.

3  **DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS**

4      95.    Plaintiff brings this action derivatively in the right and for the benefit of the

5  Company to redress Defendants' breaches of fiduciary duties, unjust enrichment, statutory

6  violations and other violations of law.

7      96.    Plaintiff is an owner of Peet's common stock and was an owner of Peet's common

8  stock at all times relevant hereto.

9      97.    Plaintiff will adequately and fairly represent the interests of the Company and its

10 shareholders in enforcing and prosecuting its rights.

11     98.    As a result of the facts set forth herein, Plaintiff has not made any demand on the

12 Peet's Board of Directors to institute this action against the Defendants.  Such demand would be

13 a futile and useless act because the Board is incapable of making an independent and

14 disinterested decision to institute and vigorously prosecute this action.

15     99.    At the time this action was commenced, the Board consisted of seven directors:

16 defendants O'Dea, Billings, Jesse, Valette, Bowker and Baldwin and non-defendant director

17 Micheal Linton.  The following directors (6 out of 7) are incapable of independently and

18 disinterestedly considering a demand to commence and vigorously prosecute this action:

19         a.    O'Dea, because, as an Option Recipient Defendant, he is directly

20 interested in the improperly backdated stock option grants complained of herein.  Also, his principal professional occupation is his position as

21 President and CEO of the Company.  As President and CEO of the Company, O'Dea stands to earn hundreds of thousands of dollars in

22 annual salary, bonuses, and other compensation, all of which must be approved by defendants Billings and Jesse and director Michael Linton,

23 who are current members of the Compensation Committee.  Accordingly, O'Dea is incapable of independently and disinterestedly considering a

24 demand to commence and vigorously prosecute this action against the Individual Defendants;

25

26         b.    Billings, because, as a member of the Compensation Committee at all relevant times hereto, Billings knowingly and deliberately backdated stock

27 option grants, as alleged herein, and as a director at all relevant times hereto, she knowingly and deliberately participated in and approved the

28

filing of false financial statements and other false SEC filings as alleged herein and knowingly and deliberately participated in and approved the Company's violations of GAAP and Section 162(m), as alleged herein, and, therefore, is substantially likely to be held liable for the misconduct complained of herein. Moreover, by colluding with the Option Recipient Defendants, as alleged herein, Billings has demonstrated that she is unable or unwilling to act independently of the Option Recipient Defendants;

c.    Jesse, because, as a member of the Compensation Committee at all relevant times hereto, Jesse knowingly and deliberately backdated stock option grants, as alleged herein, and as a member of the Audit Committee at all relevant times hereto, he knowingly and deliberately participated in and approved the filing of false financial statements and other false SEC filings as alleged herein and knowingly and deliberately participated in and approved the Company's violations of GAAP and Section 162(m), as alleged herein, and, therefore, is substantially likely to be held liable for the misconduct complained of herein. Moreover, by colluding with the Option Recipient Defendants, as alleged herein, Jesse has demonstrated that he is unable or unwilling to act independently of the Option Recipient Defendants;

d.    Valette, because, as a member of the Compensation Committee at all relevant times hereto, Valette knowingly and deliberately backdated stock option grants, as alleged herein, and as a member of the Audit Committee at all relevant times hereto, he knowingly and deliberately participated in and approved the filing of false financial statements and other false SEC filings as alleged herein and knowingly and deliberately participated in and approved the Company's violations of GAAP and Section 162(m), as alleged herein, and, therefore, is substantially likely to be held liable for the misconduct complained of herein. Moreover, by colluding with the Option Recipient Defendants, as alleged herein, Valette has demonstrated that he is unable or unwilling to act independently of the Option Recipient Defendants;

e.    Bowker, because, as a member of the Audit Committee at all relevant times hereto, he knowingly and deliberately participated in and approved the filing of false financial statements and other false SEC filings as alleged herein and knowingly and deliberately participated in and approved the Company's violations of GAAP and Section 162(m), as alleged herein, and, therefore, is substantially likely to be held liable for the misconduct complained of herein. Moreover, by colluding with the Option Recipient Defendants, as alleged herein, Bowker has demonstrated that he is unable or unwilling to act independently of the Option Recipient Defendants; and

f.    Baldwin, because, as a director at all relevant times hereto, he knowingly and deliberately participated in and approved the improper backdating of stock options, as alleged herein, and knowingly and deliberately participated in and approved the Company's filing of false financial

statements and other false SEC filings, as alleged herein, and, therefore, is substantially likely to be held liable for the misconduct complained of herein.  Moreover, by colluding with the Option Recipient Defendants and others, as alleged herein, Baldwin has demonstrated that he is unable or unwilling to act independently of the Option Recipient Defendants. Baldwin is also not disinterested because he shares a longstanding personal and professional relationship with Option Recipient Defendant, Bowker and co-founded Starbucks Corporation with him.  Baldwin also shares a close relationship with Option Recipient Defendant, Rudolph, outside of Peet's as they were directors of Specialty Coffee Association of America (SCAA) and worked together at Starbucks Corporation. Accordingly, Baldwin is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against Bowker and Rudolph.

