1   SCHIFFRIN BARROWAY
     TOPAZ & KESSLER, LLP
2   Alan R. Plutzik, of Counsel (Bar No. 077785)
    2125 Oak Grove Road, Suite 120
3   Walnut Creek, California 94598
    Telephone: (925) 945-0770
4   Fax: (925) 945-8792

5   -and-

    Eric L. Zagar
6   Michael Wagner
    Tara P. Kao
7   280 King of Prussia Road
    Radnor, PA  19087
8   Telephone: (610) 667-7706
    Fax: (610) 667-7056
9
    Counsel for Plaintiff
10
                    **UNITED STATES DISTRICT COURT**
11
                   **NORTHERN DISTRICT OF CALIFORNIA**
12

13   MARVIN W. NACH, derivatively on behalf of     )     Case No. 07-cv-00740-SI
     PEET'S COFFEE & TEA, INC.                      )
14                                                   )
                      Plaintiff,                     )     **AMENDED VERIFIED**
15                                                   )     **SHAREHOLDER DERIVATIVE**
                v.                                   )     **COMPLAINT**
16                                                   )
     GERALD BALDWIN, HILARY BILLINGS,                )
17   MICHAEL CLOUTIER, JAMES E. GRIMES,              )
     H. WILLIAM JESSE, WILLIAM M. LILLA,             )
18   BRUCE A. MACLAREN, DEBORAH McGRAW,              )
     PETER B. MEHRBERG, CHRISTOPHER P.               )
19   MOTTERN, PATRICK O'DEA,                         )
     JAMES A. REYNOLDS, MARK N.                      )
20   RUDOLPH, JEAN-MICHEL VALETTE,                   )
     and WILLIAM D. WELSH                            )
21                                                   )
                      Defendant,                     )
22                                                   )
     and                                             )     **JURY TRIAL DEMANDED**
23                                                   )
     PEET'S COFFEE & TEA, INC.                       )
24                                                   )
                    Nominal Defendant.               )
25

26

27

28
                AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
                          CASE NO. C07-00740-SI

1    Plaintiff Marvin W. Nach ("Nach"), by the undersigned attorneys, submits this Amended

2    Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named

3    herein.

4    **NATURE AND SUMMARY OF THE ACTION**

5    1.    This is a shareholder's derivative action brought for the benefit of nominal

6    defendant Peet's Coffee & Tea, Inc. ("Peet's" or the "Company") against certain members of its

7    Board of Directors (the "Board") and certain of its executive officers seeking to remedy

8    defendants' breaches of fiduciary duties, unjust enrichment, statutory violations, and other

9    violations of law.

10   2.    For several years, a majority of Peet's directors, together with its top officers,

11   engaged in a secret scheme to grant undisclosed, in-the-money stock options to themselves and

12   others by backdating stock option grants to coincide with historically low closing prices of Peet's

13   common stock.  In fact, in a striking pattern, 100% of the discretionary grants made from the

14   February 2001 to February 2003 coincided with low closing prices.  All of the backdated stock

15   options were also granted to Peet's top five compensated executives whose grants are disclosed

16   in the Company's proxy statements.

17   3.    This action seeks redress for the harm done to Peet's, and indirectly to its

18   stockholders, resulting from the self-dealing of certain of the Company's top executives and

19   directors who breached their fiduciary duties of loyalty and good faith to the Company by

20   intentionally manipulating Peet's stock option grants between February 2001 to February 2003.

21   As a result of their misconduct, these top executives and directors have secured a huge windfall

22   for themselves at the expense of Peet's and caused the misstatement of Peet's financial results

23   from the Company's fiscal year 2001 through the present.  In fact, the Company restated its

24   historical financial statements to account for ***approximately $1.7 million*** in additional

25   compensation expenses.

26   4.    These key executives and directors backdated stock option grants in order to

27   exercise the stock option grants at a lower strike price, thus pocketing more money than they

28

1 | were otherwise entitled to receive.  A stock option granted to an employee or director of the
2 | Company allows the employee or director to purchase Company stock at a specified price –
3 | referred to as the "exercise price" – for a specified period of time.  Stock options are typically
4 | granted as part of an employee's or director's compensation package to create incentives for him
5 | or her to boost profitability and the Company's stock value.  When an employee or director
6 | exercises an option, he or she purchases the stock from the Company at the exercise price,
7 | regardless of the stock price at the time the option is exercised.  Option pricing is based on the
8 | price of the Company's common stock on the day of the grant.  If an option is backdated to a day
9 | on which the market price was lower than the price on the day the option is granted, as Peet's has
10 | admitted was the case here, then the employee or director pays less for the stock option.
11 | Consequently, the Company gets less money for the stock when the option is exercised.

12 |      5.     As demonstrated below, these perfectly-timed option grants could not have been
13 | the result of mere coincidence.  They were, in fact, the result of improper and opportunistic
14 | option granting practices.  Because the Company failed to comply with the Generally Accepted
15 | Accounting Principles ("GAAP") governing the expensing of stock option grants, the backdating
16 | scheme had a material effect on Peet's financial statements from 2001 through the present. As
17 | explained *infra,* to the extent the Company failed to record, as a compensation expense, the
18 | difference between the price of Peet's stock on the date of the actual grant and the "backdated"
19 | exercise price of the options, this deliberate omission resulted in the material understatement of
20 | the Company's reported compensation expense and a material overstatement of its reported net
21 | income throughout the relevant period.

22 |      6.     In addition, the backdating practices directed by defendants rendered materially
23 | false and misleading each of the Company's annual proxy statements to shareholders, which
24 | purportedly reported the compensation, including stock option awards, of its most highly-
25 | compensated executives, as required by rules promulgated by the SEC.  The practice of
26 | backdating also rendered the defendants' statements regarding the Company's executive and

27

28

1  director stock-based compensation, contained in Peet's annual reports and annual proxy
2  statements, materially false and misleading.

3      7.    The secret practice of backdating stock options was exposed on March 18, 2006,
4  when *The Wall Street Journal* published an article entitled "The Perfect Payday," which
5  described stock option backdating practices by a number of companies where their executives
6  had achieved extremely fortuitous stock option paydays -- the likelihood of which defied random
7  chance. *The Wall Street Journal*, together with Erik Lie, a professor at Tippie College of
8  Business at the University of Iowa, David Yermack, a professor at New York University Stern
9  School of Business, and John Emerson, a professor at Yale University, studied patterns of
10  particularly favorable stock grants at certain companies and calculated the probability of such
11  patterns occurring randomly and concluded that the odds were improbable.

12      8.    This practice of backdating stock options, though widespread, remained virtually
13  undetected until such academic research revealed patterns of stock option grants that could not
14  be explained by chance. These studies noted the frequency with which stock option grants
15  occurred just after a drop in stock price and immediately before a significant increase in stock
16  price, often at the lowest price of the year. Such timing could not be statistically explained by
17  random selection of grant dates. One study hypothesized that the dates of the grants had been
18  selected retroactively. Such retroactive dating, or "backdating," would permit the grantor to
19  select the most advantageous price for the stock option and to effectively grant "in-the-money"
20  stock options (where the exercise price of the option is lower than the stock price on the date of
21  grant) that appeared to be granted when the stock price was at a historical low. Since companies
22  are required to report in-the-money grants as compensation to the recipient and as a charge to the
23  corporation, the practice of backdating would provide a means to confer additional stock value,
24  or compensation, to officers and employees that was not detectable, thereby permitting Company
25  insiders to conceal the additional compensation and forego reporting or recording the charge.

26      9.    Senator Chuck Grassley stated: "[Options backdating] is behavior that, to put it
27  bluntly, is disgusting and repulsive." SEC Chairman Christopher Cox was quoted, saying

28

1   "[Backdating options] isn't a question about 'Whoops, I may have (accidentally) crossed a line

2   here' . . . It's a question of knowingly betting on a race that's already been run."   Deputy

3   Attorney General Paul J. McNulty described the practice of stock option backdating "as a brazen

4   abuse of corporate power."   The former Chairman of the Banking and Housing Urban Affairs

5   Committee of the United States Senate, Senator Richard Shelby, also stated that manipulation of

6   options grant dates "appears to be a *black-and-white example of securities fraud."*

7       10.   According to an August 26, 2007 article in the *National Law Journal* entitled

8   "Lawyers Fly Blind on Options Penalties," the stock options backdating scandal has produced 16

9   criminal prosecutions, 220 companies that have been subject to internal or federal investigations

10   and 100 corporate earnings restatements totaling approximately $12.4 billion.

11       11.   Peet's is one of the many companies that have been subject to an internal

12   investigation involving options backdating at the Company.  After its internal investigation was

13   completed, the Company *admitted "that it incorrectly applied the measurement date, as defined*

14   *in Accounting Principles Board Opinion No. 25, 'Accounting for Stock Issued to Employees,'*

15   *with respect to certain stock option grants made from 2001 to 2006."*  Company filed its fiscal

16   2006 financial report and the first quarter reports, which accounted for additional compensation

17   expenses totaling *approximately $1.7 million*.   The Company also disclosed that its internal

18   investigation costs totaled *$2.4 million.*

19       12.   Peet's has suffered, and will continue to suffer, significant financial and non-

20   monetary damages and injuries.  Some such categories were identified in a report issued by the

21   Center for Financial Research and Analysis on May 16, 2006, titled "Options Backdating –

22   Which Companies Are at Risk?":

23   • Securities [and] Exchange Commission ("SEC") investigation risk –
        The SEC has begun information investigations at many companies in
24      recent months and has also begun to call for improved disclosures
        around all areas of executive compensation.
25

26   • Accounting restatement risk – Some companies which have admitted
        backdating options have accompanied those admissions with financial
27      restatements impacting both the balance sheet and earnings.

28

- Tax/Cash implications – The change in options from the practice of options backdating may force some companies to restate tax positions for the years in question, which could result in an obligation to pay back taxes.

- Management credibility risk – If a reputable management team is found to have repeatedly backdated options, thereby enriching themselves at the expense of shareholder, the reputation of management (and the related stock premium for superior management) could take a hit.

13.     In sum, as alleged in detail herein, in gross breach of their fiduciary duties as officers and/or directors of Peet's, defendants intentionally colluded with one another to:

        a.     improperly backdate many grants of Peet's stock options to Peet's executives, in violation of the Company's shareholder-approved stock option plans;

        b.     improperly record and account for the backdated stock options, in violation of GAAP;

        c.     improperly take tax deductions based on the backdated stock options, in violation of Section 162(m) of the Internal Revenue Code, 26 U.S.C. § 162(m) ("Section 162(m)");  and

        d.     produce and disseminate to Peet's shareholders and the market false financial statements and other false SEC filings that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options.

14.     As a result of defendants' egregious misconduct, Peet's has sustained substantial damages, and the recipients of the backdated stock options have garnered a significant amount in unlawful profits.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

16.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial

compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

17.     Plaintiff Nach is, and was at all relevant times, a shareholder of nominal defendant Peet's.   Plaintiff Nach purchased Peet's common stock in January 2001, has continuously held stock in Peet's throughout the wrongs complained of and continues to hold his shares of Peet's common stock.

18.     Nominal defendant Peet's is a Washington corporation with its principal executive offices located at 1400 Park Avenue, Emeryville, California 94608-3520.  According to its public filings, Peet's is a specialty coffee roaster and marketer of fresh roasted whole bean coffee.

**Defendant O'Dea**

19.     Defendant Patrick J. O'Dea ("O'Dea") has served as Peet's President and Chief Executive Officer ("CEO") and as a director of the Company since May 2002.

20.     Defendant O'Dea received approximately the following as compensation, not including stock option grants:

| Fiscal Year | Compensation |
|-------------|--------------|
| 2002 | $250,385 salary |
| 2003 | $420,000 salary |
| 2004 | $463,292 salary |
| 2005 | $467,566 salary |
| 2006 | $493,479 salary |

21.     Upon information and belief, Defendant O'Dea received 650,000 backdated Peet's stock options, as shown below:

| Purported Date of Grant | Exercise Price | Number of Options |
|-------------------------|----------------|-------------------|
| 05/29/02 | $15.49 | 600,000 |
| 02/10/03 | $12.98 | 50,000 |

**Defendant Baldwin**

22.    Defendant Gerald Baldwin ("Baldwin") has served as a director of the Company since 1971 and previously served as Chairman of the Board from 1994 to January 2001 and as President and Chief Executive Officer ("CEO") of Peet's from 1971 until 1994.

23.    From June 2003 to September 2006, Defendant Baldwin sold 268,197 shares of Peet's stock with total proceeds of approximately $6,979,866.31.

24.    Defendant Baldwin received the following as compensation, not including stock option grants:

| Fiscal Year | Compensation |
|---|---|
| 1999 | $250,000 salary and $63,750 bonus |
| 2000 | $250,000 salary |
| 2001 | $149,038 salary |

**Defendant Billings**

25.    Defendant Hilary Billings ("Billings") has served as a director of Peet's and as a member of the Compensation Committee of the Board (the "Compensation Committee") since January 2002.

**Defendant Jesse**

26.    Defendant H. William Jesse ("Jesse") has served as a director of the Company since August 1998 and as a member of both the Compensation Committee and the Audit Committee since at least 2000. He also served as Chairman from January 2001 to May 2002.

27.    From August 2003 to May 2006, defendant Jesse sold approximately 47,468 shares of Peet's common stock with total proceeds of approximately $1,184,635.54.

**Defendant Valette**

28.    Defendant Jean-Michel Valette ("Valette") has served as Chairman of the Board since January 2004 and as a director of the Company and as a member of both the Compensation Committee and the Audit Committee since July 2001.

**Defendant Cloutier**

29.     Defendant Michael Cloutier ("Cloutier") has served as Peet's Vice President, Information Technology and Chief Technology Officer since August 1999 and previously served as its Systems Manager from August 1999 to December 1999.

30.     In 2003, Defendant Cloutier received $133,749 in salary and $9,574 in bonus, not including stock option grants.

31.     Upon information and belief, Defendant Cloutier received 49,103 backdated Peet's stock options, as shown below:

| Purported Date of Grant | Exercise Price | Number of Options |
|---|---|---|
| 02/25/01 | $7.23 | 9,984 |
| 06/05/01 | $8.12 | 11,084 |
| 12/31/01 | $11.20 | 8,036 |
| 05/29/02 | $15.49 | 9,984 |
| 02/10/03 | $12.98 | 10,015 |

**Defendant Grimes**

32.     Defendant James E. Grimes ("Grimes") has served as Vice President of Operations and Information Systems since July 2002.

33.     Defendant Grimes received approximately the following as compensation, not including stock option grants:

| Fiscal Year | Compensation |
|---|---|
| 2003 | $182,404 salary |
| 2004 | $203,987 salary |
| 2005 | $213,193 salary |
| 2006 | $227,863 salary |

34.     Upon information and belief, Defendant Grimes received 25,000 backdated Peet's stock options with the purported grant date of February 10, 2003 and an exercise price of $12.98.

**Defendant Lilla**

35.     Defendant William M. Lilla ("Lilla") has served as Executive Vice President of the Company since December 2000 and previously served as Peet's Vice President, Marketing

and Strategy from April 1998 to December 2000.

36.     Defendant Lilla received approximately the following as compensation, not including stock option grants:

| Fiscal Year | Compensation |
|---|---|
| 1999 | $160,712 salary and $29,036 bonus |
| 2000 | $164,000 salary |
| 2001 | $193,808 salary and $15,000 bonus |
| 2002 | $195,000 salary and $14,362 bonus |
| 2003 | $195,000 salary and $14,362 bonus |

37.     Upon information and belief, Defendant Lilla received 76,044 backdated Peet's stock options, as shown below:

| Purported Date of Grant | Exercise Price | Number of Options |
|---|---|---|
| 02/25/01 | $7.23 | 19,968 |
| 06/05/01 | $8.12 | 18,011 |
| 12/31/01 | $11.20 | 13,058 |
| 05/29/02 | $15.49 | 9,984 |
| 02/10/03 | $12.98 | 15,023 |

**Defendant MacLaren**

38.     Defendant Bruce A. MacLaren ("MacLaren") served as the Company's Vice President, Direct Delivery from July 1999 to 2000.

39.     Upon information and belief, Defendant MacLaren received 17,142 backdated Peet's stock options, as shown below:

| Purported Date of Grant | Exercise Price | Number of Options |
|---|---|---|
| 02/25/01 | $7.23 | 9,984 |
| 06/05/01 | $8.12 | 7,158 |

**Defendant McGraw**

40.     Defendant Deborah McGraw ("McGraw") served as Peet's Vice President, Retail Operations from October 1995 to October 2003. She also held various positions at the Company

1  since 1982, including store manager, District Manager, Regional Director, and Director of Retail

2  Operations.

3     41.    Upon information and belief, Defendant McGraw received 41,477 backdated

4  Peet's stock options, as shown below:

| Purported Date of Grant | Exercise Price | Number of Options |
|---|---|---|
| 02/25/01 | $7.23 | 9,984 |
| 06/05/01 | $8.12 | 12,469 |
| 12/31/01 | $11.20 | 9,040 |
| 05/29/02 | $15.49 | 9,984 |

**Defendant Mehrberg**

42.    Defendant Peter B. Mehrberg ("Mehrberg") served as Vice President, Business Development of the Company from 1997 to 2005 and as its General Counsel and Assistant Secretary from 1994 to 2005.

