IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARVIN W. NACH, derivatively on behalf of PEET'S COFFEE & TEA, INC., <br><br> Plaintiff, <br><br> v. <br><br> GERALD BALDWIN, *et al.*, <br><br> Defendants, <br> and <br><br> PEET'S COFFEE & TEA, INC., <br><br> Nominal Defendant. | No. C 07-0740 SI <br><br> **ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS** |

On December 18, 2007, the Court heard oral argument on two motions: (1) the motion of nominal defendant Peet's Coffee & Tea, Inc., to dismiss this action for plaintiff's failure to make a pre-suit litigation demand; and (2) the motion of the individual defendants to dismiss the amended complaint for failure to state a claim. Having considered the arguments of the parties and the papers submitted, and for the reasons discussed below, the Court GRANTS defendants' motions.

## BACKGROUND[1]

Nominal defendant Peet's Coffe & Tea, Inc. is a specialty coffee roaster and marketer of fresh roasted whole bean coffee. Peet's is incorporated in Washington and its principal place of business is in Emeryville, California. At the time plaintiff filed this action, Peet's Board of Directors consisted of

---

[1] All background facts are taken from the allegations of plaintiff's Amended Verified Shareholder Derivative Complaint ("Complaint") that, for purposes of this motion, must be taken as true.

eight directors.[2] Only five of the eight directors are named defendants: Gerald Baldwin; Hilary Billings; President and Chief Executive Officer Patrick J. O'Dea; H. William Jesse; and Board Chair Jean-Michel Valette. Directors David Deno, Michael Linton, and Gordon Bowker are not named. In addition, ten past and present Peet's executives, officers, and directors are named defendants: Jean-Michael Cloutier, James Grimes, William Lilla, Bruce MacLaren, Deborah McGraw, Peter Mehrberg, Christopher Mottern, James Reynolds, Mark Rudolph, and William Welsh.

Plaintiff Marvin Nach is, and was at all relevant times, a shareholder of Peet's. Plaintiff alleges that from February 2001 to February 2003, defendants engaged in a scheme whereby they granted or received five discretionary backdated stock option grants. Defendants granted the backdated stock options under the company's "2000 Equity Incentive Plan" ("2000 Plan"), which was administered by the Board's Compensation Committee. The 2000 Plan required the Board to determine the exercise price of each option grant within certain limitations. Two of those limitations related to "Incentive Stock Options" and to "Nonstatutory Stock Options." The plan required that an Incentive Stock Option could not have an exercise price less than 100% of the fair market value of the common stock subject to the option on the date the option was granted. A Nonstatutory Stock Option exercise price could not be less than 85% of the common stock value. The 2000 Plan was administered by the Board's Compensation Committee, which during a portion of the relevant period was comprised of defendant directors Billings, Jesse, and Valette.

Plaintiff alleges that despite the exercise price requirements of the 2000 Plan, defendants granted backdated stock options with "strike prices" below the fair market price on the date granted. Defendants allegedly attempted to hide this backdating scheme from shareholders and the public by issuing materially false and misleading financial results and proxy statements.

On November 7, 2006, Peet's Board of Directors announced the formation of an Option Review Committee to oversee a voluntary internal review of its past stock option grant practices. On February

---

[2] The Amended Complaint alleges that the board consisted of seven members when this action commenced. Amended Complaint ¶ 198. However, Peet's asserts, and plaintiff concedes, the number was actually eight. Peet's Mot. to Dismiss at 3; Opp'n to Peet's Mot. at 9, n.3.

2

27, 2007, Peet's announced that the internal investigation revealed irregularities in stock option grants between 2001 and 2006, which would require the company to record additional compensation expenses of approximately $1.7 million in its Fiscal Year 2006 financial statements.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. The question presented by a motion to dismiss is not whether the plaintiff will prevail in the action, but whether the plaintiff is entitled to offer evidence in support of the claim. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds by Davis v. Scherer*, 468 U.S. 183 (1984).