100.    The Director Defendants' positions during the relevant period are summarized in the table below:

| Director Defendant | Recipient of Backdated Options | Member of the Compensation Committee During the Relevant Period | Member of the Audit Committee During the Relevant Period | Approved and Signed False Financial Statements |
|---|---|---|---|---|
| O'Dea | x | | | X |
| Billings | | x | | X |
| Jesse | | x | x | X |
| Valette | | x | x | X |
| Bowker | | | x | X |
| Baldwin | | | | X |

101.    Furthermore, demand is excused because the misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment.  As represented in Peet's proxy statements, the stated purpose of the Plans is "to motivate executives to focus on long-term strategic objectives, to align the interests of management and the shareholders and to provide opportunities for management to share in the benefits that they achieve for the Company's shareholders."  However, by granting Peet's stock options with backdated exercise prices, Defendants undermined the purpose of the stock option plans by awarding employees compensation that had intrinsic value regardless of Peet's performance.  In effect, this practice

1   was nothing more than secret handouts to executives and employees at the expense of

2   unsuspecting shareholders and the Company.

3       102.   Defendants could have achieved the stated purpose of motivating executives by

4   granting those employees additional stock options under their incentive plans, or by granting

5   stock options at a price less than the fair market value on the date of the grant and simply

6   disclosing and expensing these grants.  Instead, Defendants backdated stock option grants in

7   violation of the Plans and improperly reported these grants in their financial disclosures to

8   improve their bottom line.

9       103.   The practice of backdating stock options cannot be a valid exercise of business

10  judgment because it has subjected Peet's to potentially massive liability.  Peet's is performing its

11  own investigation into the Company's historical option granting practices and has already

12  announced that it expects to restate its past financial reports.  Moreover, Peet's will also likely

13  suffer tax liabilities for the additional compensation it will have to expense, and it has tarnished

14  its reputation in the investment community through this deliberate and calculated conduct.

15                              **COUNT I**

16                         **Against Defendants for**
    **Violations of § 10(b) and Rule 10b-5 of the Securities Exchange Act**
17

18      104.   Plaintiff incorporates by reference and realleges each and every allegation set

19  forth above, as though fully set forth herein.

20      105.   Throughout the relevant period, Defendants individually and in concert, directly

21  and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the

22  mails, intentionally or recklessly employed devices, schemes, and artifices to defraud and

23  engaged in acts, practices, and a course of business which operated as a fraud and deceit upon

24  the Company.

25      106.   Defendants, as top executive officers and/or directors of the Company, are liable

26  as direct participants in the wrongs complained of herein.  Through their positions of control and

27  authority as officers and/or directors of the Company, each of Defendants was able to and did

28  control the conduct complained of herein.

1    107.    Defendants acted with scienter in that they either had actual knowledge of the

2    fraud set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain

3    and to disclose the true facts, even though such facts were available to them.  Defendants were

4    among the senior management and directors of the Company and were therefore directly

5    responsible for the fraud alleged herein.

6    108.    The Company relied upon Defendants' fraud in granting the Defendants options

7    to purchase shares of the Company's common stock, as alleged herein.

8    109.    As a direct and proximate result of Defendants' foregoing breaches of fiduciary

9    duties, the Company has sustained millions of dollars in damages, including, but not limited to,

10   the additional compensation expenses and tax liabilities the Company will be required to incur,

11   the loss of funds paid to the Company upon the exercise of stock options resulting from the

12   difference between the fair market value of the stock option on the true date of grant and the

13   price that was actually paid as a result of the backdated stock option grant, and costs and

14   expenses incurred in connection with the Company's internal investigation and restatement of

15   historical financial statements.

**COUNT II**

**Against Defendants for**
**Violations of §14(a) of the Securities Exchange Act**

16

17

18

19   110.    Plaintiff incorporates by reference and realleges each and every allegation set

forth above, as though fully set forth herein.