43.    Defendant Mehrberg received approximately the following as compensation, not including stock option grants:

| Fiscal Year | Compensation |
|---|---|
| 1999 | $136,692 salary and $26,727 bonus |
| 2000 | $144,803 salary |
| 2001 | $150,000 salary |
| 2002 | $160,154 salary and $11,931 bonus |
| 2003 | $174,904 salary and $11,931 bonus |
| 2004 | $203,987 salary |

44.    Upon information and belief, Defendant Mehrberg received 68,868 backdated Peet's stock options, as shown below:

| Purported Date of Grant | Exercise Price | Number of Options |
|---|---|---|
| 02/25/01 | $7.23 | 9,984 |
| 06/05/01 | $8.12 | 13,855 |
| 12/31/01 | $11.20 | 10,045 |
| 05/29/02 | $15.49 | 9,984 |
| 02/10/03 | $12.98 | 25,000 |

## Defendant Mottern

45.      Defendant Christopher P. Mottern ("Mottern") served as a director of the Company from 1997 to December 2004, as Chairman of the Board from May 2002 to December 2003, and as Peet's Chief Executive Officer and President from May 1997 to May 2002.

46.      From November 2002 to January 2005, defendant Mottern sold approximately 362,635 shares of Peet's common stock and received total proceeds of $6,929,854.61.

47.      Defendant Mottern received approximately the following as compensation, not including stock option grants:

| Fiscal Year | Compensation |
|---|---|
| 1999 | $257,742 salary |
| 2000 | $350,000 salary |
| 2001 | $350,000 salary |
| 2002 | $228,744 salary |

48.      Upon information and belief, Defendant Mottern received 184,336 backdated Peet's stock options, as shown below:

| Purported Date of Grant | Exercise Price | Number of Options |
|---|---|---|
| 02/25/01 | $7.23 | 99,999 |
| 06/05/01 | $8.12 | 43,103 |
| 12/31/01 | $11.20 | 31,250 |
| 05/29/02 | $15.49 | 9,984 |

## Defendant Reynolds

49.      Defendant James A. Reynolds ("Reynolds") has served as the Company's Vice

President, Coffee and Tea since February 1994 and previously served as its Secretary from February 1988 to May 2001 and as a director of the Company from 1985 to 1997.

50.    Upon information and belief, Defendant Reynolds received 38,766 backdated Peet's stock options, as shown below:

| Purported Date of Grant | Exercise Price | Number of Options |
|---|---|---|
| 02/25/01 | $7.23 | at least 9,424 |
| 06/05/01 | $8.12 | at least 10,493 |
| 12/31/01 | $11.20 | at least 6,365 |
| 05/29/02 | $15.49 | 9,984 |
| 02/10/03 | $12.98 | at least 2,500 |

**Defendant Rudolph**

51.    Defendant Mark N. Rudolph ("Rudolph") served as Chief Financial Officer of the Company from September 1988 to July 2003 and was appointed Vice President in September 1994 and Treasurer and Secretary in May 2001.   Rudolph also served as Peet's Assistant Secretary from September 1994 to May 2001.

52.    Defendant Rudolph received approximately the following as compensation, not including stock option grants:

| Fiscal Year | Compensation |
|---|---|
| 1999 | $150,154 salary and $27,418 bonus |
| 2000 | $155,000 salary |
| 2001 | $161,731 salary and $15,000 bonus |

53.    Upon information and belief, Defendant Rudolph received 45,779 backdated Peet's stock options, as shown below:

| Purported Date of Grant | Exercise Price | Number of Options |
|---|---|---|
| 02/25/01 | $7.23 | 9,984 |
| 06/05/01 | $8.12 | 14,963 |
| 12/31/01 | $11.20 | 10,848 |
| 05/29/02 | $15.49 | 9,984 |

**Defendant Welsh**

54.    Defendant William D. Welsh ("Welsh") served as Vice President of Peet's from 2001 to at least 2004.

55.    Upon information and belief, Defendant Welsh received 10,478 backdated Peet's stock options, as shown below:

| Purported Date of Grant | Exercise Price | Number of Options |
|---|---|---|
| 02/25/01 | $7.23 | 4,320 |
| 06/05/01 | $8.12 | 6,158 |

### Defendants

56.    Collectively, O'Dea, Baldwin, Billings, Jesse, Valette, Cloutier, Grimes, Lilla, MacLaren, McGraw, Mehrberg, Mottern, Reynolds, Rudolph and Welsh are referred to herein as "Defendants."

### DUTIES OF THE DEFENDANTS

57.    By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, Defendants, particularly O'Dea, Mottern, Baldwin and Compensation Committee members Billings, Jesse and Valette, owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each

1  director and officer of the Company owes to the Company and its shareholders the fiduciary duty

2  to exercise good faith and diligence in the administration of the affairs of the Company and in

3  the use and preservation of its property and assets, and the highest obligations of fair dealing.

4      58.   Defendants O'Dea, Mottern, Baldwin, Billings, Jesse and Valette, because of their

5  positions of control and authority as directors and/or officers of the Company, were able to and

6  did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

7      59.   To discharge their duties, Defendants O'Dea, Mottern, Baldwin, Billings, Jesse

8  and Valette as officers and directors of the Company were required to exercise reasonable and

9  prudent supervision over the management, policies, practices and controls of the Company.  By

10  virtue of such duties, Defendants O'Dea, Mottern, Baldwin, Billings, Jesse and Valette were

11  required to, among other things:

12          a.   exercise good faith in ensuring that the affairs of the Company
13              were conducted in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business;

14

15          b.   exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and
16              requirements, including acting only within the scope of its legal authority;

17

18          c.   exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits,
19              reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the
20              Company; and

21          d.   exercise good faith in ensuring  that the Company's financial statements were prepared in accordance with GAAP; and

22

23          e.   refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

24

25      60.   Defendants, particularly O'Dea, Mottern, Baldwin and Audit Committee

26  members Jesse and Valette, were responsible for maintaining and establishing adequate internal

27  accounting controls for the Company and to ensure that the Company's financial statements were

28  based on accurate financial information.  According to GAAP, to accomplish the objectives of

accurately recording, processing, summarizing, and reporting financial data, a corporation must

establish an internal accounting control structure.   Among other things, Defendants O'Dea,

Mottern, Baldwin, Jesse and Valette were required to:

> (1)   make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and
>
> (2)   devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –
>
>> (a)   transactions are executed in accordance with management's general or specific authorization; and
>>
>> (b)   transactions are recorded as necessary to permit preparation of financial statements in conformity with [GAAP].

## DUTIES AND RESPONSIBILITIES OF THE AUDIT AND COMPENSATION COMMITTEES

61.   The standing committees of the Board include: (i) the Audit Committee and (ii) the Compensation Committee.

62.   These Committees set the policies which admittedly permitted the backdating of options to occur.

### *Compensation Committee*

63.   The following defendants served on the Compensation Committee of the Board at certain times during the relevant period:

| Compensation Committee | | | | | | |
|---|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
| Billings | | M | M | M | C | C |
| Jesse | M | M | M | M | M | M |
| Valette | | M | M | C | M | |
| M = Member; C = Chairman of Committee | | | | | | |

64.   Peet's Compensation Committee Charter provides that the Compensation Committee shall be responsible for, among other things:

- Compensation of Chief Executive Officer. The Committee, meeting in executive session, shall determine, in its sole discretion, the compensation and other terms of employment of the Company's Chief Executive Officer and shall evaluate the Chief Executive Officer's performance in light of relevant corporate performance goals and objectives. The Chief Executive Officer may not be present during these deliberations or during any vote taken in regards to his or her compensation.

  In determining the long-term incentive component of the Chief Executive Officer's compensation, the Committee should consider the Company's performance and relative stockholder return, the value of similar incentive awards given to chief executive officers of comparable companies, the awards given to the Company's Chief Executive Officer in past years, and such other criteria as the Committee deems advisable.

  Compensation of Other Officers. The Committee shall review and approve the individual and corporate performance goals and objectives of the Company's other officers, including executive officers, that are periodically established.

- Compensation of Directors. The Committee shall recommend to the Board the type and amount of compensation to be paid or awarded to Board members, including consulting, retainer, Board meeting, committee and committee chair fees and stock option grants or awards.

- Other Compensation. The Committee shall review and approve such other compensation matters as the Board of Directors or the Chief Executive Officer of the Company wishes to have the Committee approve.

- Administration of Benefit Plans. The Committee shall review with management the adoption, amendment and termination of the Company's stock option plans, stock appreciation rights plans, pension and profit sharing plans, incentive plans, stock bonus plans, stock purchase plans, bonus plans, deferred compensation plans and similar programs. The Committee shall have full power and authority to recommend changes to the Board for existing plans as well as approve grants and awards, and exercise such other power and authority as may be permitted or required under such plans.

* * *

- Compensation Discussion and Analysis. The Committee shall review and discuss with management the Company's disclosures contained under the caption "Compensation Discussion and Analysis" for use in any of the Company's annual reports on Form 10-K, registration statements, proxy statements or information statements and make recommendations to the Board that the CD&A be approved for inclusion in the Company's annual reports on Form 10-K, registration statements, proxy statements or information statements.

- Committee Report. The Committee shall prepare and review the

Committee report on executive compensation to be included in the Company's annual proxy statement in accordance with applicable SEC rules and regulations.

\* \* \*

- Report to the Board The Committee is to report to the Board of Directors of Directors from time to time, or whenever it shall be called upon to do so.

### *Audit Committee*

65.     The following defendants served on the Audit Committee of the Board at certain times during the relevant period:

| Audit Committee | | | | | | |
|---|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
| Jesse | M | M | M | C | C | C |
| Valette | | M | M | M | M | M |
| M = Member; C = Chairman of Committee | | | | | | |

66.     Peet's Audit Committee Charter provides that the Audit Committee shall be responsible for, among other things:

- ***Annual Audit Results.***  To review with management and the Auditors the results of the annual audit, including the Auditors' assessment of the quality, not just acceptability, of accounting principles, the reasonableness of significant judgments and estimates (including material changes in estimates), any material audit adjustments proposed by the Auditors and any adjustments proposed but not recorded, the adequacy of the disclosures in the financial statements and any other matters required to be communicated to the Committee by the Auditors under the standards of the Public Company Accounting Oversight Board (United States), as appropriate.

- ***Quarterly Results.***  To review with management and the Auditors, as appropriate, the results of the Auditors' review of the Company's quarterly financial statements, prior to public disclosure of quarterly financial information, if practicable, or filing with the Securities and Exchange Commission of the Company's Quarterly Report on Form 10-Q, and any other matters required to be communicated to the Committee by the Auditors under standards of the Public Company Accounting Oversight Board (United States).

- ***Management's Discussion and Analysis.***  To review with management and the Auditors, as appropriate, the Company's disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in its periodic reports to be filed with the Securities and Exchange Commission.

- ***Press Releases.*** To review with management and the Auditors, as appropriate, earnings press releases, as well as the substance of financial information and earnings guidance provided to analysts and ratings agencies, which discussions may be general discussions of the type of information to be disclosed or the type of presentation to be made. {The Chair of the Committee may represent the entire Committee for purposes of this discussion.}

- ***Accounting Principles and Policies.*** To review with management and the Auditors significant issues that arise regarding accounting principles and financial statement presentation, including critical accounting policies and practices, alternative accounting policies available under generally accepted accounting principles ("GAAP") related to material items discussed with management and any other significant reporting issues and judgments . . . .

- ***Proxy Report.*** To prepare the report required by the rules of the Securities and Exchange Commission to be included in the Company's annual proxy statement . . . .

## FACTUAL ALLEGATIONS

### The Stock Option Backdating Scandal

67. Under accounting rules in effect prior to 2004, public companies in the United States were permitted to grant stock options to employees without recording an expense, as long as the option's strike price was at or above the stock price on the day the options were granted. If the option granted was priced below the market price on the grant date, *i.e.*, in-the-money, accounting rules required that any publicly traded company recognize and record the difference as compensation expense in its financial statements. *See* Accounting Principles Board Opinion No. 25 ("APB 25"), superseded in 2004 by FAS 123(R).

68. In addition, pursuant to Section 162(m), compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's most highly compensated officers is tax deductible only if: (i) the compensation is payable solely on account of the attainment of one or more performance goals; (ii) the performance goals are determined by a compensation committee comprised solely of two or more outside directors; (iii) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the

1   payment of the compensation; and (iv) before any payment of such compensation, the
2   compensation committee certifies that the performance goals and any other material terms were
3   in fact satisfied.

4    69. As the public scrutiny has intensified, backdating has been revealed not only as a
5   practice to maximize the grant recipients' gain while concealing company expenses, but also as a
6   tax avoidance vehicle for some executives. Reporting on an analysis written by an economist at
7   the SEC, the *San Jose Mercury News* reported, "[i]n a new wrinkle in the scandal over
8   backdating stock options, an analyst has found evidence that some executives manipulated the
9   exercise dates of their options in order to cheat on their taxes." Marcy Gordon, SEC: Backdating
10  Done to Avoid Paying More Taxes, *San Jose Mercury News*, December 13, 2006, *available at*
11  http://www.mercurynews.com/search/ci_4831931.

12   70. Since the date of *The Wall Street Journal* article which first revealed the unlawful
13  practice of backdating stock options, more than 220 companies have reported internal and/or
14  governmental investigations of their backdating practices. Additional research by Professor Lie
15  suggests that between 1996 and 2005, 18.9% of unscheduled option grants to top executives
16  were backdated or manipulated by nearly one-third of the companies investigated.

17   71. Indeed, like the stock option grants examined by *The Wall Street Journal*, the
18  pattern of option grants identified at Peet's is more than randomly fortuitous, and the more likely
19  reason for the extraordinary pattern is that the stock options were improperly backdated.

20           **Peet's Stock Option Plans**

21   72. During the relevant period that defendants engaged in their secret scheme to
22  backdate stock options, the 2000 Equity Incentive Plan (the "2000 Plan") was in effect.

23   73. Under the 2000 Plan, those eligible to receive stock option awards are Peet's
24  employees, *i.e.*, "any person employed by the Company or an Affiliate." Each option grant was
25  evidenced by a stock option agreement between the Company and the employee to whom such
26  option was granted.

27   74. The Company's proxy statements also stated that the 2000 Plan was administered

28

by the Compensation Committee. The delegation of the Compensation Committee's authority to administer the 2000 Plan is permitted under the 2000 Plan but is limited as follows:

> If administration is delegated to a Committee, the Committee shall have, in connection with the administration of the Plan, the powers theretofore possessed by the Board, including the power to delegate to a subcommittee any of the administrative powers the Committee is authorized to exercise (and references in this Plan to the Board shall thereafter be to the Committee or subcommittee), subject, however, to such resolutions, not inconsistent with the provisions of the Plan, as may be adopted from time to time by the Board.

75.   Further, the exercise price of option grants under the 2000 Plan was determined by the Compensation Committee. Under the 2000 Plan, "the exercise price of each Incentive Stock Option shall be not less than one hundred percent (100%) of the Fair Market Value of the Common Stock subject to the Option on the date the Option is granted," and "[t]he exercise price of each Nonstatutory Stock Option shall be not less than eighty-five percent (85%) of the Fair Market Value of the Common Stock subject to the Option on the date the Option is granted." Under the 2000 Plan, fair market value is defined as "the closing sales price for such stock (or the closing bid, if no sales were reported) as quoted on such exchange or market . . . on the last market trading day prior to the day of determination."

76.   The Compensation Committee, according to the Company's 2002-2004 proxy statements, "ma[de] recommendations concerning salaries and incentive compensation, awards stock options and stock purchase rights to employees and consultants under the Company's stock option plans and otherwise determine[d] compensation levels and perform[ed] such other functions regarding compensation as the Board may delegate."

77.   In announcing the findings of the Company's internal review of its option granting practices in its February 22, 2007 press release and its financial statements filed on April 2, 2007, the Company did not claim that the Compensation Committee or the Board delegated their authority to administer the stock option plans and to grant stock options during the relevant period.

### Backdating of Peet's Stock Option Grants

78.   As discussed below, 5 out of 5 discretionary grant dates from February 2001 to

1    February 2003 were backdated, and the pattern of grants was more than merely fortuitous.

2        79.    From 2001 to 2006, the Compensation Committee and certain directors (O'Dea,

3    Mottern, Baldwin, Billings, Jesse and Valette) knowingly and deliberately violated the terms of

4    the 2000 Plan, APB 25 and Section 162(m) by knowingly and deliberately backdating grants of

5    stock options to make it appear as though the grants were made on dates when the market price

6    of Peet's stock was lower than the market price on the actual grant dates, thereby unduly

7    benefiting the recipients of the backdated options.    Defendants O'Dea, Mottern, Baldwin,

8    Billings, Jesse and Valette knew that the publicly reported grant dates and statements that the

9    Company followed APB 25 and granted options with exercise prices equal to the fair market

10   value of Peet's stock on the date of grant were false because the grants were in fact backdated.

11   Defendants O'Dea, Mottern, Baldwin, Billings, Jesse and Valette knowingly and deliberately

12   approved the backdating scheme with knowledge of its consequences, *e.g.*, its effects on Peet's

13   financial statements, especially because Jesse and Valette were also on the Audit Committee and

14   reviewed and oversaw the filing of Peet's financial results.