In answering this question, the Court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). Even if the face of the pleadings suggests that the chance of recovery is remote, the Court must allow the plaintiff to develop the case at this stage of the proceedings. *See United States v. City of Redwood City*, 640 F.2d 963, 966 (9th Cir. 1981).

If the Court dismisses the complaint, it must then decide whether to grant leave to amend. The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (citations and internal quotation marks omitted).

**DISCUSSION**

**1.    Demand futility**

Nominal-defendant Peet's moves the Court to dismiss this action for plaintiff's failure to make a pre-suit litigation demand. Defendants contend that plaintiff's Amended Complaint has failed to rectify the problems identified in the first motion to dismiss, filed on September 7, 2007 [Docket No.

3

28]. The Court did not have the opportunity to consider that motion because plaintiff thereafter amended his complaint. Peet's contends that plaintiff was thereby given an additional opportunity to draft a sufficient complaint, and that the first motion to dismiss put plaintiff on notice of the specific deficiencies in his pleading. Peet's contends those deficiencies remain in the Amended Complaint. Plaintiff responds that the Amended Complaint sufficiently pleads demand futility.

Federal Rule of Civil Procedure 23.1 provides, in pertinent part, that in a derivative action brought by a shareholder, the complaint must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort." According to the Ninth Circuit, pursuant to Rule 23.1:

> A shareholder seeking to vindicate the interests of a corporation through a derivative suit must first demand action from the corporation's directors or plead with particularity the reasons why such demand would have been futile. Rule 23.1, however, does not establish the circumstances under which demand would be futile. For these standards, we turn to the law of the state of incorporation.

*In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 989-90 (9th Cir. 1999).

Although Peet's is incorporated in Washington, both parties cite to *In re Cray, Inc. Derivitive Litigation*, 431 F. Supp. 2d 1114, 1119 (W.D. Wash. 2006), for the proposition that Washington courts would apply the substantive law of Delaware to issues of demand futility. The Court agrees, and will apply Delaware law here.

Under Delaware law, demand futility must be determined under the standards articulated in either *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984), or *Rales v. Blasband*, 634 A.2d 927 (Del. 1993). Under the two-pronged *Aronson* test, which is used when the board considering the demand made the challenged decision, demand is excused if the derivative complaint pleads particularized facts creating a reason to doubt that "(1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson*, 473 A.2d at 814. The two prong *Aronson* test is disjunctive. "If a derivative plaintiff can demonstrate a reasonable doubt as to the first or second prong of the *Aronson* test, then he has demonstrated that

4

demand would have been futile." *Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995).

"The essential predicate for the *Aronson* test is the fact that a decision of the board of directors is being challenged in the derivative suit." *Rales*, 634 A.2d at 933. In contrast, the *Rales* test applies "where the board that would be considering demand did not make a business decision which is being challenged in the derivative suit." *Id.* at 933-34. Such situations arise in three principal scenarios: (1) where a majority of the directors who made the decision have been replaced; (2) where the subject of the suit is not a business decision of the board; and (3) where, as in *Rales*, the challenged decision was made by the board of a different corporation. *Id.* at 934. Under *Rales*, demand is excused if the particularized factual allegations create a reasonable doubt that at least half of the directors could have properly exercised their independent and disinterested business judgment in responding to the demand. *Rales*, 634 A.2d at 934. "That is, in those three circumstances described in *Rales*, the Court will apply only the first ('disinterest' and 'independence') prong of *Aronson*." *In re Bally's Grand Deriv. Litig.*, Case No. 14644, 1997 WL 305803 at *3 (Del. Ch. June 4, 1997).