20

21   111.    Rule 14-A-9, promulgated pursuant to §14(a) of the Exchange Act, provides that

22   no proxy statement shall contain "any statement which, at the time and in the light of the

circumstances under which it is made, is false or misleading with respect to any material fact, or

23   which omits to state any material fact necessary in order to make the statements therein not false

24   or misleading."  17 C.F.R. §240.14-A-9.

25

26   112.    The proxy statements described herein violated §14(a) and Rule 14-A-9 because

they omitted material facts, including the fact that Defendants were causing the Company to

27

28

engage in an option backdating scheme, a fact which Defendants were aware of and participated in from at least 1998 to 2002.

113.    In the exercise of reasonable care, Defendants should have known that the proxy statements were materially false and misleading.

114.    The misrepresentation and omissions in the proxy statements were material. The proxy statements were an essential link in the accomplishment of the continuation of Defendants' unlawful stock option backdating scheme, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation, and the Company's compensation policies.

115.    The Company was damaged as a result of the material misrepresentations and omissions in the proxy statements.

## COUNT III

### Against Mottern, Rudolph and the Director Defendants
### for Violations of §20(a) of the Securities Exchange Act

116.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

117.    Mottern, Rudolph and the Director Defendants, by virtue of their positions with the Company and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of the Company within the meaning of §20(a) of the Exchange Act. They had the power and influence and exercised the same to cause the Company to engage in the illegal conduct and practices complained of herein.

## COUNT IV

### Against Defendants for Accounting

118.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

119.    As alleged in detail herein, each of the Defendants had a fiduciary duty to, among other things, refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

1  120. As alleged in detail herein, Defendants breached their fiduciary duties by, among

2 other things, engaging in a scheme to grant backdated stock options to themselves and/or certain

3 other officers and directors of the Company and cover up their misconduct.

4  121. The Defendants possess complete and unfettered control over the improperly

5 issued stock option grants and the books and records of the Company concerning the details of

6 such improperly backdated stock option grants.

7  122. As a result of the Defendants' misconduct, the Company has been damaged

8 financially and is entitled to a recovery as a result thereof.

9  123. Plaintiff demands an accounting be made of all stock option grants made to any of

10 the Option Recipient Defendants, including, but not limited to, the dates of the grants, the

11 amounts of the grants, the value of the grants, the recipients of the grants, the dates the options

12 were exercised, as well as the disposition of any proceeds received by any of the Option

13 Recipient Defendants via sale or other exercise of the grants.

14          **COUNT V**

15        **Against Defendants for**
      **Breach of Fiduciary Duty and/or Aiding and Abetting**
16

17  124. Plaintiff incorporates by reference and realleges each and every allegation set

 forth above, as though fully set forth herein.
18

19  125. As alleged in detail herein, each of Defendants had a fiduciary duty to, among

 other things, refrain from unduly benefiting themselves and other Company insiders at the
20

 expense of the Company.
21

22  126. As alleged in detail herein, Defendants breached their fiduciary duties by, among

 other things, engaging in a scheme to grant backdated stock options to themselves and/or certain
23

 other officers and directors of the Company and cover up their misconduct.
24

25  127. In breach of their fiduciary duties of loyalty and good faith, Defendants agreed to

 and did participate with and/or aided and abetted one another in a deliberate course of action
26

 designed to divert corporate assets to themselves and/or other Company insiders.
27

28

1    128.    Defendants' foregoing misconduct was not, and could not have been, an exercise

2    of good faith business judgment.    Rather, it was intended to, and did, unduly benefit the

3    Defendants who received backdated options at the expense of the Company.

4    129.    As a direct and proximate result of Defendants' foregoing breaches of fiduciary

5    duties, the Company has sustained millions of dollars in damages, including, but not limited to,

6    the additional compensation expenses and tax liabilities the Company will be required to incur,

7    the loss of funds paid to the Company upon the exercise of stock options resulting from the

8    difference between the fair market value of the stock option on the true date of grant and the

9    price that was actually paid as a result of the backdated stock option grant, and costs and

10   expenses incurred in connection with the Company's internal investigation and restatement of

11   historical financial statements.

## COUNT VI

### Against the Option Recipient Defendants for
### Common Law Restitution/Unjust Enrichment

130.    Plaintiff incorporates by reference and realleges each and every allegation set
forth above, as though fully set forth herein.

131.    The Option Recipient Defendants were unjustly enriched by their receipt and
retention of backdated stock option grants and the proceeds they received through exercising
backdated stock options, as alleged herein, and it would be unconscionable to allow them to
retain the benefits thereof.