15       80.    Between 2002 and 2004, defendants O'Dea, Mottern, Baldwin, Billings, Jesse and

16   Valette repeated in proxy statements that the stock option grants made during that period carried

17   an exercise price that was equal the fair market value on the date of grant.  However, until 2006,

18   defendants O'Dea, Mottern, Baldwin, Billings, Jesse and Valette concealed that the stock option

19   grants were repeatedly and consciously backdated to ensure that the strike price associated with

20   the option grants was below fair market value.  Defendants O'Dea, Mottern, Baldwin, Billings,

21   Jesse and Valette selected grant dates that coincided with dates when the stock prices were

22   significantly below the current market price.  They would then falsify the relevant documents to

23   make it appear as if the stock options were granted on the earlier selected date.

24       81.    As a result, the executive would receive in-the-money stock options while the

25   Company's records would appear to show no difference between the option price and the market

26   price on the purported date of the grant, thereby avoiding both the reporting requirement and the

27   additional compensation expense.

28

1    82.    In addition, in order to maximize remuneration to its officers and employees, and

2  to attract non-employee executives to the Company's ranks without impacting its reported

3  income, defendants O'Dea, Mottern, Baldwin, Billings, Jesse and Valette engaged in a practice

4  of backdating the issue date of stock options to certain key personnel and other Peet's employees

5  as admitted in the Company's February 22, 2007 press release and financial statements filed on

6  April 2, 2007.

7  February 25, 2001 Grants

8    83.    The Compensation Committee had the authority to choose the date and, in fact,

9  did choose the date on which these stock options were granted.  For the purported February 25,

10 2001 stock option grants, Defendants Billings, Jesse and Valette, as Compensation Committee

11 members, had the authority to administer the stock option plans and grant stock options

12 thereunder.

13    84.    Defendants Billings, Jesse and Valette were aware that the stock option plans

14 required that stock options be granted at not less than fair market value on the date of grant.

15 Defendants Billings, Jesse and Valette approved these grants on a date after the reported grant

16 date and knowingly used hindsight to select a favorable date.  Defendants Billings, Jesse and

17 Valette knew that backdating option grants to a date with a lower price violated the 2000 Plan.

18    85.    Defendants Billings, Jesse and Valette granted defendants Mottern, Lilla,

19 Rudolph, Mehrberg, McGraw, Cloutier, MacLaren, Reynolds and Welsh stock options dated

20 February 25, 2001, knowing that February 25, 2001 was not the date they actually approved the

21 grants.  The February 25, 2001 grants were approved by Billings, Jesse and Valette on a later

22 date, occurring between the next trading day February 26, 2001 and June 4, 2001, the day before

23 the next option grants.  Moreover, Defendants Mottern and Baldwin knew that the February 25,

24 2001 grants were backdated because of their positions and knowledge of the Company as they

25 were intimately involved in its management.  Specifically, Mottern was the President and CEO

26 of the Company during the time of the option grants, and Baldwin is the Chairman of the Board

27 and former President and CEO of Peet's.

28

86.    Defendants Billings, Jesse and Valette, with the knowledge of Mottern and Baldwin, granted stock options to Defendants Lilla, Rudolph, Mehrberg, McGraw, Cloutier, MacLaren, Reynolds and Welsh and Mottern, purportedly on February 25, 2001 with an exercise price of 85% of fair market value on the purported date of grant. Peet's closing stock price decreased dramatically before February 25, 2001 and rose $0.64, or 7.5%, in ten (10) trading days following the purported grant date, as demonstrated below:





| Purported Date of Grant | Name | Exercise Price | Number of Options[1] |
|---|---|---|---|
| 02/25/01 | Mottern | $7.23 | 99,999 |
| | Lilla | $7.23 | 19,968 |
| | Rudolph | $7.23 | 9,984 |
| | Mehrberg | $7.23 | 9,984 |
| | McGraw | $7.23 | 9,984 |
| | Cloutier | $7.23 | 9,984 |
| | MacLaren | $7.23 | 9,984 |
| | Reynolds | $7.23 | at least 9,424 |
| | Welsh | $7.23 | at least 4,320 |

June 5, 2001 Grants

87.     The Compensation Committee had the authority to choose the date and, in fact, did choose the date on which these stock options were granted.  For the June 5, 2001 stock option grants, Defendants Billings, Jesse and Valette, as Compensation Committee members, had the authority to administer the stock option plans and grant stock options thereunder.

88.     Defendants Billings, Jesse and Valette were aware that the stock option plans required that stock options be granted at not less than fair market value on the date of grant. Defendants Billings, Jesse and Valette approved these grants on a date after the reported grant date and knowingly used hindsight to select a favorable date.  Defendants Billings, Jesse and Valette knew that backdating option grants to a date with a lower price violated the 2000 Plan.

89.     Defendants Billings, Jesse and Valette granted Defendants Mottern, Lilla, Rudolph, Mehrberg, McGraw, Cloutier, MacLaren, Reynolds and Welsh stock options purportedly on June 5, 2001, knowing that June 5, 2001 was not the date that they approved the grant.  Moreover, Defendants Mottern and Baldwin approved and participated in the backdating of the June 5, 2001 grants.  Defendants Mottern, Baldwin, Billings, Jesse and Valette knew that

---

[1] Where the total number of options is unknown, *i.e.* where the phrase "at least" is utilized, the stock option grant did not appear in any proxy statements filed by the Company but was first disclosed in Form 4 filings, which only included the number of options pursuant to the grant that were exercised and left unexercised on the transaction date.

the June 5, 2001 grants were approved by Billings, Jesse and Valette on a later date.

90.    The actual grant date occurred between June 7, 2001 and December 27, 2001, the day before the next option grants, by which point Peet's closing price rose $2.93, or 36% following the purported grant date, as demonstrated below:





| Purported Date of Grant | Name | Exercise Price | Number of Options |
|---|---|---|---|
| 06/05/01 | Mottern | $8.12 | 43,103 |
| | Lilla | $8.12 | 18,011 |
| | Rudolph | $8.12 | 14,963 |
| | Mehrberg | $8.12 | 13,855 |
| | McGraw | $8.12 | 12,469 |

| Cloutier | $8.12 | 11,084 |
| MacLaren | $8.12 | 7,158 |
| Reynolds | $8.12 | At least 10,493 |
| Welsh | $8.12 | at least 6,158 |

December 31, 2001 Grants

91.    The Compensation Committee had the authority to choose the date and, in fact, did choose the date on which these stock options were granted.  For the December 31, 2001 stock option grants, Defendants Billings, Jesse and Valette, as Compensation Committee members, had the authority to administer the stock option plans and grant stock options thereunder.

92.    Defendants Billings, Jesse and Valette were aware that the stock option plans required that stock options be granted at not less than fair market value on the date of grant. Defendants Billings, Jesse and Valette approved these grants on a date after the reported grant date and knowingly used hindsight to select a favorable date.  Defendants Billings, Jesse and Valette knew that backdating option grants to a date with a lower price violated the 2000 Plan.

93.    Defendants Billings, Jesse and Valette granted stock options to Mottern, Lilla, Rudolph, Mehrberg, Cloutier, McGraw and Reynolds that were backdated to December 31, 2001.  Billings, Jesse and Valette knew that December 31, 2001 was not the date that they approved the grant and thus approved the backdating of the December 31, 2001 grants. Defendants Mottern and Baldwin, because of their positions with the Company, also knew that the December 31, 2001 grant was granted at a later date.

94.    The actual grant date occurred between the next trading day on January 1, 2002 and May 27, 2002, the day before the next option grants, by which point Peet's stock price rose $5.50, or 49.1%, following the purported grant date, as demonstrated below:









| Purported Date of Grant | Name | Exercise Price | Number of Options |
|---|---|---|---|
| 12/31/01 | Mottern | $11.20 | 31,250 |
| | Lilla | $11.20 | 13,058 |
| | Rudolph | $11.20 | 10,848 |
| | Mehrberg | $11.20 | 10,045 |
| | Cloutier | $11.20 | 8,036 |
| | McGraw | $11.20 | 9,040 |
| | Reynolds | $11.20 | at least 6,365 |

May 29, 2002 Grants

95.     The Compensation Committee had the authority to choose the date and, in fact, did choose the date on which these stock options were granted.  For the May 29, 2002 stock option grants, Defendants Billings, Jesse and Valette, as Compensation Committee members, had the authority to administer the stock option plans and grant stock options thereunder.

96.     Defendants Billings, Jesse and Valette were aware that the stock option plans required that stock options be granted at not less than fair market value on the date of grant. Defendants Billings, Jesse and Valette approved these grants on a date after the reported grant date and knowingly used hindsight to select a favorable date.  Defendants Billings, Jesse and Valette knew that backdating option grants to a date with a lower price violated the 2000 Plan.

97.     Defendants Billings, Jesse and Valette granted stock options to Defendants Mottern, O'Dea, Lilla, Rudolph, Mehrberg, Cloutier, McGraw and Reynolds that were backdated to May 29, 2002 with the knowledge that May 29, 2002 was not the date that they approved the grants.  Furthermore, Defendants Mottern and Baldwin also knew that the grants were backdated.

98.     Defendants Billings, Jesse and Valette, with the participation and knowledge of Mottern and Baldwin, granted stock options backdated to May 29, 2002 of which President and CEO O'Dea received 600,000.  The actual grant date of the May 29, 2002 grants is between May 30, 2002 and June 30, 2002, a month later, by which point Peet's closing price rose $2.92, or 18.85%, following the purported grant date, as demonstrated below:









| Purported Date of Grant | Name | Exercise Price | Number of Options |
|---|---|---|---|

| 05/29/02 | Mottern | $15.49 | 9,984 |
|----------|---------|--------|-------|
| | O'Dea | $15.49 | 600,000 |
| | Lilla | $15.49 | 9,984 |
| | Rudolph | $15.49 | 9,984 |
| | Mehrberg | $15.49 | 9,984 |
| | Cloutier | $15.49 | 9,984 |
| | McGraw | $15.49 | 9,984 |
| | Reynolds | $15.49 | 9,984 |

99.     Prior to the enactment of the Sarbanes-Oxley Act of 2002 ("SOX"), Defendants were able to engage in backdating of option grants with relative ease because under federal law they were only required to report option grants to the SEC once a year.  Pursuant to SOX, beginning on August 29, 2002, executives and directors were required to report option grants to the SEC within two days of the grant.

100.     Notwithstanding the SOX reporting requirement, Cloutier, Grimes, Lilla, Mehrberg and Reynolds *never* reported their February 10, 2003 stock option grants in a Form 4 Filing, while O'Dea did not report his February 10, 2003 grant until July 23, 2003.

February 10, 2003 Grants

101.     The Compensation Committee had the authority to choose the date and, in fact, did choose the date on which these stock options were granted.  For the February 10, 2003 stock option grants, Defendants Billings, Jesse and Valette, as Compensation Committee members, had the authority to administer the stock option plans and grant stock options thereunder.

102.     Defendants Billings, Jesse and Valette were aware that the stock option plans required that stock options be granted at not less than fair market value on the date of grant. Defendants Billings, Jesse and Valette approved these grants on a date after the reported grant date and knowingly used hindsight to select a favorable date.  Defendants Billings, Jesse and Valette knew that backdating option grants to a date with a lower price violated the 2000 Plan.

103.     Defendants Billings, Jesse and Valette granted stock options to defendants O'Dea, Cloutier, Grimes, Lilla, Mehrberg and Reynolds purportedly on February 10, 2003. However, Billings, Jesse and Valette who approved the grants knew that February 10, 2003 was not the actual date of their approval of the grants, which actually took place at a later date — some time

between the next trading day on February 11, 2003 and the disclosure date of July 23, 2003. Because of their involvement in the running of the Company, O'Dea, Peet's President and CEO, and Baldwin also knew that the February 11, 2003 grants were backdated.

104.    Between the purported grant date of February 10, 2003 and the disclosure date of July 23, 2003, Peet's closing price rose $4.90, or 37.75%, as demonstrated below:



| Purported Date of Grant | Name | Exercise Price | Number of Options |
|---|---|---|---|
| 02/10/03 | O'Dea | $12.98 | 50,000 |
| | Cloutier | $12.98 | 10,015 |
| | Grimes | $12.98 | 25,000 |
| | Lilla | $12.98 | 15,023 |
| | Mehrberg | $12.98 | 25,000 |
| | Reynolds | $12.98 | at least 2,500 |

105.   100% (5 of 5) of the discretionary grants made between February 2001 and February 2003 that were disclosed in proxy statements and Form 4s and 5s were backdated to coincide with particularly low closing prices.  Moreover, all of those grants were made to certain of the top five compensated executives as disclosed in the Company's proxy statements.

106.   In addition, each and every one of the aforementioned stock option grants was dated just before a significant increase in Peet's stock price.  The reason for the extraordinary pattern set forth in the preceding paragraphs is that the purported grant dates set forth therein were not the actual dates on which the stock option grants were made.  Rather, at the behest of the option recipients (O'Dea, Cloutier, Grimes, Lilla, MacLaren, McGraw, Mehrberg, Mottern, Reynolds, Rudolph and Welsh), the Compensation Committee members Billings, Jesse and Valette, with the knowledge and approval of O'Dea, Mottern and Baldwin, knowingly and deliberately backdated the stock option grants to make it appear as though the grants were made on dates when the market price of Peet's stock was lower than the market price on the actual grant dates.  This improper backdating, which violated the terms of the 2000 Plan, resulted in option grants with lower exercise prices, which improperly increased the value of the options and improperly reduced the amounts Defendants O'Dea, Cloutier, Grimes, Lilla, MacLaren, McGraw, Mehrberg, Mottern, Reynolds, Rudolph and Welsh had to pay the Company upon exercise of the options.

**Peet's Admission of Backdating**

107. On February 22, 2007, the Company issued a press release, admitting to misdating of their stock option grants:

> Peet's Coffee and Tea, Inc. (Nasdaq: PEET) today announced that the Option Review Committee of its Board of Directors has completed its voluntary review of the Company's historical stock option granting practices. As previously announced, the review was conducted with the assistance of independent legal counsel, Shartsis Friese LLP, which was retained by the Committee in October 2006. Shartsis Friese also retained KPMG LLP as a consultant, and KPMG has conducted its own investigation and review of information relevant to the Company's stock option granting practices. The Committee's findings and recommendations have been discussed with the Company's independent registered public accounting firm, Deloitte & Touche LLP.

> The Committee's review covered the period from the Company's 2001 initial public offering to August 2006. The Committee reported that its independent counsel received full cooperation from Company management, was given complete access to all potentially necessary and relevant electronic and other documents, and interviewed all key persons who were and are primarily involved in the stock option granting process at the Company, as well as the Company's outside counsel and accountants.

> * * *

> Based upon the Committee's findings, *the Company has concluded that it incorrectly applied the measurement date, as defined in Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees," with respect to certain stock option grants made from 2001 to 2006.* Additionally, the Company found other isolated instances of inaccurate accounting for stock option grants during this period.

> In order to correct the accounting errors that resulted from the misapplication of the measurement date and other stock option-related corrections, the Company *expects to restate its previously issued consolidated financial statements to record non-cash, pre-tax compensation expense totaling approximately $1.7 million.* Of the total adjustment, all but approximately $95,000 relates to grants made prior to June 2002. The amounts of the restatement and related expenses are subject to adjustment pending finalization by the Company. No current executive officer of the Company received any option that will be included in the restatement.

> In addition to the restatement charge, the Company expects to recognize $2.4 million of pre-tax expense related to conducting the investigation, with $1.8 million being incurred in its 2006 fiscal fourth quarter and approximately $0.6 million incurred in the first quarter of 2007. As recently announced, certain of the Company's current and former directors and officers have been named as defendants in stockholder derivative lawsuits relating to the Company's past option grant practices. The costs and any potential liabilities that the Company may incur in connection

1    with such lawsuits have not been included in the charges and costs referred
     to above.

2    The Company expects to file its Form 10-K for the fiscal year ended
3    December 31, 2006 reflecting the restatement, as well as amended Forms
     10-Q for the first two quarters of 2006 and its delayed Form 10-Q for the
     third quarter of 2006, by April 2, 2007.
4
5    (emphasis added).

6        108.    Although Peet's admitted to the misdating of its stock option grants, Peet's

7    claimed that:

8    The Committee's final report indicates that neither Shartsis Friese nor
     KPMG have found evidence that there was any deliberate attempt to
9    manipulate the price at which any stock option was granted nor the date of
     the grant in order to benefit the grant recipient or the Company. The
10   Committee also reported that they have not discovered any evidence of
     intentional wrongdoing by any Peet's employee or Board member. In its
11   final report, the Committee did conclude the Company had a lack of
     documentation and internal controls in connection with the stock
12   administration system, particularly in the 2001 to 2003 period.

13       109.    Such a statement ignores the Company's own admission that there was some

14   misdating of grants from 2001 to 2006 and cannot be squared with the striking pattern of the

15   2001-2003 stock option grants, which demonstrates knowing and intentional backdating to dates

16   when Peet's stock was at historical lows.   As stated herein, the Compensation Committee

17   members Billings, Jesse and Valette, with the knowing participation of O'Dea, Mottern and

18   Baldwin, knowingly and deliberately continued to manipulate stock option grants and should

19   therefore be held accountable for participating in the backdating scheme.   In addition, the

20   Company failed to provide explanations of the lack of documentation and internal controls and

21   also did not disclose specific details with respect to those it found responsible for the misdating

22   of Peet's stock options.  As such, Peet's statement noted above should be disregarded.