Here, the parties do not clearly specify which test should apply. While Peet's describes both tests in its motion (without preferring one), plaintiff appears to rely only on *Rales* because "the whole board has not approved the transaction at issue." Opp'n to Peet's Mot. at 6. That is, the challenged decision was made by a compensation committee that consisted of less than half of the eight-person board in place at the time the complaint was filed.[3] Complaint ¶ 75. Because "the compensation committee, not the entire board, approved the challenged option grants," and because "this decision was [therefore] not a board decision, plaintiff must comply with *Rales*, alleging facts that raise a reason to

---

[3]The complaint is unclear about the size of the board, and the compensation committee, during the 2001-2003 period. *See* Complaint ¶¶ 19-56. While the board clearly consisted of eight members at the time the complaint was filed, the picture is less clear for the 2001-2003 period during which the challenged transactions were approved. For example, during the first half of 2001, when two challenged grants occurred, plaintiff identifies only four board members, and only one member of the compensation committee (Jesse). *Id.* Valette joined the board, and the compensation committee, in July of that year, bringing the count to at least five. *Id.* Billings joined both the board and the compensation committee in January 2002, bringing the count to at least six. *Id.* The complaint does not state whether there were other members of the board or the compensation committee who may have left during the 2001-2003 period. *Id.*

5

doubt that the board members could have properly exercised their independent and disinterested business judgment in responding to a demand." *Ryan v. Gifford*, 918 A.2d 341, 353 (Del. Ch. Feb. 6, 2007) (however, "[w]here one half or more of the board in place at the time the complaint was filed [served on the committee that] approved the underlying transactions, which approval may be imputed to the entire board for purposes of proving demand futility, the *Aronson* test applies"). Accordingly, because the *Aronson* test is disjunctive, because its first prong is essentially the same as the *Rales* test, and because plaintiff appears to concede that the challenged decisions are not attributable to the full board in place at the time the complaint was filed, the court will not consider the second prong of the *Aronson* test, which measures whether the challenged action itself was a valid exercise of business judgment. Rather, the Court will only consider questions of "disinterest" and "independence" with respect to a majority the board's ability to consider a demand at the time the complaint was filed.

**2. Plaintiff failed to raise a reason to doubt that the Board is disinterested**

"A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders. Directorial interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders." *Rales*, 634 A.2d at 936 (Del. 1993) (citing *Aronson*). "[T]he mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors, although in rare cases a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a *substantial likelihood* of director liability therefore exists." *Aronson*, 473 A.2d at 815 (emphasis added). In the context of derivative suits alleging stock option backdating,

> [a] director who *approves* the backdating of options faces at the very least a substantial likelihood of liability, if only because it is difficult to conceive of a context in which a director may simultaneously lie to his shareholders (regarding his violation of a shareholder-approved plan) and yet satisfy his duty of loyalty. Backdating options qualifies as one of those "rare cases [in which] a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists."

6

*Ryan*, 918 A.3d at 355-56 (quoting *Aronson*, 473 A.2d at 815) (emphasis added). The particularized allegation that a board member *accepts* a backdated option is also sufficient "to raise a reason to doubt the disinterestedness of" that board member. *Id.*; *see also In re CNET Networks, Inc. S'holder Deriv. Litig.*, 483 F. Supp. 2d 947, 958 (N.D. Cal. 2007) ("If a director received backdated stock options, he or she would be receiving a benefit not shared by the shareholders [and thus would be interested].").

Here, plaintiff alleges that defendant O'Dea is interested because he received 650,000 backdated options dated May 29, 2002 and February 10, 2003. Complaint ¶ 201. Plaintiff alleges that defendants Billings, Jesse, and Valette are interested because they were members of the Compensation Committee "at all relevant times."[4] *Id.* ¶¶ 208, 210, 212. Finally, plaintiff alleges that defendants Baldwin and Bowker are "not disinterested" because of their close, and longstanding, "personal and professional relationship[s]" with directors or officers who either approved or received backdated options. *Id.* ¶¶ 214, 215. Finally, plaintiff alleges that O'Dea, Billings, Jesse, and Valette are interested because they "knowingly and deliberately participated in and approved the filing of false financial statements and other false SEC filings" related to the allegedly backdated options. *Id.* ¶ 203, 206, 208, 210, 212.