132.    To remedy these Defendants' unjust enrichment, the Court should order them to
disgorge to the Company all of the backdated stock options they received, including the proceeds
of any such options that have been exercised, sold, pledged, or otherwise monetized.

## COUNT VII

### Against the Option Recipient Defendants for Rescission

133.    Plaintiff incorporates by reference and realleges each and every allegation set
forth above, as though fully set forth herein.

1    134.   As a result of the acts alleged herein, the stock option contracts between the

2  Option Recipient Defendants and the Company entered into during the relevant period were

3  obtained through Defendants' fraud, deceit, and abuse of control. Further, the backdated stock

4  options were illegal grants and thus invalid as they were not authorized in accordance with the

5  terms of the Plans.

6    135.   All contracts which provide for stock option grants to the Option Recipient

7  Defendants and were entered into during the relevant period should, therefore, be rescinded, with

8  all sums paid under such contracts returned to the Company, and all such executory contracts

9  cancelled and declared void.

10                                   **COUNT VIII**

11                   **Against the Insider Selling Defendants**
                **for Insider Selling and Misappropriation of Information**
12

13    136.   Plaintiff incorporates by reference and realleges each and every allegation set

14  forth above, as though fully set forth herein.

15    137.   At the time of their stock sales, the Insider Selling Defendants knew that the

16  Company's financial results were false and misleading.  These Defendants' sales of Peet's

17  common stock while in possession and control of this material adverse nonpublic information

18  was a breach of their fiduciary duties of good faith, honesty and loyalty.

19    138.   Since the use of the Company's proprietary information for their own gain

20  constitutes a breach of the fiduciary owed by the Insider Selling Defendants to the Company,

21  Plaintiff, on behalf of the Company, is entitled to the imposition of a trust on any profits the

22  Insider Selling Defendants obtained thereby.

23    139.   Plaintiff, as a shareholder of Peet's, seeks damages and other relief for Peet's.

24    WHEREFORE, Plaintiff demands judgment as follows:

25        A.    Against all of the Defendants and in favor of the Company for
              the amount of damages sustained by the Company as a result of
26              Defendants' misconduct;

27        B.    Ordering the Option Recipient Defendants to disgorge to the
              Company all of the backdated stock options they received,
28              including the proceeds of any such options that have been

exercised, sold, pledged, or otherwise monetized, and imposing a constructive trust thereover;

C.   Granting appropriate equitable relief to remedy Defendants' breaches of fiduciary duties;

D.   Directing the Company to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with applicable law, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote adoption of the following Corporate Governance policies:

  (a)   a proposal requiring that the office of CEO of the Company and Chairman of the Board be permanently held by separate individuals and that the Chairman of the Board meets rigorous "independent" standards;

  (b)   a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

  (c)   appropriately test and then strengthen the internal audit and control functions;

  (d)   rotate independent auditing firms every five years;

  (e)   control and limit insider stock selling and the terms and timing of stock option grants; and

  (f)   reform executive compensation;

E.   Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.   Granting such other and further relief as the Court deems just and proper.

1

## **JURY TRIAL DEMANDED**

2

Plaintiff demands a trial by jury.

3

## **CERTIFICATION OF INTERESTED ENTITIES OR PERSONS**

4

Pursuant to Civil Local Rule 3-16, the undersigned certifies that as of this date, other than

5

the named parties there is no such interest to report.

6

Dated: February 5, 2007                    Respectfully submitted,

7

SCHIFFRIN BARROWAY

8                                          TOPAZ & KESSLER, LLP

9

10                                         _____
                                           Alan R. Plutzik, Of Counsel (Bar No. 077785)

11                                         2125 Oak Grove Road, Suite 120
                                           Walnut Creek, California 94598

12                                         Telephone: (925) 945-0200
                                           Fax: (925) 945-8792

13

14                                         -and-

15                                         Eric L. Zagar
                                           Tara P. Kao

16                                         280 King of Prussia Road
                                           Radnor, PA 19087

17                                         Telephone: (610) 667-7706
                                           Fax: (610) 667-7056

18

19

20

21

22

23

24

25

26

27

28

SHAREHOLDER DERIVATIVE COMPLAINT
-41-

## VERIFICATION

I, **Marvin W. Nach**, hereby verify that I have authorized the filing of the attached Complaint, that I have reviewed the Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief. I declare under penalty of perjury that the foregoing is true and correct.

DATE: _Feb / 2009_

_MARVIN W. NACH_

**MARVIN W. NACH**

281561.1