23                    **BACKDATING CAUSED HARM TO THE COMPANY**

24       110.    As a result of the backdating and other manipulation of options issued to

25   Defendants O'Dea, Cloutier, Grimes, Lilla, MacLaren, McGraw, Mehrberg, Mottern, Reynolds,

26   Rudolph and Welsh, they have been unjustly enriched in the amount of millions of dollars at the

27   expense of the Company.  The Company has received and will receive less money from these

28

1  defendants when they exercise their options at prices substantially lower than they would have if

2  the options had not been backdated.

3  **Restatement of Peet's Financial Statements**

4      111.    The practice of backdating stock options not only lined the pockets of the

5  Company's executives at the direct expense of the Company and the shareholders but also

6  resulted in the overstatement of the Company's net income. This is because options priced

7  below the stock's fair market value when they were awarded brought the recipient an instant

8  paper gain that must be accounted for as additional compensation and treated as an expense to

9  the Company. Indeed, the Company restated its historical financial results to account for

10  additional stock-based compensation totaling *approximately $1.7 million*.

11      112.    The Option Review Committee concluded that, pursuant to the requirements of

12  APB 25, different accounting measurement dates for the purpose of computing compensation

13  costs for certain stock option grants should have been used. Furthermore, the additional non-

14  cash stock-based compensation expense under the revised calculations will have the effect of

15  decreasing reported net income or increasing reported net loss, and increasing the reported

16  accumulated deficit contained in the Company's historical financial statements.

17      113.    On April 2, 2007, Peet's filed its financial results the fiscal year ended December

18  31, 2006, which included restatements of the following previously filed financial statements and

19  data:

20          This annual report on Form 10-K for the fiscal year ended December 31,
2006 ("Form 10-K") includes the restatement of our consolidated

21  financial statements and the related disclosures as of January 1, 2006 and
for the two fiscals year ended January 1, 2006 resulting from the (i)

22  previously disclosed voluntary review of historical stock option grant
practices and (ii) incorrect methodology used to allocate procurement and

23  production costs into inventory. In this Form 10-K, we have restated our
consolidated balance sheet as of January 1, 2006 and the related

24  consolidated statements of income, shareholders' equity, and cash flows
for the years ended January 1, 2006 (fiscal 2005) and January 2, 2005

25  (fiscal 2004) and quarterly data for fiscal years 2006 and 2005. In
addition, the following items of this Form 10-K include restated financial

26  data: (i) Part II, Item 6—Selected Financial Data; (ii) Part II, Item 7 –
Management's Discussion and Analysis of Financial Condition and

27  Results of Operations; and (iii) Part II, Item 8 – Financial Statements and
Supplementary Data.

28
AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
CASE NO. C07-00740-SI
-35-

1

2     114.    In addition to the serious and adverse tax consequences, which resulted from the

3     Company's failure to record the additional non-cash stock-based compensation, Peet's faces

4     substantial costs associated with the Special Committee's internal investigation and the related

5     restatements.    In the Company's February 22, 2007 press release, Peet's admitted that "[i]n

6     addition to the restatement charge, the Company expects to recognize *$2.4 million of pre-tax*

7     *expense related to conducting the investigation*, with $1.8 million being incurred in its 2006

8     fiscal fourth quarter and approximately $0.6 million incurred in the first quarter of 2007."

9     (emphasis added).

### Dissemination of False Financial Statements

10    115.    As known by Defendants O'Dea, Mottern, Baldwin, Billings, Jesse and Valette,

11    their option backdating scheme caused each of Peet's Forms 10-K and 10-Qs for the relevant

12    period to materially understate Peet's compensation expense and materially overstate the

13    Company's net income, because Defendants failed to expense the in-the-money portion of Peet's

14    stock option grants during the period as required by APB 25.

15    116.    Particularly, defendants Jesse and Valette also served on the Audit Committee and

16    were well aware of GAAP and other accounting rules.  As such, they were aware of the material

17    effect  their  backdating  scheme  had  on  Peet's  financial  statements.     Furthermore,

18    Defendant O'Dea and Mottern as the Company's President and CEO during the relevant period

19    knowingly made false statements in Peet's financial reports.  Defendants O'Dea, Mottern, Jesse

20    and Valette knew that, as a result of their misconduct, the compensation expenses were

21    understated and thus their net income was overstated.

22    117.    As a result of the improper backdating of stock options, the Company, with the

23    knowledge, approval, and participation of Defendants O'Dea, Mottern, Baldwin, Billings, Jesse

24    and Valette:

25            a.      violated the terms of the 2000 Plan by granting stock options with
26                    exercise prices less than the fair market value of the stock on the
                      actual date of grant;
27
              b.      violated GAAP by failing to recognize compensation expenses
28

incurred when the improperly backdated options were granted;

    c.    violated Section 162(m) by taking tax deductions based on stock option grants that were not payable solely on account of the attainment of one or more performance goals and violated the terms of the 2000 Plan; and

    d.    produced and disseminated to Peet's shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants, and thereby understated compensation expenses and overstated net income.

118.    The Company, with the knowledge, approval, and participation of Defendants O'Dea, Mottern, Baldwin, Billings, Jesse and Valette, disseminated its false financial statements in, *inter alia*, the following Form 10-K filings:

    a.    Form 10-K for the year ended December 31, 2001, filed with the SEC on March 28, 2002, and signed by defendants Mottern, Rudolph, Baldwin, Jesse, Valette and Billings;

    b.    Form 10-K for the year ended December 31, 2002, filed with the SEC on March 31, 2003, and signed by defendants O'Dea, Rudolph, Mottern, Baldwin, Billings, Jesse and Valette;

    c.    Form 10-K for the year ended December 31, 2003, filed with the SEC on March 12, 2004, and signed by defendants O'Dea, Valette, Baldwin, Billings, Jesse and Mottern;

    d.    Form 10-K for the year ended December 31, 2004, filed with the SEC on March 18, 2005, and signed by defendants O'Dea, Valette, Baldwin, Billings and Jesse; and

    e.    Form 10-K for the year ended December 31, 2005, filed with the SEC on March 16, 2006, and signed by defendants O'Dea, Valette, Baldwin, Billings and Jesse.

119.    Furthermore, Peet's executives, including defendants O'Dea, Cloutier, Grimes, Lilla, MacLaren, McGraw, Mehrberg, Mottern, Reynolds, Rudolph and Welsh, were overpaid improper cash bonuses based on the foregoing false and misleading financial information that should be repaid to the Company.

2001 Form 10-K

120.    On or about March 28, 2002, Peet's filed its 2001 Report on Form 10-K with the SEC. Defendants Mottern, Baldwin, Billings, Jesse and Valette approved and signed the Form

1   10-K that included Peet's 2001 financial statements, which they knew were materially false and

2   misleading and presented in violation of GAAP, due to improper accounting for the backdated

3   stock options.  As stated above, Audit Committee and Compensation Committee members Jesse

4   and Valette, with the knowledge and participation of defendants Mottern, Baldwin and Billings,

5   knowingly backdated the stock option grants to February 25, 2001 and June 5, 2001 when Peet's

6   stock price was lower than the actual grant date.  Defendants Mottern, Baldwin, Billings, Jesse

7   and Valette knew that the grants were approved on dates after the purported grant dates.

8   Furthermore, these defendants granted these improperly priced and dated options for the benefit

9   of Company insiders to the detriment of the Company.   As a result, defendants Mottern,

10  Baldwin, Billings, Jesse and Valette knew that Peet's compensation expense was understated and

11  its net earnings were overstated and thus knowingly approved the false Form 10-K for fiscal year

12  2001 filed on March 28, 2002.

13      121.   In addition, Defendants Mottern, Baldwin, Billings, Jesse and Valette made the

14  following misrepresentations about option plans in the 2001 Report on Form 10-K:

> In 1994, the Company established two stock option plans, of which one is inclusive of California residents only, both of which provide for incentive and nonqualified stock options for the purchase of 831,600 shares of common stock of the Company. During 1999, the Board of Directors approved a reduction of 208,914 shares available under these plans. Incentive stock options may be granted to employees of the Company. Nonqualified stock options may be granted only to employees, directors, officers, agents, consultants or advisors of the Company. The purchase price of the common stock issuable under the stock option plans is determined by the Board of Directors and may not be less than the fair market value of the common stock at the grant date for incentive stock options and not less than 85% of the fair market value of the common stock at the grant date for nonqualified stock options. The term of a granted stock option is 10 years from the grant date. Stock options granted through December 30, 1994 vest 20% on each anniversary of the employee's date of hire and, accordingly, are fully vested and exercisable after five years of employment. Stock options granted subsequent to December 30, 1994 generally vest over three to four years.

> In 1997, the Company adopted a successor equity incentive plan to the Company's existing stock option plans, which provides a means by which selected employees, directors, and consultants of the Company may benefit from increased stock value through the granting of incentive and nonstatutory stock options. The Company has reserved 1,280,000 shares of common stock for issuance pursuant to the plan. The purchase price of the common stock issuable under this plan is determined by the Board of

Directors, however may not be less than 85% of the fair market value of common stock at the grant date. The term of a granted stock option is 10 years from the grant date. Stock options generally vest over three to four years.

In 2000, the Company adopted a new stock option plan (effective January 24, 2001). The Company has reserved 700,000 shares of common stock for issuance pursuant to the plan. As of each annual meeting of the Company's shareholders, beginning in 2002, and continuing through and including the annual meeting of the Company's shareholders in 2010, the number of shares of common stock reserved for issuance under the 2000 plan will be increased automatically by the lesser of (i) three percent (3%) of the total number of shares of common stock outstanding on such date, (ii) five hundred thousand (500,000) shares, or (iii) a number of shares determined by the Board prior to such date, which number shall be less than (i) and (ii) above. The purchase price of the common stock issuable under this plan is determined by the Board of Directors, however may not be less than 85% of the fair market value of common stock at the grant date. The term of a granted stock option is 10 years from the grant date. All stock options vest at a minimum rate of 20% per year.

122.   As detailed above, this statement was knowingly false and misleading because the stock options purportedly dated February 25, 2001 and June 5, 2001 were not granted at fair market value on the date of grant but in fact had an exercise price less than the stock price on the actual date of grant.   Defendants Mottern, Baldwin, Billings, Jesse and Valette knew the statement was false and misleading when they made the representation in the 2001 Form 10-K because they were involved in the backdating of the foregoing 2001 stock option grants.

123.   Furthermore, Defendants Mottern, Baldwin, Billings, Jesse and Valette caused Peet's to falsely state in the 2001 Form 10-K that, the Company "accounts for its stock-based awards using the intrinsic value method in accordance with Accounting Principles Board Opinion No. 25, Accounting for Stock Issued to Employees, and its related interpretations. Accordingly, no compensation cost has been recognized for the stock option awards granted at fair market value."   This statement was materially false and misleading because Mottern, Baldwin, Billings, Jesse and Valette knowingly granted stock options at prices that were below fair market value on the date of the grant and failed to account for the in-the-money options as required by APB 25.

124.   The 2001 Form 10-K was signed by defendants Mottern, Rudolph, Baldwin, Jesse, Valette and Billings and because of their involvement in the backdating scheme, Mottern,

1  Baldwin, Billings, Jesse and Valette knowingly approved the filing of the false Form 10-K for

2  fiscal year 2001.

3  The 2002 Form 10-K

4  125.  On or about March 31, 2003, Peet's filed its 2002 Report on Form 10-K with the

5  SEC. Defendants O'Dea, Mottern, Baldwin, Billings, Jesse and Valette approved and signed the

6  Form 10-K that included Peet's 2002 financial statements, which they knew were materially

7  false and misleading and presented in violation of GAAP, due to improper accounting for the

8  backdated stock options.  As stated above, Audit Committee and Compensation Committee

9  members, Jesse and Valette, with the knowledge and participation of defendants O'Dea, Mottern,

10  Baldwin and Billings, knowingly backdated the stock option grants to December 31, 2001 and

11  May 29, 2002 when Peet's stock price was lower than the actual grant date. Defendants O'Dea,

12  Mottern, Baldwin, Billings, Jesse and Valette knew that the grant was approved at a later date.

13  Furthermore, these defendants granted these improperly priced and dated options for the benefit

14  of Company insiders to the detriment of the Company.  As a result, defendants O'Dea, Mottern,

15  Baldwin, Billings, Jesse and Valette knew that Peet's compensation expense was understated and

16  its net earnings were overstated and thus knowingly approved the false Form 10-K for fiscal year

17  2002 filed on March 31, 2003.

18  126.  In addition, Defendants O'Dea, Mottern, Baldwin, Billings, Jesse and Valette

19  made the following false and misleading statements about the Company's stock option plans in

20  the 2002 Report on Form 10-K:

> In 1994, the Company established two stock option plans, of which one includes only California residents, both of which provide for incentive and nonqualified stock options for the purchase of 831,600 shares of common stock of the Company. During 1999, the Board of Directors approved a reduction of 208,914 shares available under these plans. Incentive stock options may be granted to employees of the Company. Nonqualified stock options may be granted only to employees, directors, officers, agents, consultants or advisors of the Company. The purchase price of the common stock issuable under the stock option plans is determined by the Board of Directors and may not be less than the fair market value of the common stock at the grant date for incentive stock options and not less than 85% of the fair market value of the common stock at the grant date for nonqualified stock options. The term of a granted stock option is 10 years from the grant date. Stock options granted through December 30,

1994 vest 20% on each anniversary of the employee's date of hire and, accordingly, are fully vested and exercisable after five years of employment. Stock options granted subsequent to December 30, 1994 generally vest over three to four years.   In 1997, the Company adopted a successor equity incentive plan to the Company's existing stock option plans, which provides a means by which selected employees, directors, and consultants of the Company may benefit from increased stock value through the granting of incentive and nonstatutory stock options. The Company has reserved 1,280,000 shares of common stock for issuance pursuant to the plan. The purchase price of the common stock issuable under this plan is determined by the Board of Directors, however may not be less than 85% of the fair market value of common stock at the grant date. The term of a granted stock option is 10 years from the grant date. Stock options generally vest over three to four years.

In 2000, the Company adopted a new stock option plan (effective January 24, 2001). The Company had reserved 700,000 shares of common stock for issuance pursuant to the plan. As of each annual meeting of Company's shareholders, beginning in 2002, and continuing through and including the annual meeting of the Company's shareholders in 2010, the number of shares of common stock reserved for issuance under the 2000 plan will be increased automatically by the lesser of (i) three percent (3%) of the total number of shares of common stock outstanding on such date, (ii) five hundred thousand (500,000) shares, or (iii) a number of shares determined by the Board prior to such date, which number shall be less than (i) and (ii) above. At the May 2002 annual meeting, the shareholders approved an amendment to the plan to increase the aggregate number of shares of common stock authorized for issuance by 800,000 shares and to increase the annual increase of shares reserved for issuance from 3% to 5%. The purchase price of the common stock issuable under this plan is determined by the Board of Directors, however may not be less than 85% of the fair market value of common stock at the grant date. The term of a granted stock option is 10 years from the grant date. All stock options vest at a minimum rate of 20% per year.

127.    As detailed above, this statement was knowingly false and misleading because the stock options purportedly dated December 31, 2001 and May 29, 2002 were not granted at fair market value on the date of grant but in fact had an exercise price less than the stock price on the actual date of grant.  Defendants O'Dea, Mottern, Baldwin, Billings, Jesse and Valette knew the statement was false and misleading when they made the representation in the 2002 Form 10-K because they were involved in the backdating of the stock option grants dated December 31, 2001 and May 29, 2002, as detailed above.

128.    Furthermore, Defendants O'Dea, Mottern, Baldwin, Billings, Jesse and Valette caused Peet's to falsely state in the 2002 Form 10-K that, the Company "accounts for stock-based awards to employees using the intrinsic value method in accordance with Accounting

1  Principle Board, (APB), No. 25, Accounting for Stock Issued to Employees. Accordingly, no

2  compensation cost has been recognized for the stock option awards granted at fair market value."

3  This statement was materially false and misleading because O'Dea, Mottern, Baldwin, Billings,

4  Jesse and Valette knowingly granted stock options at prices that were below fair market value on

5  the date of the grant and failed to account for the in-the-money options as required by APB 25.

6      129.   The 2002 Form 10-K was signed by defendants O'Dea, Rudolph, Mottern,

7  Baldwin, Billings, Jesse and Valette and because of their involvement in the backdating scheme,

8  O'Dea, Mottern, Baldwin, Billings, Jesse and Valette knowingly approved the filing of the false

9  Form 10-K for fiscal year 2002.

10     130.   Defendant O'Dea signed a Certification of Chief Executive Officer Pursuant to 18

11  U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002,

12  which attested to the purported accuracy of the financial statements contained in the 2002 annual

13  report, the effectiveness of the internal controls, and compliance with Section 13(a) of the

14  Exchange Act, when he knew that this Certification was false and misleading.  Because of his

15  involvement in the backdating scheme, Defendant O'Dea knew that the 2002 financial results

16  understated compensation expenses and overstated net income.  In the 2002 Certification, O'Dea

17  made the following false and misleading certification: "(1) The Company's Annual Report on

18  Form 10-K for the period ended December 29, 2002 . . . complies with the requirements of

19  section 13(a) or section 15(d) of the Securities Exchange Act of 1934, and (2) The

20  information contained in the Periodic Report fairly presents, in all material respects, the

21  financial condition and results of operations of the Company."