To prevail on his allegation that the six aforementioned directors are interested, plaintiff must raise a reason to doubt that the option grants were not backdated. That is, he must allege circumstances from which the Court can "reasonably infer backdating as opposed to innocent bookkeeping error." *CNET*, 483 F. Supp. 2d at 956 ("[i]ntentionally employing hindsight to adjust the grant date to an advantageously low price, or 'backdating,' is fraud," whereas "innocent error" is not).[5] This Court

---

[4]As discussed above in footnote 3, plaintiff's allegations are inconsistent. Plaintiff alleges that defendant Valette joined the board, and the Compensation Committee, in July 2001, Complaint ¶ 28, and that Billings joined the board, and the Compensation Committee, in January 2002, Complaint ¶ 25.

Plaintiff further alleges that the option grants dated February 25, 2001 were "approved by Billings, Jesse and Valette" sometime between February 26 and June 4, 2001. This would be impossible since Billings and Valette were not yet members of the board. Likewise, plaintiff's allegation that the June 5, 2001 grants were approved by "Billings, Jesse and Valette" between June 7, 2001 and December 27, 2001 is also impossible since Billings had still not yet joined the board.

[5]There are several ways in which a company might have used an incorrect measurement date in the absence of wrongdoing, including: (1) where grants are orally approved, but administrative actions are not taken until later; (2) where options are granted to prospective employees before they commence

7

recently addressed a complaint alleging a stock option backdating scheme similar to the one alleged here. *In re Openwave Sys. Inc. S'holder Deriv. Litig.*, 503 F. Supp. 2d 1341, 1346 (N.D. Cal. 2007) (granting defendant's motion to dismiss for failure to show demand futility); *see also CNET*, 483 F. Supp. 2d 947 (same); *In re Linear Tech. Corp. Deriv. Litig.*, 2006 WL 3533024 (N.D. Cal. Dec. 7, 2006) (same).[6] After analyzing the plaintiff's allegations of backdating in *Openwave*, this Court ruled that, because the plaintiff had failed to state whether the challenged grants were *all* of the option grants to directors and top officers or just a fraction thereof, the challenged transactions were "as consistent with a random selection of stock option grant dates, as with a pattern of backdating." 503 F. Supp. 2d at 1350. In that case, the plaintiff's analysis of the trading data for the relevant period was also deficient because it failed to compare the questionable option grants to any meaningful benchmarks. *Id.* at 1351. Accordingly, the Court found that the plaintiff's "allegations and statistical analyses [were] simply insufficient . . . to allow a reasonable inference of backdating and thus of demand futility." *Id.* Similarly, in *Linear*, Judge Chesney held that the plaintiff's general allegations that stock options were dated "just after a sharp drop" in the company's stock price and "just before a substantial rise" were insufficient to show that backdating had occurred. *Linear*, 2006 WL 3533024 at *3 ("Because plaintiffs provide no facts as to how often and at what times the Committee Defendants have granted stock options in the past, no 'pattern,' let alone a 'striking' one, is apparent."). In contrast, in *Ryan*, the court denied the defendant's motion to dismiss because demand would have been futile in that case. There, the plaintiff alleged that

"every challenged option grant occurred during the lowest market price of the month or year in which it was granted." *Ryan*, 918 A.2d at 354. The plaintiff also presented a statistical analysis by Merrill

---

work; or (3) where the board approves the number of options, but the actual recipient and their respective numbers are subject to change. *CNET*, 483 F. Supp. 2d at 955-56 (taking judicial notice of a statement made by the Chief Accountant of the SEC).

[6]While these cases were decided primarily under the second prong of the *Aronson* test, which relates to whether the challenged decisions were a valid exercise of business judgment, such analysis is relevant here for the limited purpose of testing whether the specific directors who took the challenged actions – rather than the whole board – are interested for demand futility purposes.

8

1 Lynch which "looked at annualized stock price returns for the twenty day period subsequent to options
2 pricing in comparison to stock price returns for the calendar year in which the options were granted."
3 *Id.* at 346-47; *see also Openwave*, 503 F. Supp. 2d at 1346 (quoting text).