22  The 2003 Form 10-K

23     131.   On or about March 12, 2004, Peet's filed its 2003 Report on Form 10-K with the

24  SEC. Defendants O'Dea, Mottern, Baldwin, Billings, Jesse and Valette approved and signed the

25  Form 10-K that included Peet's 2003 financial statements, which they knew were materially

26  false and misleading and presented in violation of GAAP, due to improper accounting for the

27  backdated stock options.  As stated above, Audit Committee and Compensation Committee

28

1    members, Jesse and Valette, with the knowledge and participation of defendants O'Dea, Mottern,

2    Baldwin and Billings, knowingly backdated the stock option grants to February 10, 2003 when

3    Peet's stock price was lower than the actual grant date. Defendants O'Dea, Mottern, Baldwin,

4    Billings, Jesse and Valette knew that the grant was approved at a later date. Furthermore, these

5    defendants granted these improperly priced and dated options for the benefit of Company

6    insiders to the detriment of the Company. As a result, defendants O'Dea, Mottern, Baldwin,

7    Billings, Jesse and Valette knew that Peet's compensation expense was understated and its net

8    earnings were overstated and thus knowingly approved the false Form 10-K for fiscal year 2003

9    filed on March 12, 2004.

10         132.    Defendants O'Dea, Mottern, Baldwin, Billings, Jesse and Valette caused Peet's to

11    falsely state in the 2003 Form 10-K that, the Company has "chosen certain accounting policies

12    when options are available, including the intrinsic value method under APB Opinion No. 25,

13    'Accounting for Stock Issued to Employees,' to account for our stock option awards. These

14    accounting policies are applied consistently for all years presented." This statement was

15    materially false and misleading because O'Dea, Mottern, Baldwin, Billings, Jesse and Valette

16    knowingly granted stock options at prices that were below fair market value on the date of the

17    grant and failed to account for the in-the-money options as required by APB 25.

18         133.    The 2003 Form 10-K was signed by defendants O'Dea, Valette, Baldwin,

19    Billings, Jesse and Mottern and because of their involvement in the backdating scheme, these

20    defendants knowingly approved the filing of the false Form 10-K for fiscal year 2003.

21         134.    Defendant O'Dea signed a Certification of Chief Executive Officer Pursuant to 18

22    U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002,

23    which attested to the purported accuracy of the financial statements contained in the 2003 annual

24    report, the effectiveness of the internal controls, and compliance with Section 13(a) of the

25    Exchange Act, when he knew that this Certification was false and misleading. Because of his

26    involvement in the backdating scheme, Defendant O'Dea knew that the 2003 financial results

27    understated compensation expenses and overstated net income. In the 2003 Certification, O'Dea

28

1   made the following false and misleading certification: "(1) The Company's Annual Report on

2   Form 10-K for the period ended December 28, 2003 . . . fully complies with the requirements of

3   section 13(a) or section 15(d) of the Securities Exchange Act of 1934, and (2) The

4   information contained in the Annual Report fairly presents, in all material respects, the

5   financial condition and results of operations of the Company."

6   The 2004 Form 10-K

7          135.    On or about March 18, 2005, Peet's filed its 2004 Report on Form 10-K with the

8   SEC. Defendants O'Dea, Baldwin, Billings, Jesse and Valette approved and signed the Form 10-

9   K that included Peet's 2004 financial statements as well as the 2001-2003 financial statements,

10  which they knew were materially false and misleading and presented in violation of GAAP, due

11  to improper accounting for the backdated stock options. As stated above, Audit Committee and

12  Compensation Committee members, Jesse and Valette, with the knowledge and participation of

13  defendants O'Dea, Baldwin and Billings, knowingly backdated the stock option grants from

14  February 2001 to February 2003 when Peet's stock price was lower than the actual grant date.

15  Defendants O'Dea, Baldwin, Billings, Jesse and Valette knew that the grant was approved at a

16  later date. Furthermore, these defendants granted these improperly priced and dated options for

17  the benefit of Company insiders to the detriment of the Company. As a result, defendants

18  O'Dea, Baldwin, Billings, Jesse and Valette knew that Peet's compensation expense was

19  understated and its net earnings were overstated and thus knowingly approved the false Form 10-

20  K for fiscal year 2004 filed on March 18, 2005.

21          136.    Furthermore, Defendants O'Dea, Baldwin, Billings, Jesse and Valette caused

22  Peet's to falsely state in the 2004 Form 10-K that, the Company "accounts for stock-based

23  awards to employees using the intrinsic value method in accordance with Accounting Principle

24  Board No. 25, Accounting for Stock Issued to Employees. Accordingly, no compensation cost

25  has been recognized for the stock option awards granted at fair market value." This statement

26  was materially false and misleading because O'Dea, Baldwin, Billings, Jesse and Valette

27

28

1  knowingly granted stock options at prices that were below fair market value on the date of the
2  grant and failed to account for the in-the-money options as required by APB 25.

3      137.   The 2004 Form 10-K was signed by defendants O'Dea, Valette, Baldwin,
4  Billings, and Jesse and because of their involvement in the backdating scheme, these defendants
5  knowingly approved the filing of the false Form 10-K for fiscal year 2004.

6      138.   Defendant O'Dea signed a Certification of Chief Executive Officer Pursuant to 18
7  U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002,
8  which attested to the purported accuracy of the financial statements contained in the 2004 annual
9  report, the effectiveness of the internal controls, and compliance with Section 13(a) of the
10  Exchange Act, when he knew that this Certification was false and misleading.  Because of his
11  involvement in the backdating scheme, Defendant O'Dea knew that the 2004 financial results
12  understated compensation expenses and overstated net income.  In the 2004 Certification, O'Dea
13  made the following false and misleading certification: "(1) The Company's annual report on
14  Form 10-K for the period ended January 2, 2005, to which this Certification is attached as
15  Exhibit 32.1 (the "Annual Report" ) fully complies with the requirements of section 13(a) or
16  section 15(d) of the Securities Exchange Act of 1934, and (2) The information contained in the
17  Annual Report fairly presents, in all material respects, the financial condition and results of
18  operations of the Company."

19  The 2005 Form 10-K

20      139.   On or about March 16, 2006, Peet's filed its 2005 Report on Form 10-K with the
21  SEC.  Defendants O'Dea, Baldwin, Billings, Jesse and Valette approved and signed the Form
22  10-K that included Peet's 2005 financial statements as well as the 2001-2003 financial
23  statements, which they knew were materially false and misleading and presented in violation of
24  GAAP, due to improper accounting for the backdated stock options.  As stated above, Audit
25  Committee and Compensation Committee members, Jesse and Valette, with the knowledge and
26  participation of defendants O'Dea, Baldwin and Billings, knowingly backdated the stock option
27  grants from February 2001 to February 2003 when Peet's stock price was lower than the actual

28

1  grant date.  Defendants O'Dea, Baldwin, Billings, Jesse and Valette knew that the grant was
2  approved at a later date.  Furthermore, these defendants granted these improperly priced and
3  dated options for the benefit of Company insiders to the detriment of the Company.  As a result,
4  defendants O'Dea, Baldwin, Billings, Jesse and Valette knew that Peet's compensation expense
5  was understated and its net earnings were overstated and thus knowingly approved the false
6  Form 10-K for fiscal year 2005 filed on March 16, 2006.

7  140.  Furthermore, Defendants O'Dea, Baldwin, Billings, Jesse and Valette caused
8  Peet's to falsely state in the 2005 Form 10-K that, the Company "accounts for stock-based
9  awards to employees using the intrinsic value method in accordance with Accounting Principle
10 Board, (APB), No. 25, Accounting for Stock Issued to Employees.  Accordingly, no
11 compensation cost has been recognized for the stock option awards granted at fair market value."
12 This statement was materially false and misleading because O'Dea, Baldwin, Billings, Jesse and
13 Valette knowingly granted stock options at prices that were below fair market value on the date
14 of the grant and failed to account for the in-the-money options as required by APB 25.

15 141.  The 2005 Form 10-K was signed by defendants O'Dea, Valette, Baldwin, Billings
16 and Jesse, and because of their involvement in the backdating scheme, these defendants
17 knowingly approved the filing of the false Form 10-K for fiscal year 2005.

18 142.  Defendant O'Dea signed a Certification of Chief Executive Officer Pursuant to 18
19 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002,
20 which attested to the purported accuracy of the financial statements contained in the 2005 annual
21 report, the effectiveness of the internal controls, and compliance with Section 13(a) of the
22 Exchange Act, when he knew that this Certification was false and misleading.  Because of his
23 involvement in the backdating scheme, Defendant O'Dea knew that the 2005 financial results
24 understated compensation expenses and overstated net income.  In the 2005 Certification, O'Dea
25 made the following false and misleading certification:  "(1) The Company's annual report on
26 Form 10-K for the period ended January 1, 2006, to which this Certification is attached as
27 Exhibit 32.1 (the "Annual Report" ) fully complies with the requirements of section 13(a) or

28

1  section 15(d) of the Securities Exchange Act of 1934, as amended, and (2) The information

2  contained in the Annual Report fairly presents, in all material respects, the financial condition

3  and results of operations of the Company."

**Defendants' Concealment of Their Misconduct**

5  143.  Defendants O'Dea, Mottern, Baldwin, Billings, Jesse and Valette caused Peet's to

6  disseminate to shareholders and to file with the SEC proxy statements in connection with the

7  Company's annual shareholder meetings and periodically for special shareholder meetings

8  during the Relevant Period. Defendants O'Dea, Mottern, Baldwin, Billings, Jesse and Valette

9  prepared and reviewed each proxy statement between 2002 and 2004 and knew that the proxies

10  were materially false and misleading. Each proxy statement sent to shareholders during this

11  period contained materially false and misleading disclosures or omitted information about Peet's

12  stock option practices, as detailed above. Moreover, O'Dea, Mottern, Baldwin, Billings, Jesse

13  and Valette knew that the proxies were materially false and misleading as they participated in the

14  backdating of stock option grants from February 2001 to February 2003.

15  144.  Peet's shareholders routinely relied upon the false and misleading proxy

16  statements issued by the Company and voted for the Company's stock option plans under which

17  these defendants backdated stock option grants in order to benefit Company insiders at the

18  expense of the Company and its shareholders.

19  145.  From 2002 to 2004, the Company, with the knowledge, approval, and

20  participation of Defendants O'Dea, Mottern, Baldwin, Billings, Jesse and Valette, for the

21  purpose and with the effect of concealing the improper option backdating, disseminated to

22  shareholders and filed with the SEC annual proxy statements that falsely reported the dates of

23  stock option grants to Defendants O'Dea, Cloutier, Grimes, Lilla, MacLaren, McGraw,

24  Mehrberg, Mottern, Reynolds, Rudolph and Welsh and falsely stated that options were granted to

25  these Defendants with an exercise price "equal to the fair market value of the Common Stock on

26  the date of grant."

27  2002 Proxy Statement

1    146.   Peet's proxy statement filed with the SEC on April 23, 2002 falsely reported that

2  options granted to Mottern, Lilla, Rudolph and Mehrberg were granted on February 25, 2001 and

3  June 5, 2001.

4    147.   In the proxy statement filed on April 23, 2002, the Compensation Committee

5  (Defendants Billings, Jesse and Valette) made the following representations about Peet's stock

6  option grants:

7        Stock options under the Company's stock option plans are used to underscore the
        common interests of shareholders and management. Options are granted to
8        executives to provide a continuing financial incentive to maximize long-term
        value to shareholders and to help make the executive's total compensation
9        opportunity competitive. Options may be tax-qualified incentive stock options or
        nonstatutory stock options. Options granted prior to the Company's initial public
10       offering typically had exercise prices set at 85% of the fair market value of the
        Common Stock on the date of the grant as determined by the Board of Directors.
11       Options granted after the Company's initial public offering typically have exercise
        prices set at the fair market value of the Common Stock on the date of grant. In
12       addition, because stock options generally become exercisable over a period of
        several years, options encourage executives to remain in the long-term employ of
13       the Company.

14    148.   Each of the above statements concerning the value of the stock options on the date

15  of grant was knowingly false and misleading because the options purportedly granted on

16  February 25, 2001 and June 5, 2001 were, in fact, backdated.  Thus, these grants were issued at

17  less than fair market value as reported by Compensation Committee members and as prohibited

18  by the 2000 Plan.  Contrary to the above representations, none of the backdated options were

19  ever approved by the shareholders, nor were shareholders ever aware of this illicit compensation.

20    149.   Moreover, the Report of the Compensation Committee disclosed in the 2002

21  proxy statement falsely stated the "[t]he Company's executive management program is designed

22  (i) to attract and retain outstanding executive officers capable of leading the Company to

23  fulfillment of its business objectives and (ii) to establish an appropriate link between executive

24  compensation and achievement of the Company's strategic and financial performance goals,

25  including the enhancement of shareholder value," when in fact the backdated stock options

26  provided the officers with immediate profits regardless of the Company's financial performance.

27

28

1    150.   Further still, the Peet's Board presented proposal for the amendment of the 2000

2  Plan for shareholder approval.  Peet's shareholders relied upon the false proxy statement and

3  voted for the amendment of the 2000 Plan while Defendants Mottern, Baldwin, Billings, Jesse

4  and Valette who disseminated the false proxy knew that stock options granted under the

5  Company's stock plans were backdated.

6  <u>2003 Proxy Statement</u>

7    151.   Peet's proxy statement filed with the SEC on April 22, 2003 falsely reported that

8  options granted to Mottern, Lilla, Rudolph and Mehrberg were granted on December 31, 2001,

9  and options granted to Mottern, O'Dea, Lilla, Rudolph and Mehrberg were granted on May 29,

10  2002, and that "[t]he exercise price per share of each option was equal to the fair market value of

11  the Common Stock on the date of grant."

12    152.   In the proxy statement filed on April 22, 2003, the Compensation Committee

13  (Defendants Billings, Jesse and Valette), made the following representations about Peet's stock

14  option grants:

> 15  Stock options under the Company's stock option plans are used to underscore the common interests of shareholders and management.
> 16  Options are granted to executives to provide a continuing financial incentive to maximize long-term value to shareholders and to help make
> 17  the executive's total compensation opportunity competitive. Options may be tax-qualified incentive stock options or nonstatutory stock options.
> 18  Options granted prior to the Company's initial public offering typically had exercise prices set at 85% of the fair market value of the Common
> 19  Stock on the date of the grant as determined by the Board of Directors. Options granted after the Company's initial public offering typically have
> 20  exercise prices set at the fair market value of the Common Stock on the date of grant. In addition, because stock options generally become
> 21  exercisable over a period of several years, options encourage executives to remain in the long-term employ of the Company.
> 22

23    153.   Each of the above statements concerning the value of the stock options on the date

24  of grant was knowingly false and misleading because the options purportedly granted on

25  December 31, 2001 and May 29, 2002 were, in fact, backdated.  Thus, these grants were issued

26  at less than fair market value as reported by Compensation Committee members and as

27  prohibited by the 2000 Plan.  Contrary to the above representations, none of the backdated

28

1   options were ever approved by the shareholders, nor were shareholders ever aware of this illicit
2   compensation.

3       154.    Moreover, the Report of the Compensation Committee disclosed in the 2003
4   proxy statement falsely stated the "[t]he Company's executive management program is designed
5   (i) to attract and retain outstanding executive officers capable of leading the Company to
6   fulfillment of its business objectives and (ii) to establish an appropriate link between executive
7   compensation and achievement of the Company's strategic and financial performance goals,
8   including the enhancement of shareholder value," when in fact the backdated stock options
9   provided the officers with immediate profits regardless of the Company's financial performance.

10  2004 Proxy Statement

11      155.    Peet's proxy statement filed with the SEC on April 23, 2004 falsely reported that
12  options granted to O'Dea, Cloutier, Grimes, Lilla and Mehrberg were granted on February 10,
13  2003, and that "[t]he exercise price per share of each option was equal to the fair market value of
14  the Common Stock on the date of grant."

15      156.    In the proxy statement filed on April 23, 2004, the Compensation Committee
16  (Defendants Billings, Jesse and Valette), made the following representations about Peet's stock
17  option grants:

18      Stock options under the Company's stock option plans are used to
19  underscore the common interests of shareholders and management.
     Options are granted to executives to provide a continuing financial
     incentive to maximize long-term value to shareholders and to help make
20   the executive's total compensation opportunity competitive. Options may
     be tax-qualified incentive stock options or nonstatutory stock options.
21   Options granted prior to the Company's initial public offering typically
     had exercise prices set at 85% of the fair market value of the Common
22   Stock on the date of the grant as determined by the Board of Directors.
     Options granted after the Company's initial public offering typically have
23   exercise prices set at the fair market value of the Common Stock on the
     date of grant. In addition, because stock options generally become
24   exercisable over a period of several years, options encourage executives to
     remain in the long-term employ of the Company.
25

26      157.    Each of the above statements concerning the value of the stock options on the date
27  of grant was knowingly false and misleading because the options purportedly granted on
28

1    February 10, 2003 were, in fact, backdated.  Thus, these grants were issued at less than fair

2    market value as reported by Compensation Committee members and as prohibited by the 2000

3    Plan.  Contrary to the above representations, none of the backdated options were ever approved

4    by the shareholders, nor were shareholders ever aware of this illicit compensation.