Here, plaintiff has alleged that five discretionary grants that occurred between February 2001 and February 2003 were backdated. Complaint ¶ 78. The specific challenged grant dates are February 25, 2001; June 5, 2001; December 31, 2001; May 29, 2002; and February 10, 2003. *Id.* ¶¶ 83, 87, 91, 95, 101. Plaintiff does not allege what the proper dates of these discretionary grants should be, but rather alleges that each option grant was approved some time between the first trading day following each respective option grant and the trading date immediately prior to the next option grant date.

Plaintiff argues that his backdating claims are supported by three types of allegations: (a) allegations of specific, fortuitously-timed option grants; (b) an "analysis measur[ing] the extent to which stock price performance subsequent to option pricing events diverged from stock price performance over a longer period of time," *Openwave*, 503 F. Supp. at 1347 (quoting *Ryan*, 918 A.2d at 353); and (c) Peet's own statements following its internal investigation.

### A. Plaintiff's specific allegations

Paragraphs 78 through 106 of the Complaint allege that all five of the challenged grants "were made on dates when the market price of Peet's stock was lower than the market price on the actual grant dates . . . thereby unduly benefitting the recipients of the backdated options." Complaint ¶ 79. While plaintiff's factual allegations are loosely similar to those in *Ryan*, where the court found that demand was futile, there are some important differences. As in *Openwave*, plaintiff does not specify whether the five challenged option grants identified in the complaint represent *all* of the option grants to directors and top officers during the years at issue. Instead, plaintiff qualifies his allegation by stating that the five challenged grants "were the only instances in which discretionary stock options were reported to have been granted to *several* of Peet's officers and directors *on the same date*. Stated differently, every time Peet's granted stock options to *more than one* of its senior officers and directors

9

in those years, the purported dates of the stock option grants favorably coincided with periodic lows in Peet's stock price." Opp'n to Peet's Mot. at 11 (emphasis added) (internal citations omitted). Plaintiff thus appears to focus on a subset of option grants, and he fails to explain why this subset is analytically important, and why he has not included data on *all* grants – assuming there were others – during the relevant period. Just as in *Openwave*, *CNET*, and *Linear*, because plaintiff provides "no facts as to how often and at what times the Committee Defendants have granted stock options in the past, no 'pattern,' let alone a 'striking' one, is apparent." *Openwave*, 503 F.Supp. 2d at 1348 (quoting *Linear*, 2006 WL 3533024 at *3); *see also CNET*, 483 F. Supp. 2d at 958.

Plaintiff's complaint also tracks the complaints in *Ryan* and *Openwave* to the extent that it attempts to show that the five grants were backdated by alleging that the stock price fell at some point before the purported grant date, and rose some time thereafter. However, plaintiff here departs from those cases because he does not allege that the challenged grants "were granted at or near the lowest closing price for the month and/or fiscal quarter." *Openwave*, 503 F. Supp. 2d at 1348. Plaintiff contends that such a standard is not required, and that to accept such an argument would be "like giving a bank robber credit for leaving some cash in the vault." *CNET*, 483 F. Supp. 2d at 961. Instead, plaintiff relies on his generic allegation that he has "sufficiently demonstrated a striking pattern where each grant preceded an immediate and significant increase in stock price." Opp'n to Peet's Mot. at 13. Although plaintiff is correct that a complaint need not show that stocks were granted on dates with the lowest closing prices, his failure to allege that any of the options granted by Peet's fell at or near the lowest closing prices for the month, quarter, or fiscal year greatly distinguishes his case from *Ryan*, where every grant occurred on the lowest price of the month or year, 918 A.2d at 354, and *Edmonds v. Getty*, 2007 WL 4302769 *4 (W.D. Wash. Dec. 5, 2007), where eight out of 25 grants were made at or near the lowest price of the fiscal year and 14 out of 25 were made at or near the lowest price of the quarter.