5          158.    Moreover, the Report of the Compensation Committee disclosed in the 2004

6    proxy statement falsely stated the "[t]he Company's executive compensation program is

7    designed (i) to attract and retain outstanding executive officers capable of leading the Company

8    to fulfillment of its business objectives and (ii) to establish an appropriate link between executive

9    compensation and achievement of the Company's strategic and financial performance goals,

10   including the enhancement of shareholder value," when in fact the backdated stock options

11   provided the officers with immediate profits regardless of the Company's financial performance.

12   **False Form 4s**

13         159.    From 2003 to 2005, Peet's, with the knowledge, approval and participation of

14   Defendants O'Dea, Mottern, Baldwin, Billings, Jesse and Valette, for the purpose and with the

15   effect of concealing the improper stock option backdating, filed with the SEC Form 4s that

16   falsely reported the dates of Peet's stock option grants to Defendants O'Dea, Cloutier, Grimes,

17   Lilla, MacLaren, McGraw, Mehrberg, Mottern, Reynolds, Rudolph and Welsh, as follows:

18/19        a.    Mottern's Form 4 filed with the SEC on September 3, 2003 falsely reported that options granted to Mottern had been granted on June 5, 2001;

20/21        b.    Reynolds' Form 4 filed with the SEC on November 4, 2003 falsely reported that options granted to Reynolds had been granted on February 25, 2001;

22/23        c.    Reynolds' Form 4 filed with the SEC on December 3, 2003 falsely reported that options granted to Reynolds had been granted on February 25, 2001 and June 5, 2001;

24/25        d.    Reynolds' Form 4 filed with the SEC on December 31, 2003 falsely reported that options granted to Reynolds had been granted on June 5, 2001;

26/27        e.    Reynolds' Form 4 filed with the SEC on February 19, 2004 falsely reported that options granted to Reynolds had been granted on June 5, 2001, December 31, 2001 and May 29, 2002;

28        f.    Mottern's Form 4 filed with the SEC on February 26, 2004 falsely reported

that options granted to Mottern had been granted on February 25, 2001;

g.  Reynolds' Form 4 filed with the SEC on March 29, 2004 falsely reported that options granted to Reynolds had been granted on February 25, 2001, May 29, 2002 and February 10, 2003;

h.  Reynolds' Form 4 filed with the SEC on April 30, 2004 falsely reported that options granted to Reynolds had been granted on February 25, 2001 and May 29, 2002;

i.  Welsh's Form 4 filed with the SEC on May 7, 2004 falsely reported that options granted to Welsh had been granted on February 25, 2001 and June 5, 2001;

j.  Grimes' Form 4 filed with the SEC on May 17, 2004 falsely reported that options granted to Grimes had been granted on February 10, 2003;

k.  Mottern's Form 4s filed with the SEC on May 27, 2004 and May 28, 2004 falsely reported that options granted to Mottern had been granted on February 25, 2001;

l.  Mottern's Form 4s filed with the SEC on June 1, 2004, June 3, 2004, June 17, 2004, August 6, 2004, August 18, 2004, August 20, 2004, September 2, 2004, September 07, 2004, November 4, 2004, December 7, 2004 and January 5, 2005, falsely reported that options granted to Mottern had been granted on February 25, 2001;

m.  Grimes' Form 4s filed with the SEC on March 28, 2005, April 20, 2005 and May 25, 2005 falsely reported that options granted to Grimes had been granted on February 10, 2003;

n.  Reynolds' Form 4 filed with the SEC on May 27, 2005 falsely reported that options granted to Reynolds had been granted on February 25, 2001; and

o.  Reynolds' Form 4 filed with the SEC on May 27, 2005 falsely reported that options granted to Reynolds had been granted on May 29, 2002.

**Backdating Revealed at Peet's**

160.    Defendants O'Dea, Mottern, Baldwin, Billings, Jesse and Valette continued to conceal their foregoing misconduct until November 7, 2006, when Peet's issued a press release announcing the formation of an Option Review Committee to perform a review of Company's historical stock option grants:

> The Company also announced today that on October 20, 2006, the Board of Directors appointed an Option Review Committee consisting of two independent directors to oversee a review of the Company's past stock option granting practices. This voluntary review was initiated in light of the recent media coverage regarding stock option granting practices of other publicly traded companies. This review involves examination of past stock option grants including those prior to the Company's initial public

offering in January 2001. The Committee is conducting this review with the assistance of independent legal counsel and accounting advisors. The Committee, on the Company's behalf, has voluntarily contacted the Securities and Exchange Commission staff to inform them about the ongoing review.

The Option Review Committee has not completed its factual investigation nor reached any conclusions, but it has discussed with the Audit Committee in general terms the information it has obtained through the interviews and document reviews completed to date. Following these discussions, Bill Jesse, Chairman of the Audit Committee, said, "Although we recognize there remains a significant amount of factual review yet to be done by the Option Review Committee and new information could be discovered at any time, the preliminary information that has been shared with us to date does not suggest to me that there was any purposeful misconduct by persons involved in the Company's past stock option grants."

Although the Option Review Committee's review is ongoing, the Audit Committee has concluded *the Company will most likely need to restate its historical financial statements to record additional non-cash stock-based compensation expense as a result of errors in recording the measurement date for certain stock option grants.* Any additional stock-based compensation expense recorded will not affect the Company's cash position or reported revenue for the third quarter of 2006 or any previous periods. Accordingly, the Company advises that its financial statements and related communications for periods commencing on or after January 1, 1996 should not be relied upon until the Option Review Committee completes its review and any adjustments that may result from the review of certain stock option grants have been determined and reflected in restated historical financial statements.

The Company does not expect to be in a position to announce final financial results for the third quarter until the Option Review Committee has completed its review. At this time, the Company does not expect to file its Form 10-Q for the third quarter by the November 13, 2006 due date.

(emphasis added).

161.    On November 22, 2007, Peet's issued a press release announcing a request for a hearing before the NASDAQ Panel:

Peet's Coffee & Tea, Inc. (Nasdaq: PEET) today announced that it will request a hearing before the NASDAQ Listing Qualifications Panel in response to the receipt of a NASDAQ Staff Determination letter indicating that the Company is not in compliance with the filing requirements for continued listing as set forth in Marketplace Rule 4310(c)(14). As anticipated, the letter was issued in accordance with NASDAQ procedures due to the Company's failure to file its Form 10-Q for the quarter ended October 1, 2006. Pending a decision by the Panel, the Company's shares will remain listed on The NASDAQ Global Select Market.

As previously announced by the Company on November 7, 2006, an Option Review Committee consisting of two independent members of its Board of Directors is conducting a voluntary review of the Company's stock option practices from 1996 through the current fiscal year. As a result of the ongoing review, the Company has been unable to file its Quarterly Report on Form 10-Q for the quarter ended October 1, 2006.

162.    On February 22, 2007, the Company issued a press release, announcing its conclusion that "it incorrectly applied the measurement date, as defined in Accounting Principles Board Opinion No. 25, 'Accounting for Stock Issued to Employees,' with respect to certain stock option grants made from 2001 to 2006."

163.    On April 2, 2007, the Company filed with the SEC its Form 10-K and Form 10-Q, restating its financial results to account for an additional $1.672 million and announcing the findings of its Option Review Committee:

As previously disclosed, on October 20, 2006, our Board of Directors appointed an Option Review Committee (the "Special Committee") consisting of two independent directors to oversee a review of the Company's past stock option granting practices. This voluntary review was initiated in light of the media coverage regarding stock option granting practices of other publicly traded companies. The Special Committee's review covered the period from the Company's 2001 initial public offering to August 2006. The Company also reviewed all options granted beginning in 1996. The review was conducted with the assistance of independent legal counsel and accounting experts (the "Review Team").

*Special Committee Findings*

The Review Team reviewed the facts and circumstances surrounding stock option grants made during the review period, which included grants made on 80 dates. The Review Team conducted an extensive investigation including the review of physical and electronic documents and interviews with current and former directors, officers, employees and advisors. Documents reviewed included final versions and electronically stored drafts of board and committee meeting minutes and unanimous written consents, communication records with the Company's Board of Directors and its Compensation Committee, grant lists and other documents. As part of its investigation, the Special Committee evaluated whether the correct measurement dates had been used under applicable accounting principles for the options granted. The measurement date as defined under Accounting Principles Board Opinion No. 25, Accounting for Stock Issued to Employees ("APB 25") and related interpretations, is the first date where there is evidence of proper approval and on which all of the following are known: (1) the individual employee who is entitled to receive the option grant, (2) the number of options that an individual employee is entitled to receive, and (3) the option's exercise price.

The Special Committee concluded its review and reported its findings to the Board of Directors on March 6, 2007. The Special Committee reported that based on their review of data and interviews, the Review Team did not find evidence that there was any deliberate attempt to manipulate the price at which any stock option was granted nor the date of the grant in order to benefit the grant recipient or Peet's. The Review Team also reported that they did not discover evidence of intentional wrongdoing by any Peet's employee or Board member. The Review Team did, however, discover a lack of documentation and internal controls in connection with our stock administration system, particularly in the 2001-2003 period.

Based on the work of the Special Committee and the Review Team, we have determined that we used an incorrect measurement date for financial accounting purposes for a number of stock option grants. These errors resulted primarily from misapplication of accounting standards related to the determination of certain measurement dates, as discussed below, which on a number of occasions resulted in employees receiving options with stated exercise prices higher or lower than the market prices on the revised measurement dates as determined by the applicable accounting standards. Accordingly, we sought to determine, based on the available evidence for each of the grants, when all prerequisites had been met in order to establish a revised measurement date for the granted options. In addition, we found instances in which the measurement dates for option grants were determined appropriately but the options were accounted for incorrectly. Based on these conclusions, we have restated the accompanying fiscal 2005 and 2004 consolidated financial statements to record additional non-cash stock-based compensation expense and related tax effects with regard to past stock option grants. The cumulative effect of these stock-based compensation adjustments, after tax, aggregate $1.0 million for fiscal years 1998 through 2005. The adjustments, after tax, for fiscal years 2005 and 2004 are $15,000 and $74,000, respectively.

* * *

Revised Measurement Dates. Based on available evidence, the Company applied the methodologies described below to determine the revised measurement dates under APB No. 25 for grants in the following categories: (1) annual grants to all Company employees ("All Employee Grants"); (2) bonus award option grants to directors and officers ("Bonus Grants"); and (3) grants in connection with the hiring and promotion of employees and other discretionary grants ("Other Grants").

• All Employee Grants—Since the Company's initial public offering in 2001, the Company has made an annual grant of stock options to all employees of the Company. These grants require approval by the Board of Directors or the Compensation Committee of the Board of Directors ("Compensation Committee"). The number of shares to be granted to each individual is based upon job level in the organization and years of service.

We determined that the fiscal 2001 grant was not approved at a Board of Directors or Compensation Committee meeting, but instead we used a unanimous written consent ("UWC") to obtain Board of Director approval. However, the UWC relating to the grant was not

1

2

fully executed by the grant date. We have determined the appropriate measurement date of this award to be the date the final Board member signature was obtained on the UWC.

3

4

5

6

7

We also determined that we used the incorrect measurement date for the fiscal 2002 grant. While Board of Directors approval was received for the shares to be issued and documented in a regularly scheduled board meeting, there was no evidence that the exercise price was determined on the stated date. We have determined the revised measurement date for this grant using our judgment of when the grant details were likely finalized, based on review of available evidence, such as e-mail communications, interviews and supporting facts and circumstances.

8

9

10

11

12

13

14

• Bonus Grants—In 2001, the Company began to grant stock options to director-level employees and above as incentive compensation. The number of options to be granted was determined using a predefined formula that utilizes the exercise price to determine the number of shares to be granted. For the 2001 and 2002 bonus grants, we determined we used an incorrect measurement date for accounting purposes because the list containing the names of grantees, the options awarded to each grantee, and/or the grant date was not evidenced to be approved and determined with finality until a date subsequent to the measurement dates we previously used. We determined the revised measurement dates for the 2001 and 2002 bonus grants based on the date when the formula used to compute the number of options granted to each employee was approved by the Board of Directors and there was evidence that the grant price was established.

15

16

17

18

19

20

21

22

23

24

• Other Grants—The Company also awarded options to key new hires, for promotions and in select situations to reward and retain key individuals. The Company's general practice has been to grant stock options on the date the employee started work, was promoted or was notified of a discretionary grant. The Company would obtain approval for these grants in two different ways: (1) for grants over 10,000 shares the Company required Board of Directors or Compensation Committee approval, and (2) beginning in February 2003, the Compensation Committee delegated authority to the Chief Executive Officer in his capacity as a member of the Board of Directors to approve grants up to 10,000 shares, as prior to that date the delegation was implied. In certain instances, the available documentation for the grants did not support the original measurement date as all the terms of the grant were not approved and known with finality at the stated grant date. We used the methodology described below for: 1) grants requiring Board of Directors or Compensation Committee approval and 2) grants where granting authority was delegated to the Chief Executive Officer.

25

26

27

Other Grants requiring Board of Directors or Compensation Committee approval—We determined the revised measurement date for each stock option grant that requires Board of Directors or Compensation Committee approval to be the Approval Date (as defined below) for the stock option, provided the criteria set forth below were met. If there was not clear documentation supporting the

28

Approval Date, we used the evidence described below to determine the most likely measurement date.

- "Approval Date"—The Approval Date was the date of approval set forth in executed minutes or a fully-executed UWC of the Board of Directors or Compensation Committee documenting the grant of the stock option (i.e. employee, number of options, and exercise price.) When we did not have evidence of the approvals through either the minutes or signed UWC, we used other available evidence of approval by the Board of Directors or Compensation Committee, including email communications.

- "Most Likely Measurement Date"—If the Approval Date criteria was not evidenced (i.e. all signed UWCs were not returned), we used the earlier of the following dates to determine the revised measurement date as we believe approval of the grant would have occurred prior to this date:

  - The date the employee was notified of the terms of the option grant,

  - The signature date of management approvals on the Company's grant approval form,

  - The date the grant approval form was received by our human resources department,

  - Print date or metadata creation date on notice of grant of stock form, or

  - The date the option was entered into our stock option database application.

Other Grants where granting authority was delegated to the Chief Executive Officer:

- New Hire Grants—The Company's Chief Executive Officer has been directly involved in determining the stock options to be granted to new hires. Generally, the terms of these stock options were included in the employee's offer letter. Therefore, we determined the measurement date for new hire option grants to be the employee's start date if all of the terms of the option grant were documented in the employee's offer letter. Where we have determined that new hire option terms had not been determined and approved with finality prior to the employee's start date, we have used the methodology defined above under "Most Likely Measurement Date", to determine the revised measurement date.

- Promotion and Discretionary Grants—We did not follow a consistent practice in granting, approving or documenting promotion and discretionary grants throughout the years. In many of our promotion and discretionary grants, the available documentation for the grants did not support the original measurement date as all the terms of the grant were not approved and known with finality at the stated grant date. In such instances, we have used the methodology defined above under

"Most Likely Measurement Date", to determine the revised measurement date.

Incorrect Accounting for Grants to Consultants, Modifications and Discounted Options. We also identified other accounting errors related to option grants. We identified one Company-wide grant from 1998, before Peet's became a public company that was intentionally granted with an exercise price equal to 85% of fair value, consistent with the operative stock plan and the Company's practice at the time, with respect to which we did not correctly account for the discount to fair value. We also identified two options granted to consultants that were incorrectly accounted for as grants to employees. In addition, we found several instances in which we incorrectly accounted for modifications to outstanding options, including one employee option that was accelerated upon termination of employment outside the provisions of the original grant and 11 instances in which employees' periods to exercise options were extended.

Misapplication of Non-Employee Director Stock Option Plan. The Non-Employee Director Plan provides for non-discretionary, automatic option grants to non-employee directors (including both initial grants and annual grants), requiring no independent action of the Board or any committee of the Board. The plan stipulates that each director automatically receives an initial grant and a prorated annual grant on the day of initial election or appointment to the Board of Directors and an ongoing annual grant on the day following each annual meeting of shareholders. Prior to May 2005 the plan specified that options would have an exercise price equal to the market value of the option grant, which was defined as the closing price of the stock on the day prior to the grant. The plan was amended in May 2005 to define the market value as the closing price of the stock on the day of the option grant. The Company incorrectly administered three annual grants to all directors and one initial grant by applying a measurement date that was incorrect by one day. In addition, in two instances, the Company did not record the proper prorated grant upon a new director being named to the Board. The Company intends to correct these two administrative errors on the prorated grants in accordance with the plan. Of the three annual grants to all directors, two were recorded at an exercise price higher than the market price on the revised measurement date, and therefore no additional expense has been recognized in respect to these grants.

### Defendants' Insider Selling

164. From 2003 to 2006, Defendants Baldwin, Mottern and Jesse, while in possession of materially adverse non-public information regarding the backdating of stock options and the false financial statements resulting therefrom, sold more than $15 million in Peet's stock. Specifically, from June 25, 2003 to September 1, 2006, defendant Baldwin sold approximately 268,197 shares of Peet's common stock and received approximately $6,979,866.31 in total proceeds. From August 27, 2003 to May 22, 2006, defendant Jesse sold approximately 47,468

1    shares of Peet's common stock and received approximately $1,184,635.54 in total proceedings.