Peet's contends that plaintiff's comparisons for each grant date are "completely arbitrary and blatantly cherry-picked specifically to make each grant look suspicious." Peet's Mot. at 12. The Court

10

agrees with Peet's that "a cursory glance at the charts contained in ¶¶ 86, 90, 94, 98, and 104 of the Complaint visually confirms the weakness of the backdating allegations: only one of the grants, the February 21, 2001 grant, reflects anything approaching the classic 'V' configuration with the grant date at the bottom of the 'V.'" *Id.* Even with respect to the February 21, 2001 grant, plaintiff's chart shows that, on seven different days within a twenty-day window surrounding the grant date, Peet's stock price closed below its February 21, 2001 closing price of $8.50. *See* Peet's Mot. at 13; Santamaria Decl. Ex. B; Complaint ¶ 86. Peet's contends plaintiff's comparison points for the four other challenged grants are even more misleading. In each case, Peet's argues that plaintiff has "cherry-picked" single dates for purposes of comparison, ignoring intervening fluctuations in Peet's stock price, and the numerous times the price fell below the option grant price during the twenty-day period following each grant. Peet's Mot. at 13-14. The Court agrees: plaintiff's choice of comparison dates and prices is inconsistent and therefore arbitrary. *See* Complaint ¶ 86 (comparing the February 25, 2001 grant with a stock price ten days later); ¶ 90 (comparing the June 5, 2001 grant with a stock price more than six months later); ¶ 94 (comparing the December 31, 2001 grant with a stock price nearly five months later); ¶ 98 (comparing the May 29, 2002 grant with a stock price one month later) and ¶ 104 (comparing the February 10, 2003 grant with a stock price five months later). Some, but not all, of these comparison dates relate to the amount of time that lapsed between option grants. *See id.* And plaintiff fails to explain why these comparisons, which vary in time, which often occur five or six months later, and which are tied to inconsistent reference points, are useful in any event.

### B. Plaintiff's Merrill Lynch-style analysis

Aside from offering arbitrary comparison dates and prices, plaintiff's complaint offers no meaningful analysis of the alleged "striking pattern" of backdating. This too diverges from the complaints in *Ryan* and in *Openwave* where the plaintiffs provided an analysis by, or based on the methodology of, Merrill Lynch, which "looked at annualized stock price returns for the twenty day period subsequent to options pricing in comparison to stock price returns for the calendar year in which

11

the options were granted."[7] *Openwave*, 503 F. Supp. 2d 1341 (quoting *Ryan*, 918 A.2d 341 at 346-47). Instead, plaintiff relies on *Conrad v. Blank*, 2007 WL 2593540 *5 (Del. Ch. Sept. 7, 2007), for the proposition that a plaintiff may offer a Merrill Lynch-style analysis when responding to a motion to dismiss.[8] Even assuming that plaintiff may offer this analysis in response to a motion to dismiss rather than in the complaint itself, the Court will not rely on a Merrill Lynch-style analysis that consists entirely of two sentences and lacks any explanation of how plaintiff arrived at his conclusions. Moreover, the Court agrees at least in part with Peet's that plaintiff's methodology – to the extent it can be deciphered – raises serious concerns about, for instance, the applicability of the Merrill Lynch-style analysis where so few stock option grants are at issue.

### C. Peet's internal investigation

Plaintiff's third basis for attacking the disinterestedness of various board members is the fact that Peet's formed an Option Review Committee that conducted an internal investigation, following which the company admitted "that it incorrectly applied the measurement date . . . with respect to certain stock option grants made from 2001 to 2006." Complaint ¶ 11; *see also id.* ¶¶ 107-114. Peet's thereafter recorded additional compensation expenses of approximately $1.7 million in its FY 2006 financial statements. Notwithstanding the clear difference between incorrectly applying a stock option measurement date and fraudulent backdating, *CNET*, 483 F. Supp. 2d at 956 ("innocent error" is not "backdating"), plaintiff nonetheless construes Peet's statements as an "admission" of wrongdoing,