2    From November 5, 2002 to January 3, 2005, defendant Mottern sold approximately 362,635

3    shares of Peet's common stock and received total proceeds of $6,929,854.61.

### PEET'S FALSE FINANCIAL REPORTING

### IN VIOLATION OF GAAP, SEC REGULATIONS AND IRS RULES

6    165.    As a result of Defendants O'Dea, Mottern, Baldwin, Billings, Jesse and Valette's

7    improper backdating of stock options, Defendants caused Peet's to violate GAAP, SEC

8    regulations and Internal Revenue Service ("IRS") rules and regulations.

9    166.    Peet's financial results for 2001 through 2006 were included in reports filed with

10   the SEC and in other shareholder reports.   In these reports, Defendants O'Dea, Mottern,

11   Baldwin, Billings, Jesse and Valette represented that Peet's financial results were presented in a

12   fair manner and in accordance with GAAP.

13   167.    Defendants   O'Dea,   Mottern,   Baldwin,   Billings,   Jesse   and   Valette's

14   representations were false and misleading as to the financial information reported, as such

15   financial information was not prepared in conformity with GAAP, nor was the financial

16   information "a fair presentation" of the Company's financial condition and operations, causing

17   the financial results to be presented in violation of GAAP and SEC rules.

18   168.    GAAP consists of those principles recognized by the accounting profession as the

19   conventions, rules, and procedures necessary to define accepted accounting practice at the

20   particular time. Regulation S-X, to which the Company is subject as a registrant under the

21   Securities Exchange Act of 1934 ("Exchange Act"), 17 C.F.R. §210.4-01(a)(1), provides that

22   financial statements filed with the SEC, which are not prepared in compliance with GAAP, are

23   presumed to be misleading and inaccurate.

### Violations of GAAP

25   169.    During the relevant period, Defendants O'Dea, Mottern, Baldwin, Billings, Jesse

26   and Valette caused the Company to understate its compensation expense by not properly

27   accounting for its stock options under GAAP and thus overstated the Company's net earnings.

28

1      170.    Under well-settled accounting principles in effect throughout the relevant period,

2    Peet's did not need to record an expense for options granted to employees at the current market

3    price (at-the-money).  The Company was, however, required to record an expense in its financial

4    statements for any options granted below the current market price (in-the-money).  In order to

5    provide Peet's executives and employees with far more lucrative in-the-money options, while

6    avoiding having to inform shareholders about millions of dollars incurred by the Company in

7    compensation expenses (and without paying the IRS millions of dollars in employment taxes),

8    Defendants O'Dea, Mottern, Baldwin, Billings, Jesse and Valette systematically falsified

9    Company records to create the false appearance that options had been granted at the market price

10   on an earlier date.

11     171.    Throughout the relevant period, Peet's accounted for stock options using the

12   intrinsic method described in APB 25.  Under APB 25, employers were required to record as an

13   expense on their financial statements the "intrinsic value" of a fixed stock option on its

14   "measurement date."  An option that is in-the-money on the measurement date has intrinsic

15   value, and the difference between its exercise price and the quoted market price must be recorded

16   as compensation expense to be recognized over the vesting period of the option.  Options that are

17   at-the-money or out-of-the-money on the measurement date need not be expensed.  Excluding

18   non-employee directors, APB 25 required employers to record compensation expenses on

19   options granted to non-employees irrespective of whether they were in-the-money or not on the

20   date of grant.

21

22                    **Peet's GAAP Violations Were Material**

23     172.    Peet's false and misleading relevant period statements and omissions regarding its

24   accounting were material, particularly in light of SEC guidance on materiality.  SEC Staff

25   Accounting Bulletin ("SAB") Topic 1M, Materiality, summarizes GAAP definitions of

26   materiality.  Among other items, SAB Topic 1M says: "A matter is 'material' if there is a

27   substantial likelihood that a reasonable person would consider it important."  It also stresses that

28

materiality requires qualitative, as well as quantitative, considerations.  For example, if a known misstatement would cause a significant market reaction, that reaction should be taken into account in determining the materiality of the misstatement.

173.   SAB Topic 1M further states:

> among the considerations that may well render material a quantitatively small misstatement of a financial statement item are –
>
> \*        \*        \*
>
> whether the misstatement masks a change in earnings or other trends
>
> whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise
>
> \*        \*        \*
>
> whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability.

174.   SAB Topic 1M also says that an intentional misstatement of even immaterial items may be illegal and constitute fraudulent financial reporting.

175.   Peet's misstatements satisfy these criteria and thus were material from both a quantitative and qualitative perspective.

### Peet's Financial Statements Violated Fundamental Concepts of GAAP

176.   Due to these accounting improprieties, the Company presented its financial results and statements in a manner that violated GAAP, which are described by the following statements:

> (a)   The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, ¶10);
>
> (b)   The principle that financial reporting should provide information that is useful to existing and potential investors and creditors and other users in making rational investment, credit and similar decisions (Financial Accounting Standards Board  ("FASB") Statement of Concepts No. 1, ¶34);
>
> (c)   The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources FASB Statement of Concepts No. 1, ¶40);

(d)  The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to stockholders for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)  The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶58-59);

(f)  The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶79); and

(g)  The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, ¶¶95, 97).

177.  Further, the undisclosed adverse information concealed by Defendants O'Dea, Mottern, Baldwin, Billings, Jesse and Valette during the relevant period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

### Peet's Financial Statements Violated SEC Regulations

178.  During the relevant period, Defendants O'Dea, Mottern, Baldwin, Billings, Jesse and Valette caused Peet's to violate SEC regulations by failing to disclose that the Company's senior executives had been granted backdated stock options.

179.  Under SEC Regulations, Item 8 of Form 14-A and Item 11 of Form 10-K, an issuer must furnish information required by Item 402 of Regulation S-K [17 C.F.R. §229.303]. Item 402(b) and (c) require a company to provide both a Summary Compensation Table and an Option/SAR Grants table identifying the compensation of the named executive officers – the Company's CEO and its next four most highly paid executives.  Item 402 requires particularized disclosures involving a company's stock option grants in the last fiscal year.  In the summary compensation table, the issuer must identify in a column "other annual compensation" received

1   by the named executives that is not properly categorized as salary or bonus, including any

2   "[a]bove market or preferential earnings on restricted stock, options, SARs or deferred

3   compensation" paid to the officer during the period. Item 402(b)(2)(iii)(C)(2). In the option

4   grant table, the issuer must identify in a column "[t]he per-share exercise or base price of the

5   options. . . . If such exercise or base price is less than the market price of the underlying security

6   on the date of grant, a separate, adjoining column shall be added showing market price on the

7   date of grant. . . ." Item 402(c)(2)(iv).

8       180.    Defendants O'Dea, Mottern, Baldwin, Billings, Jesse and Valette caused Peet's to

9   violate SEC regulations by failing to disclose that the Company's named executive officers had

10  been granted options with exercise prices below the market value on the date the Board or

11  Compensation Committee approved the grant.

12  **Violations of IRS Rules and Regulations**

13      181.    During the relevant period, Defendants O'Dea, Mottern, Baldwin, Billings, Jesse

14  and Valette further caused Peet's to violate IRS rules and regulations due to its improper

15  accounting for the backdated stock options. As a result, the Company's tax liabilities were

16  understated, exposing Peet's to potential amounts owed for back taxes, penalties and interest to

17  the IRS for improperly reporting compensation.

18      182.    Defendants O'Dea, Mottern, Baldwin, Billings, Jesse and Valette caused the

19  Company to violate Section 162(m), which generally limits a publicly traded company's tax

20  deductions for compensation paid to each of its named executive officers to $1 million unless the

21  pay is determined to be "performance-based." In order for compensation to be performance-

22  based, the Compensation Committee must have set pre-established and objective performance

23  goals. The goals must then be approved by the shareholders. Section 162(m) defines stock

24  options as performance-based provided they are issued at an exercise price that is no less than the

25  fair market value of the stock on the date of the grant. Accordingly, properly issued stock

26  options do not have to be taken into account in calculating whether an executive's compensation

27  has exceeded the $1 million compensation cap.

28

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
CASE NO. C07-00740-SI
-63-

1     183.    Section 162(m), known as the $1 million rule, was enacted in 1993 in order to tie

2 top executives' soaring pay packages more closely to a company's performance. This change in

3 the tax law turned compensation practices for a company's top executives away from straight

4 salary-based compensation to performance-based compensation, including stock options.

5 According to former SEC Chairman Harvey Pitt: "What [162[m]] did was create incentives to

6 find other forms of compensation so people could get over the $1 million threshold without

7 running afoul of the code."

8     184.    Defendants O'Dea, Mottern, Baldwin, Billings, Jesse and Valette caused Peet's to

9 violate Section 162(m) by providing backdated options to the Company's named executive

10 officers, which were granted with exercise prices that were less than the fair market value of the

11 stock on the date of the grant. As a result, all of the income resulting from the exercise of the

12 options must be included for purposes of calculating whether the named executive's

13 compensation exceeds the $1 million cap for federal tax purposes.

14     185.    The chart below illustrates Peet's false and misleading annual financial results

15 which materially understated its compensation expenses and thus overstated its earnings and

16 earnings per share:

| Fiscal Year | Reported Earnings (Loss) | Reported Basic Earnings (Loss) Per Share |
|---|---|---|
| 2001 | $1.155 million | $0.15 |
| 2002 | $4.657 million | $0.43 |
| 2003 | $5.178 million | $0.41 |
| 2004 | $8.785 million | $0.66 |
| 2005 | $10.687 million | $0.77 |

23     186.    Indeed, Peet's has restate its financial statements due to errors in accounting for

24 its historical stock option grants, which decreased its reported earnings and earnings per share by

25 a material amount.

**DEFENDANTS' BREACHES OF FIDUCIARY DUTIES**

1    187.    Former SEC Chairman Harvey L. Pitt was quoted saying "What's so terrible

2    about backdating options grants?  For one thing, it likely renders a company's proxy materials

3    false and misleading.  Proxies typically indicate that options are granted at fair market value.

4    But if the grant is backdated, the options value isn't fair – at least not from the vantage point of

5    the company and its shareholders."

6    188.    SEC Chairman Christopher Cox announced that "[backdating in many cases]

7    makes a hash of (companies') financial statements . . . [and is] poisonous [to efficient markets].

8    . . It is securities fraud if you falsify books and records.  It is securities fraud if you present

9    financial statements to the SEC that do not comply with generally accepted accounting

10    principles.  There is no requirement that (the defendant) personally profit [to prove that a crime

11    occurred.]"  He further stated, "Rather obviously, this fact pattern [of backdating options] results

12    in a violation of the SEC's disclosure rules, a violation of accounting rules, and also a violation

13    of the tax laws."  The Commissioner of the IRS Mark Everson agreed and further stated,

14    "Picking a date on which the stock price was low in comparison with the current price gives the

15    employee the largest potential for gain on the option and makes it possible for the employee to

16    benefit from corporate performance that occurred before the option was granted."

17    189.    In addition to the foregoing, a recent academic study revealed that outside

18    directors of companies were also benefiting from backdating and were recipients of manipulated

19    stock option grants, as detailed in *The Wall Street Journal* article published on December 18,

20    2006 below:

21            A new academic study suggests that many outside directors received
22    manipulated stock-option grants, a finding that may help explain why the
     practice of options backdating wasn't stopped by the boards of some
23    companies.

24            The statistical study, which names no individuals or firms, estimates that
     1,400 outside directors at 460 companies received questionable option
25    grants, suggesting the widespread practice extended well beyond the
     executive suite.

26            The study is notable because it suggests that outside, or independent,
     directors -- who are supposed to play a special role safeguarding against
27    cozy board relationships with management -- may have been co-opted in
     options backdating by receiving manipulated grants themselves. The New

28

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
CASE NO. C07-00740-SI
-65-

York Stock Exchange requires that a majority of board seats, and all compensation- and audit-committee members, be independent . . . .

The evidence "contributes to understanding the possible factors that led to or enabled manipulation to occur," states the unpublished study, which was conducted by professors at Harvard and Cornell universities and the French business school Insead . . . .

190. In a misguided effort to attract and retain employees in a competitive environment, Defendants O'Dea, Mottern, Baldwin, Billings, Jesse and Valette exceeded the bounds of the law and legitimate business judgment by perpetrating their backdating scheme. Their misconduct was unjustifiable, and these Defendants grossly breached of their fiduciary duties by:

        a.     colluding with each other to backdate stock option grants;

        b.     colluding with each other to violate GAAP and Section 162(m);

        c.     colluding with each other to produce and disseminate to Peet's shareholders and the market false financial statements that improperly recorded and accounted for the backdated option grants and concealed the improper backdating of stock options; and

        d.     colluding with each other to file false proxy statements, false financial statements and false Form 4s in order to conceal the improper backdating of stock options.

191. Defendants O'Dea, Mottern, Baldwin, Billings, Jesse and Valette's foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit the Defendants who received backdated options at the expense of the Company.

192. As a direct and proximate result of Defendants O'Dea, Mottern, Baldwin, Billings, Jesse and Valette's foregoing breaches of fiduciary duties, the Company has sustained substantial damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company will be required to incur, the loss of funds paid to the Company upon the exercise of stock options resulting from the difference between the fair market value of the stock option on the true date of grant and the price that was actually paid as a result of the backdated stock option grant, and costs and expenses incurred in connection with the Company's internal investigation totaling $2.4 million and restatement of historical financial statements.

1    193.    Defendants O'Dea, Cloutier, Grimes, Lilla, MacLaren, McGraw, Mehrberg,
2    Mottern, Reynolds, Rudolph and Welsh have exercised thousands of backdated options at
3    improperly low prices and have then sold the shares for substantial profits. Consequently, these
4    Defendants have been unjustly enriched by garnering significant amounts in illicit profits and
5    depriving the Company of substantial payments that the Company should have received upon
6    exercise of the options.

7    ## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

8    194.    Plaintiff brings this action derivatively in the right and for the benefit of the
9    Company to redress Defendants' breaches of fiduciary duties, unjust enrichment, statutory
10   violations and other violations of law.

11   195.    Plaintiff is an owner of Peet's common stock and was an owner of Peet's common
12   stock at all times relevant hereto.

13   196.    Plaintiff will adequately and fairly represent the interests of the Company and its
14   shareholders in enforcing and prosecuting its rights.

15   197.    As a result of the facts set forth herein, Plaintiff has not made any demand on the
16   Peet's Board of Directors to institute this action against the Defendants. Such demand would be
17   a futile and useless act because the Board is incapable of making an independent and
18   disinterested decision to institute and vigorously prosecute this action.

19   198.    At the time this action was commenced, the Board consisted of seven directors:
20   defendants O'Dea, Billings, Jesse, Valette and Baldwin and non-defendant directors Gordon A.
21   Bowker ("Bowker") and Michael Linton ("Linton"). A majority of the directors are incapable of
22   independently and disinterestedly considering a demand to commence and vigorously prosecute
23   this action.

24   199.    The following defendants' positions during the relevant period are summarized in
25   the table below:

26
27
28

| Director | Recipient of Backdated Options | Member of the Compensation Committee During the Relevant Period | Member of the Audit Committee During the Relevant Period | Approved and Signed False Financial Statements |
|---|---|---|---|---|
| O'Dea | x | | | x |
| Billings | | x | | x |
| Jesse | | x | x | x |
| Valette | | x | x | x |
| Baldwin | | | | x |

200.    The following directors are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action:

### O'Dea

201.    During the relevant period, O'Dea received 650,000 backdated stock options and therefore is directly interested in the improperly backdated stock option grants complained of herein.

202.    His principal professional occupation is his position as President and CEO of the Company. As President and CEO of the Company, O'Dea stands to earn hundreds of thousands of dollars in annual salary, bonuses, and other compensation, all of which must be approved by defendants Billings and Jesse and director Michael Linton, who are current members of the Compensation Committee.

203.    Also, as President and CEO of the Company, Defendant O'Dea knowingly and deliberately participated in and approved the improper backdating of stock options, as alleged herein, and therefore is substantially likely to be held liable for the misconduct complained of herein. Because of his knowing participation in the backdating scheme, O'Dea knowingly and deliberately participated in and approved the Company's filing of false financial statements and other false SEC filings, as alleged herein, and knowingly and deliberately participated in and approved the Company's violations of GAAP and Section 162(m), as alleged herein, and therefore is substantially likely to be held liable for the misconduct complained of herein. Moreover, by colluding with the other defendants who received backdated options, as alleged

1   herein, O'Dea has demonstrated that he is unable or unwilling to act independently of these other
2   defendants.

3       204.    Moreover, in connection with the proxy statements dated April 23, 2002, April
4   22, 2003 and April 23, 2004, O'Dea knowingly and intentionally misrepresented Peet's
5   compensation practices while simultaneously seeking shareholder approval of the stock option
6   plans under which O'Dea and others backdated stock options and seeking shareholder approval
7   to increase the authorized number of Company shares allowed under the stock incentive plans in
8   order to continue the backdating scheme.

9       205.    Accordingly, O'Dea is incapable of independently and disinterestedly considering
10   a demand to commence and vigorously prosecute this action against the Individual Defendants.