---

[7]The Merrill Lynch report cited in this case and others looked at a twenty day period for a specific reason: twenty days was the approximate window for reporting stock option grants prior to the Sarbanes-Oxley Act of 2002. Merrill Lynch Report at 2, Freeman Decl. ¶ 3 and Ex. A thereto; *see also* 15 U.S.C. § 78p. The Merrill Lynch report covered only the period from 1997 to 2002, noting that "the implementation of Sarbanes Oxley reporting requirements following 2002 renders the analysis less valuable." *Id.*

[8]Under plaintiff's Merrill Lynch-style analysis, he states that "the average annualized returns of recipients of the option grants identified in the relevant proxy statements for calendar years 2001 through 2003 is 166%, as compared to 23% average annualized return to investors. Stated plainly, the Individual Defendants averaged more than seven times the return of ordinary investors." Pl. Erratum to Pl. Opp'n to Peet's Mot. at 4:5-8.

12

Complaint ¶ 107.

Plaintiff primarily relies on *Conrad* for the proposition that "[d]emand on the Peet's Board is also excused because the Board never sought 'redress of any kind' from those who benefitted from the exercise of, or were responsible for approving and granting, backdated Peet's stock options, despite the completion of an internal review . . . ." Opp'n to Peet's Mot. at 19 (citing *Conrad,* 2007 WL 2493540 at \*7). Specifically, plaintiff notes that "[t]he Special Committee of Peet's Board hired a group of outside attorneys and accountants to assist with the internal review," and was "thus aware of claims for relief available to the Company, even if somehow otherwise 'disinterested' under the *Rales* analysis." *Id.* Plaintiff contends that the *Conrad* court found this aspect of the defendant's investigation in that case "troubling" because it "undermine[d] the court's confidence in the ability of the board to properly consider a demand." *Id.* (citing *Conrad,* 2007 WL 2493540 at \*7). Plaintiff asserts that "there is no meaningful difference between *Conrad* and the instant case" because in both cases, the defendants' public statements only described the results of their internal investigations in general terms. Opp'n to Peet's Mot. at 20.

Peet's responds by noting that plaintiff's complaint fails to allege that the Board's internal review did not indicate that the Board was seeking to take action against certain defendants whom plaintiff asserts were responsible for or benefitted from backdated options. The Court agrees: the complaint only alleges that the board "admitted" that the company had used inaccurate measurement dates. The complaint says nothing about a failure to seek redress.

Peet's also relies on *In re Verisign, Inc. S'holder Deriv. Litig.*, 2007 WL 2705221 \*17 (N.D. Cal. Sept. 14, 2007) for the proposition that

> [s]uch boilerplate allegations that the directors are not independent because they failed to act or assert claims against certain directors are not sufficient to establish demand futility, for two reasons.
> First, plaintiffs make this argument with regard to the entire Board, and not as to the individual directors. Thus it cannot be used to support an assertion that a particular director was "interested" or conflicted.
> Second, . . . such allegations essentially constitute an attempt to plead a claim of "failure of oversight." When pled as a separate cause of action, such a claim is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *In re Caramark Int'l Inc. S'holder Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch.

13

> 1996). Such a claim requires a showing, for example, that a company's board of directors or a board committee met only sporadically or devoted patently inadequate time to its work, or that the board or a committee had clear notice of wrongdoing and simply chose to ignore that evidence. [*See Guttman v. Huang*, 932 A.2d at 492, 505-07 (Del. Ch. 2003).]

*Id.*

Finally, Peet's points out that the result of its internal investigation resulted in a restatement of historical earnings in the aggregate amount of $1.7 million, which stands in stark contrast to companies that have had to restate tens or hundreds of millions in earnings. *See, e.g., Conrad*, 2007 WL 2593540 at *1 (the defendant recorded a $10.8 million expense).