11                                  **Billings**

12       206.    As a member of the Compensation Committee at all relevant times hereto,
13   Billings knowingly and deliberately backdated stock option grants, as alleged herein, and as a
14   director at all relevant times hereto, she knowingly and deliberately participated in and approved
15   the filing of false financial statements and other false SEC filings as alleged herein and
16   knowingly and deliberately participated in and approved the Company's violations of GAAP and
17   Section 162(m), as alleged herein, and, therefore, is substantially likely to be held liable for the
18   misconduct complained of herein.  Moreover, by colluding with the other Defendants, Billings
19   has demonstrated that she is unable or unwilling to act independently of these Defendants.

20       207.    Moreover, in connection with the proxy statements dated April 23, 2002, April
21   22, 2003 and April 23, 2004, Billings knowingly and intentionally misrepresented Peet's
22   compensation practices while simultaneously seeking shareholder approval of the stock option
23   plans under which Billings and others backdated stock options and seeking shareholder approval
24   to increase the authorized number of Company shares allowed under the stock incentive plans in
25   order to continue the backdating scheme.

26                                   **Jesse**

27       208.    Jesse, because, as a member of the Compensation Committee at all relevant times

28

1    hereto, Jesse knowingly and deliberately backdated stock option grants, as alleged herein, and as

2    a member of the Audit Committee at all relevant times hereto, Jesse knowingly and deliberately

3    participated in and approved the filing of false financial statements and other false SEC filings as

4    alleged herein and knowingly and deliberately participated in and approved the Company's

5    violations of GAAP and Section 162(m), as alleged herein, and, therefore, is substantially likely

6    to be held liable for the misconduct complained of herein.  Moreover, by colluding with  the

7    other Defendants, as alleged herein, Jesse has demonstrated that he is unable or unwilling to act

8    independently of these Defendants.

9        209.    Moreover, in connection with the proxy statements dated April 23, 2002, April

10   22, 2003 and April 23, 2004, Jesse knowingly and intentionally misrepresented Peet's

11   compensation practices while simultaneously seeking shareholder approval of the stock option

12   plans under which Jesse and others backdated stock options and seeking shareholder approval to

13   increase the authorized number of Company shares allowed under the stock incentive plans in

14   order to continue the backdating scheme.

**Valette**

16       210.    Valette, because, as a member of the Compensation Committee at all relevant

17   times hereto, Valette knowingly and deliberately backdated stock option grants, as alleged

18   herein, and as a member of the Audit Committee at all relevant times hereto, he knowingly and

19   deliberately participated in and approved the filing of false financial statements and other false

20   SEC filings as alleged herein and knowingly and deliberately participated in and approved the

21   Company's violations of GAAP and Section 162(m), as alleged herein, and, therefore, is

22   substantially likely to be held liable for the misconduct complained of herein.  Moreover, by

23   colluding with the other Defendants, as alleged herein, Valette has demonstrated that he is unable

24   or unwilling to act independently of these Defendants.

25       211.    Moreover, in connection with the proxy statements dated April 23, 2002, April

26   22, 2003 and April 23, 2004, Valette knowingly and intentionally misrepresented Peet's

27   compensation practices while simultaneously seeking shareholder approval of the stock option

28

1   plans under which Valette and others backdated stock options and seeking shareholder approval

2   to increase the authorized number of Company shares allowed under the stock incentive plans in

3   order to continue the backdating scheme.

### Baldwin

5   212.   Baldwin, because, as a director at all relevant times hereto, he knowingly and

6   deliberately participated in and approved the improper backdating of stock options, as alleged

7   herein, and knowingly and deliberately participated in and approved the Company's filing of

8   false financial statements and other false SEC filings, as alleged herein, and, therefore, is

9   substantially likely to be held liable for the misconduct complained of herein.  Moreover, by

10  colluding with the other Defendants, as alleged herein, Baldwin has demonstrated that he is

11  unable or unwilling to act independently of these Defendants.

12  213.   Moreover, in connection with the proxy statements dated April 23, 2002, April

13  22, 2003 and April 23, 2004, Baldwin knowingly and intentionally misrepresented Peet's

14  compensation practices while simultaneously seeking shareholder approval of the stock option

15  plans under which Baldwin and others backdated stock options and seeking shareholder approval

16  to increase the authorized number of Company shares allowed under the stock incentive plans in

17  order to continue the backdating scheme.

18  214.   Baldwin is not disinterested because he shares a close personal and professionally

19  relationship with Defendant Rudolph outside of Peet's as they were directors of Specialty Coffee

20  Association of America (SCAA) and worked together at Starbucks Corporation.  Accordingly,

21  Baldwin is incapable of independently and disinterestedly considering a demand to commence

22  and vigorously prosecute this action against defendant Rudolph.

### Bowker

24  215.   Bowker is not disinterested because he shares a longstanding personal and

25  professional relationship with Defendant Baldwin and co-founded Starbucks Corporation with

26  him.   Accordingly, Bowker is incapable of independently and disinterestedly considering a

27  demand to commence and vigorously prosecute this action against defendant Baldwin.

28

1

**Backdating Is Not an Exercise of Valid Business Judgment**

2     216.   Furthermore, demand is excused because the misconduct complained of herein

3 was not, and could not have been, an exercise of good faith business judgment. As represented

4 in Peet's proxy statements, the stated purpose of the Plans is "to motivate executives to focus on

5 long-term strategic objectives, to align the interests of management and the shareholders and to

6 provide opportunities for management to share in the benefits that they achieve for the

7 Company's shareholders." However, by granting Peet's stock options with backdated exercise

8 prices, Defendants O'Dea, Billings, Jesse, Valette and Baldwin undermined the purpose of the

9 stock option plans by awarding employees compensation that had intrinsic value regardless of

10 Peet's performance. In effect, this practice was nothing more than secret handouts to executives

11 and employees at the expense of unsuspecting shareholders and the Company.

12     217.   Defendants O'Dea, Baldwin, Billings, Jesse and Valette could have achieved the

13 stated purpose of motivating executives by granting those employees additional stock options

14 under their incentive plans, or by granting stock options at a price less than the fair market value

15 on the date of the grant and simply disclosing and expensing these grants. Instead, Defendants

16 O'Dea, Baldwin, Billings, Jesse and Valette backdated stock option grants in violation of the

17 Company's shareholder-approved stock option plans and improperly reported these grants in

18 their financial disclosures to improve their bottom line.

19     218.   The practice of backdating stock options cannot be a valid exercise of business

20 judgment because it has subjected Peet's to potentially massive liability. Peet's performed its

21 own investigation into the Company's historical option granting practices and has already

22 restated its past financial results. Moreover, Peet's will also likely suffer tax liabilities for the

23 additional compensation it will have to expense, and it has tarnished its reputation in the

24 investment community through this deliberate and calculated conduct.

25

**COUNT I**

26

**Against Defendants O'Dea, Mottern, Baldwin, Billings, Jesse and Valette for**

27

**Violations of § 10(b) and Rule 10b-5 of the Securities Exchange Act**

28

1   219.   Plaintiff incorporates by reference and realleges each and every allegation set
2   forth above, as though fully set forth herein.

3   220.   Throughout the relevant period, Defendants O'Dea, Mottern, Baldwin, Billings,
4   Jesse and Valette individually and in concert, directly and indirectly, by the use and means of
5   instrumentalities of interstate commerce and/or of the mails, intentionally or recklessly employed
6   devices, schemes, and artifices to defraud and engaged in acts, practices, and a course of
7   business which operated as a fraud and deceit upon the Company.

8   221.   Defendants O'Dea, Mottern, Baldwin, Billings, Jesse and Valette, as top
9   executive officers and/or directors of the Company, are liable as direct participants in the wrongs
10  complained of herein.   Through their positions of control and authority as officers and/or
11  directors of the Company, each of these Defendants was able to and did control the conduct
12  complained of herein.

13  222.   Defendants O'Dea, Mottern, Baldwin, Billings, Jesse and Valette acted with
14  scienter in that they either had actual knowledge of the fraud set forth herein, or acted with
15  reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even
16  though such facts were available to them.   Defendants O'Dea, Mottern, Baldwin, Billings, Jesse
17  and Valette were among the senior management and directors of the Company and were
18  therefore directly responsible for the fraud alleged herein.

19  223.   The Company relied upon Defendants O'Dea, Mottern, Baldwin, Billings, Jesse
20  and Valette's fraud in granting Defendants O'Dea, Mottern, Cloutier, Grimes, Lilla, MacLaren,
21  McGraw, Mehrberg, Mottern, Reynolds, Rudolph and Welsh options to purchase shares of the
22  Company's common stock, as alleged herein.

23  224.   As a direct and proximate result of Defendants O'Dea, Mottern, Baldwin,
24  Billings, Jesse and Valette's foregoing breaches of fiduciary duties, the Company has sustained
25  millions of dollars in damages, including, but not limited to, the additional compensation
26  expenses and tax liabilities the Company will be required to incur, the loss of funds paid to the
27  Company upon the exercise of stock options resulting from the difference between the fair

28

1   market value of the stock option on the true date of grant and the price that was actually paid as a

2   result of the backdated stock option grant, and costs and expenses incurred in connection with

3   the Company's internal investigation totaling $2.4 million and restatement of historical financial

4   statements.

5

6   **COUNT II**

7   **Against Defendants O'Dea, Mottern, Baldwin, Billings, Jesse and Valette**

8   **for Violations of §20(a) of the Securities Exchange Act**

9   225.   Plaintiff incorporates by reference and realleges each and every allegation set

10   forth above, as though fully set forth herein.

11   226.   Defendants O'Dea, Mottern, Baldwin, Billings, Jesse and Valette, by virtue of

12   their positions with the Company and their specific acts, were, at the time of the wrongs alleged

13   herein, controlling persons of the Company within the meaning of §20(a) of the Exchange Act.

14   They had the power and influence and exercised the same to cause the Company to engage in the

15   illegal conduct and practices complained of herein.

16   **COUNT III**

17   **Against Defendants O'Dea, Mottern, Baldwin, Billings, Jesse and Valette for**

18   **Breach of Fiduciary Duty and/or Aiding and Abetting**

19   227.   Plaintiff incorporates by reference and realleges each and every allegation set

20   forth above, as though fully set forth herein.

21   228.   As alleged in detail herein, Defendants O'Dea, Mottern, Baldwin, Billings, Jesse

22   and Valette had a fiduciary duty to, among other things, refrain from unduly benefiting

23   themselves and other Company insiders at the expense of the Company.

24   229.   As alleged in detail herein, Defendants O'Dea, Mottern, Baldwin, Billings, Jesse

25   and Valette breached their fiduciary duties by, among other things, engaging in a scheme to grant

26   backdated stock options to themselves and/or certain other officers and directors of the Company

27   and cover up their misconduct.

28

1    230.    In breach of their fiduciary duties of loyalty and good faith, Defendants O'Dea,

2    Mottern, Baldwin, Billings, Jesse and Valette agreed to and did participate with and/or aided and

3    abetted one another in a deliberate course of action designed to divert corporate assets to

4    themselves and/or other Company insiders.

5    231.    Defendants O'Dea, Mottern, Baldwin, Billings, Jesse and Valette's foregoing

6    misconduct was not, and could not have been, an exercise of good faith business judgment.

7    Rather, it was intended to, and did, unduly benefit Defendants O'Dea, Cloutier, Grimes, Lilla,

8    MacLaren, McGraw, Mehrberg, Mottern, Reynolds, Rudolph and Welsh.

9    232.    As a direct and proximate result of Defendants O'Dea, Mottern, Baldwin,

10    Billings, Jesse and Valette's foregoing breaches of fiduciary duties, the Company has sustained

11    millions of dollars in damages, including, but not limited to, the additional compensation

12    expenses and tax liabilities the Company will be required to incur, the loss of funds paid to the

13    Company upon the exercise of stock options resulting from the difference between the fair

14    market value of the stock option on the true date of grant and the price that was actually paid as a

15    result of the backdated stock option grant, and costs and expenses incurred in connection with

16    the Company's internal investigation totaling $2.4 million and restatement of historical financial

17    statements.

### COUNT IV

**Against Defendants O'Dea, Cloutier, Grimes, Lilla, MacLaren, McGraw, Mehrberg,**

**Mottern, Reynolds, Rudolph and Welsh for Unjust Enrichment**

21    233.    Plaintiff incorporates by reference and realleges each and every allegation set

22    forth above, as though fully set forth herein.

23    234.    Defendants O'Dea, Cloutier, Grimes, Lilla, MacLaren, McGraw, Mehrberg,

24    Mottern, Reynolds, Rudolph and Welsh were unjustly enriched by their receipt and retention of

25    backdated stock option grants and the proceeds they received through exercising backdated stock

26    options, as alleged herein, and it would be unconscionable to allow them to retain the benefits

27    thereof.

28

1    235.    To remedy these Defendants' unjust enrichment, the Court should order them to

2  disgorge to the Company all of the backdated stock options they received, including the proceeds

3  of any such options that have been exercised, sold, pledged, or otherwise monetized.

### COUNT V

**Against Defendants Baldwin, Mottern and Jesse**

**for Insider Selling and Misappropriation of Information**

7    236.    Plaintiff incorporates by reference and realleges each and every allegation set

8  forth above, as though fully set forth herein.

9    237.    At the time of their stock sales, Defendants Baldwin, Mottern and Jesse knew that

10  the Company's financial results were false and misleading.  These Defendants' sales of Peet's

11  common stock while in possession and control of this material adverse nonpublic information

12  was a breach of their fiduciary duties of good faith, honesty and loyalty.

13    238.    Since the use of the Company's proprietary information for their own gain

14  constitutes a breach of the fiduciary owed by Defendants Baldwin, Mottern and Jesse to the

15  Company, Plaintiff, on behalf of the Company, is entitled to the imposition of a trust on any

16  profits Defendants Baldwin, Mottern and Jesse obtained thereby.

17    239.    Plaintiff, as a shareholder of Peet's, seeks damages and other relief for Peet's.

18    WHEREFORE, Plaintiff demands judgment as follows:

19    A.    Against Defendants O'Dea, Mottern, Baldwin, Billings, Jesse and Valette
20  and in favor of the Company for the amount of damages sustained by the
     Company as a result of Defendants O'Dea, Mottern, Baldwin, Billings,
21  Jesse and Valette's misconduct;

22    B.    Ordering Defendants O'Dea, Cloutier, Grimes, Lilla, MacLaren, McGraw,
     Mehrberg, Mottern, Reynolds, Rudolph and Welsh to disgorge to the
23  Company all of the backdated stock options they received, including the
     proceeds of any such options that have been exercised, sold, pledged, or
24  otherwise monetized, and imposing a constructive trust thereover;

25    C.    Granting appropriate equitable relief to remedy Defendants O'Dea,
     Mottern, Baldwin, Billings, Jesse and Valette's breaches of fiduciary
26  duties;

27    D.    Directing the Company to take all necessary actions to reform and
     improve its corporate governance and internal control procedures to
28  comply with applicable law, including, but not limited to, putting forward

for a shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote adoption of the following Corporate Governance policies:

    (a)    a proposal requiring that the office of CEO of the Company and Chairman of the Board be permanently held by separate individuals and that the Chairman of the Board meets rigorous "independent" standards;

    (b)    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

    (c)    appropriately test and then strengthen the internal audit and control functions;

    (d)    rotate independent auditing firms every five years;

    (e)    control and limit insider stock selling and the terms and timing of stock option grants; and

    (f)    reform executive compensation;

E.    Ordering an accounting of all stock option grants made to defendants O'Dea, Cloutier, Grimes, Lilla, MacLaren, McGraw, Mehrberg, Mottern, Reynolds, Rudolph and Welsh, including, but not limited to, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the dates the stock options were exercised, as well as the disposition of any proceeds received by defendants O'Dea, Cloutier, Grimes, Lilla, MacLaren, McGraw, Mehrberg, Mottern, Reynolds, Rudolph and Welsh via sale or other exercise of the grants;

F.    Ordering all contracts which provide for stock option grants to defendants O'Dea, Cloutier, Grimes, Lilla, MacLaren, McGraw, Mehrberg, Mottern, Reynolds, Rudolph and Welsh and were entered into during the relevant period should, therefore, be rescinded, with all sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void;

G.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.    Granting such other and further relief as the Court deems just and proper.

1

## JURY TRIAL DEMANDED

2

3

4      Plaintiff demands a trial by jury.

5   Dated: October 12, 2007                    Respectfully submitted,

6                                              SCHIFFRIN BARROWAY
                                                 TOPAZ & KESSLER, LLP
7

8                                              _____/s/_____
                                               Alan R. Plutzik, of Counsel (Bar No. 077785)
9                                              2125 Oak Grove Road, Suite 120
                                               Walnut Creek, California 94598
10                                             Telephone:  (925) 945-0770
                                               Fax: (925) 945-8792
11
                                               -and-
12                                             Eric L. Zagar
                                               Michael Wagner
13                                             Tara P. Kao
                                               280 King of Prussia Road
14                                             Radnor, PA  19087
                                               Telephone:  (610) 667-7706
15                                             Fax: (610) 667-7056

16

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
CASE NO. C07-00740-SI
-78-

## **VERIFICATION**

I, MARVIN NACH, hereby verify that I have reviewed the Complaint and authorize its filing and that the foregoing is true and correct to the best of my knowledge, information and belief.

I verify under penalty of perjury that the foregoing is true and correct.

DATE: *Sept 25, 2007*                MARVIN NACH