In addition to finding each of Peet's arguments persuasive, the Court notes three additional important differences between this case and *Conrad*. First, "[i]mportantly," the *Conrad* court noted that "the relevant stockholder option plan in *Desimone* did not require all options to be priced at the fair market value of the common stock on the grant date." *Conrad,* 2007 WL 2593540 at *8 (citing *Desimone*, 924 A.2d at 930-31). In contrast, the stockholder-approved option plans at issue in *Conrad* "gave no discretion to the compensation committee in setting exercise prices." *Id.* As was the case in *Desimone*, here Peet's 2000 Plan permitted option pricing as low as 85% of the fair market value of the stock on the option grant date. *See* Santamaria Decl. ¶ 5 and Ex. D thereto at art. 6(c).

Second, the internal review that the *Conrad* court found deficient was conducted by the "the Company and its Audit Committee." *Conrad*, 2007 WL 2593540 at *1. In contrast, Peet's created a separate Option Review Committee, and while it is unclear which directors served on that committee, plaintiff concedes that "the review was conducted with the assistance of independent legal counsel, Shartsis Friese LLP [who are not representing Peet's in this action], which was retained by the Committee in October 2006." *See* Santamaria Decl. ¶ 2 and Ex. A thereto. "Shartsis Friese also retained KPMG LLP as a consultant, and KPMG has conducted its own investigation and review of information relevant to the Company's stock option granting practices." *Id.* "[N]either Shartsis Friese nor KMPG have found evidence that there was any deliberate attempt to manipulate the price at which any stock option was granted nor the date of the grant in order to benefit the grant recipient or the

14

Company." *Id.* The fact that the Peet's board took steps to ensure that its voluntary review of its options granting practices was conducted by impartial third parties stands in contrast to the "troubling aspects" of the internal review in *Conrad*. *Conrad*, 2007 WL 2593540 at *7.

Finally, the *Conrad* court was presented with a much stronger showing of backdating than plaintiff has presented here. *Conrad*, like *Ryan* and *Getty*, and unlike this case, "involved a series of grants over a period of years priced at the lowest trading dates of the month or year." *Conrad*, 2007 WL 2593540 at *8 (citing *Ryan* generally). In contrast, Peet's has identified numerous dates surrounding each challenged grant date where Peet's stock price traded at prices significantly lower than those challenged by plaintiff. *See* Peet's Mot. at 13-14. Peet's has also presented a serious and credible challenge to the merits of plaintiff's unexplained Merrill Lynch-style analysis. Accordingly, the Court cannot infer that backdating actually occurred, and thus cannot fault Peet's Board for declining to seek redress against any of its directors or officers.

### 3. Plaintiff failed to raise a reason to doubt that the Board is independent

To sufficiently allege lack of independence, a plaintiff must allege particularized facts demonstrating that the director is "beholden" to the interested person or is under that person's influence such that the director's discretion "would be sterilized." *Aronson*, 473 A.2d at 816. The evaluation of a director's independence requires a "contextual inquiry." *Beam v. Martha Stewart*, 845 A.2d 1040, 1049 (Del. 2004). That is, "[n]ot only must the Court consider the power and influence of the allegedly dominating person, but it must also address the susceptibility of the directors to the exercise of that leverage." *Zimmerman v. Braddock*, 2005 WL 2266566 at *9 (Del. Ch. Sept. 8, 2005), *rev'd* on other grounds by *Braddock v. Zimmerman*, 906 A.2d 776 (Del. 2006).

Here, because plaintiff has failed to show that any of Peet's directors is interested, it follows that he also cannot raise the requisite doubt as to any director's "independence." That is, there is no interested person or director to whom another director might be beholden.

15

**CONCLUSION**

For the foregoing reasons and for good cause shown, the Court hereby GRANTS nominal defendant Peet's motion to dismiss for failure to comply with Rule 23.1, with leave to amend [Docket No. 41]. Named defendants' motion to dismiss is likewise GRANTED on this one basis only [Docket No. 42]. **Any amended complaint must be filed on or before February 29, 2008.**

**IT IS SO ORDERED.**

Dated: February 12, 2008

SUSAN ILLSTON
United States District Judge